**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CABLEVIEW COMMUNICATIONS OF
JACKSONVILLE, INC., a Florida
corporation,

                        Plaintiff,

vs.                                        Case No.  3:13-cv-306-J-34JRK

TIME WARNER CABLE SOUTHEAST LLC
a/k/a TIME WARNER CABLE
ENTERPRISES LLC f/k/a TIME WARNER
ENTERTAINMENT COMPANY, L.P. a/k/a
TIME WARNER ENTERTAINMENT-
ADVANCE/NEWHOUSE PARTNERSHIP
d/b/a TIME WARNER CABLE,

                        Defendant.
_____/

## ORDER

      **THIS CAUSE** is before the Court on Defendant's Motion to Dismiss and Incorporated

Memorandum of Law (Doc. No. 14; Motion to Dismiss) as well as Defendant's Motion to

Transfer Venue to the Middle District of North Carolina and Incorporated Memorandum of

Law (Doc. No. 15; Motion to Transfer) (collectively "Motions"), both filed on May 20, 2013.

Plaintiff filed responses opposing both Motions on June 17, 2013. See Plaintiff's Response

in Opposition (with Memorandum of Law) to Defendant's Motion to Dismiss (Doc. No. 19;

Response to Motion to Dismiss); Plaintiff's Response in Opposition (with Memorandum of

Law) to Defendant's Motion to Transfer Venue (Doc. No. 20; Response to Motion to

Transfer).  Both Motions are fully briefed and ripe for review.

## I.    Background[1]

On March 21, 2013, Plaintiff Cableview Communications of Jacksonville, Inc. ("Cableview") initiated the instant action, filing its Complaint against Defendant Time Warner Cable Southeast LLC ("Time Warner").  (Doc. No. 1; Complaint).  This action revolves around Time Warner's methods of obtaining payment for a disputed debt that arose out of a workplace injury.  On July 19, 2004, Cableview and Time Warner entered into a written agreement whereby Cableview agreed to provide cable television installation services for Time Warner in the Greensboro, North Carolina area.  Complaint at ¶¶4-5; see also Exhibit A to Complaint (Doc. No. 1-1; Installation Agreement).  Almost four years into the agreement, one of Cableview's employees, James McClarty, was injured when the utility pole he was working on collapsed while he was stringing a cable television line for Time Warner.  Complaint at ¶¶6-7.  Duke Energy Carolinas, LLC (Duke) owned the utility pole and allowed Time Warner access to it.  Id. at ¶10.  After settling a worker's compensation claim against Cableview through Cableview's worker's compensation insurance carrier, McClarty filed suit against Duke in the General Court of Justice, Superior Court, Division for Durham County, North Carolina (McClarty Action).  Id. at ¶¶7-9.  Duke tendered the suit to Time Warner for defense and indemnification.  Id. at ¶11.

Time Warner accepted defense of the McClarty Action from Duke, and in turn, sought defense and indemnification from Cableview.  Id. at ¶11-12.  Cableview's general liability

---

[1] In considering the Motion to Dismiss, the Court must accept all factual allegations in the Complaint as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations. Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531, 1534 (11th Cir. 1994).  As such, the facts recited here are drawn from the Complaint, and may well differ from those that ultimately can be proved.

carrier reviewed the claim and, on October 28, 2010, notified both Cableview and Time Warner that the McClarty Action was not covered under Cableview's policy as the action "did not fall within Cableview's contractual indemnification obligations to Time Warner." Id. at ¶14.  As a result, Time Warner defended Duke in the McClarty Action, ultimately negotiating a settlement on Duke's behalf without any further communication with Cableview. Id. at ¶15.

In late 2011, the officers of Cableview began negotiating with FTS USA, LLC (FTS) for the sale of Cableview and its affiliates, which would include the sale of the installation agreements with cable providers such as Time Warner. Id. at ¶¶18, 22.  As a condition of the Installation Agreement, however, Time Warner had to consent in writing to any assignment of the duties or obligations under the agreement.  Id. at ¶20; Installation Agreement at ¶21.  Accordingly, in early 2012, both FTS and Cableview notified Time Warner of FTS's potential acquisition of Cableview, and Time Warner gave its verbal consent to the required assignment.  Id. at ¶20.

Not having resolved its dispute with Cableview regarding the McClarity Action, on February 17, 2012, Time Warner applied for an extension of time to file suit against Cableview in North Carolina.[2] Id. at ¶25.  Time Warner faxed a copy the application to Cableview on the same day. Id. Following receipt of the application, Cableview notified FTS of the potential North Carolina lawsuit against it, and amended the Asset Purchase

---

[2]    Under the North Carolina Rules of Civil Procedure, as an alternative to filing a complaint to commence a civil action, a party may file an application for twenty additional days to file a complaint in order to allow a plaintiff more time to investigate potential claims and file a well-pled complaint.  See N.C.R.P. 3; see also Carlton v. Melvin, 697 S.E.2d 360, 363 (N.C. Ct. App. 2010).  Although Time Warner ultimately did file a complaint against Cableview in North Carolina for indemnification  and breach of contract, it elected not to serve the complaint and instead pursued "other efforts" to obtain payment from Cableview.  See Complaint at ¶35 n.3.

Agreement to exclude liability for this claim.  Id. at ¶¶25, 28.  One day before the sale of

Cableview to FTS was scheduled to close, Time Warner sent FTS a letter demanding that,

as a condition to Time Warner's consent to the assignment of the Installation Agreement,

FTS must assume the alleged obligation to indemnify Time Warner for the costs in settling

the McClarty Action.  Id. at ¶¶29-30.

> After frenzied discussions between Time Warner, FTS, and Cableview, Time
> Warner ultimately insisted, as a condition of a written assignment, prior to the
> close of the Cableview-FTS transaction, that Cableview acquiesce to the
> addition of language to the Asset Purchase Agreement that would obligate
> FTS to withhold and remit the sum of $515,000 to Time Warner

from the amount FTS was to pay Cableview.  Id. at ¶32.  Although Time Warner allegedly

settled the McClarty Action for approximately $350,000, and originally requested this

amount, it later increased the amount to $515,000, without justification or explanation.

Complaint at ¶33 n.2.  Cableview also alleges that Time Warner again increased the amount

of money to be paid to over $600,000.  Id. at ¶36.  In the end, Time Warner received

$560,000 of the proceeds from FTS's purchase of Cableview.  Id. at ¶39.

Based on Time Warner's involvement in this transaction, Cableview filed the instant

four-count Complaint.  In Count One, Cableview alleges that Time Warner materially

breached the Installation Agreement when it failed to provide Cableview with an opportunity

to participate in the settlement negotiations in the McClarty Action and when it unreasonably

withheld its consent to the assignment of the Installation Agreement.  See Complaint at 9-10.

Similarly, Cableview contends in Count Two that Time Warner's actions in preventing the

closing, and forcing Cableview to pay Time Warner, constitute tortious interference with a

business relationship.  See id. at 10.  In Count Three, Cableview alleges that Time Warner

violated Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) by using its position in the cable television industry to gain financially from a contract to which it was not a party. See id. at 10.  Finally, in Count Four, Cableview alleges that Time Warner negligently misrepresented that it would agree to FTS's purchase of Cableview.  See id. at 11-12.

## II.    Summary of the Arguments

In the instant Motion to Dismiss, Time Warner contends that, as a foreign entity that does no business here, it is not subject to personal jurisdiction in the State of Florida, and thus, this Court must dismiss the Complaint.  See Motion to Dismiss at 9-15.  In support of this contention, Time Warner provides the Declaration of William C. Wesselman (Doc. No. 14-1; Wesselman Decl.).  Alternatively, Time Warner argues that the Complaint fails to state causes of action for tortious interference with a business relationship and negligent misrepresentation, and that Cableview does not have standing to sue for a violation of FDUTPA.  See id. at 21-25.  As further grounds for dismissal, Time Warner contends that Cableview assigned all of its claims to FTS, and therefore, does not have standing, has already agreed to settle its claims in a valid and enforceable settlement agreement with Time Warner, and made a voluntary payment to Time Warner barring its claims.  See id. at 16-21.

In the Motion to Transfer, Time Warner seeks the transfer of this case from this Court to the Middle District of North Carolina arguing that the Installation Agreement contains a valid and enforceable forum selection clause, all of the events and conduct in the Complaint occurred in North Carolina, and a majority of the relevant documents and witnesses are located in North Carolina.  See generally Motion to Transfer.  Cableview opposes both

Motions, arguing that Time Warner is subject to the jurisdiction of this Court because it conducted business here through its contact with Cableview, and due to its tortious conduct directed at and causing injury in Florida. <u>See</u> Response to Motion to Dismiss at 3-5. Further, Cableview argues that Time Warner's transfer arguments fail because the forum selection clause in the Installation Agreement is permissive, events giving rise to the Complaint occurred in Florida, and the inconvenience to Time Warner is not sufficient to warrant a transfer of venue. <u>See</u> Response to Motion to Transfer at 3-8.

## III.    Standing

Although Time Warner has raised several threshold issues as grounds for dismissal of the Complaint, the Court first addresses Time Warner's standing argument. Time Warner argues that Cableview lacks standing to assert any claims against it because Cableview assigned and transferred all assets to FTS, which would include any and all potential claims against Time Warner. <u>See</u> Motion at 16. A legal assignment transfers all the interests and rights to the thing assigned, and permits the assignee to stand in the assignor's shoes and "enforce the contract against the original obligor or in his own name." <u>Slip-N-Slide Records, Inc. v. TVT Records, LLC</u>, No. 05-CIV-21113, 2007 WL 3232270, at *4 (S.D. Fla. Oct. 31, 2007); <u>see also</u> <u>Hansen v. Wheaton Van Lines, Inc.</u>, 486 F. Supp. 2d 1339, 1346 (S.D. Fla. 2006). "Because a legal assignment vests in the assignee the right to enforce the contract, an assignor normally retains no rights to enforce the contract after it has been assigned." <u>Slip-N-Slide Records, Inc.</u>, 2007 WL 3232270, at *4; <u>see also</u> <u>Hansen</u>, 486 F. Supp. 2d at 1346. The Court interprets an assignment as it would any other contract under Florida law,

giving effect to the contract's clear and unambiguous terms. See Slip-n-Slide Records, Inc., 2007 WL 3232270, at *3.

Quoting the Asset Purchase Agreement, Cableview responds that the contract language excluded "all contracts that relate solely to either or both of the Excluded Assets or Excluded Liabilities," and "Excluded Liabilities" was defined to include "any litigation, arbitration, mediation or similar claims against any Seller including without limitation that certain civil action described in the Civil Summons listed on Schedule 2.2(v) (the 'TW Action') in the claim amount of $515,303.17 (the 'TW Claim Amount')." See Response to Motion to Dismiss at 7. Cableview, of course, is one of the Sellers in the Asset Purchase Agreement. See Asset Purchase Agreement at 1. Nevertheless, the cited language does not carry the day for Cableview. Although the cited contractual language clearly excludes Time Warner's action against Cableview for indemnification from the liabilities FTS assumed in purchasing substantially all of Cableview's assets, it does not exclude actions that Cableview might have against Time Warner for breach of the Installation Agreement that it assigned to FTS.

Notably, the Asset Purchase Agreement provides that "the Corporate Sellers shall sell, transfer, convey and assign to Purchaser [(FTS)] and Purchaser shall purchase and acquire, all of the respective right, title and interest of each of the Corporate Sellers in and to all of the assets, properties and rights of the Business," including customer contracts. Asset Purchase Agreement at 1. The Installation Agreement is such a customer contract, which Cableview assigned to FTS, as is apparent from the face of the Complaint. See Complaint at ¶¶30-39. The fact that the Asset Purchase Agreement excluded "all contracts

that relate solely to either or both of the Excluded Assets or Excluded Liabilities" does not render the Installation Agreement excluded from the sale because the Installation Agreement does not relate solely to Time Warner's claims against Cableview. Moreover, Cableview's breach of contract claim does not fall within the contracts excluded <u>liabilities</u>, which clearly contemplate claims <u>against</u> Cableview. <u>See</u> Asset Purchase Agreement at 3. Because Cableview assigned the Installation Agreement, and therefore the right to bring a claim for breach of the Installation Agreement, Cableview has no standing to pursue the breach of contract claim asserted in Count One of the Complaint. <u>See</u> <u>W.S. Badcock Corp. v. Webb</u>, 699 So. 2d 859, 861 (Fla. 5th DCA 1997) (directing trial court to dismiss breach of contract claim where plaintiffs assigned away their right to file such a claim). Accordingly, Count One of the Complaint is due to be dismissed.

Although Time Warner broadly argues in its Motion that Cableview lacks standing to pursue any of its claims, the Asset Purchase Agreement does not purport to assign causes of action that Cableview might have against Time Warner. <u>See</u> Asset Purchase Agreement at 1 (listing assets being sold and transferred to FTS, which include property such as inventory, machinery, customer contracts and accounts, distribution and sales agreements, leases, records, permits, computer software, non-compete agreements, and trade names). Because Cableview did not assign the remaining causes of action asserted in Counts Two through Four of the Complaint, Cableview does have standing to bring these claims.

## IV.    Personal Jurisdiction

A district court has discretion to conduct an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction. <u>See</u> <u>Delong Equip. Co. v. Wash. Mills Abrasive Co.</u>,

840 F.2d 843, 845 (11th Cir. 1988).  However, where the court does not conduct a hearing, "the plaintiff must present only a prima facie showing of . . . personal jurisdiction." Id.  Here, upon consideration of the Motion to Dismiss and the Response to the Motion to Dismiss, as well as the accompanying affidavits, the Court determines that an evidentiary hearing is not warranted.  Accordingly, the Court considers whether Cableview has made a prima facie showing of personal jurisdiction as to Time Warner.

With respect to personal jurisdiction, a plaintiff makes a prima facie showing by presenting evidence sufficient to withstand a motion for directed verdict on the issue. Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988).  Thus, "[t]he district court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits[,]" and "where the evidence presented by the parties' affidavits . . . conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff." Id. (citing Delong Equip. Co., 840 F.2d at 845).  This construction in favor of the plaintiff is particularly necessary where, as in the instant case, the jurisdictional questions are intertwined with the merits of a case. See Delong Equip. Co., 840 F.2d at 845.

As described above, Cableview filed its Complaint asserting multiple state law claims, with subject matter jurisdiction premised on allegations of diversity of citizenship. See Complaint at ¶¶1-2.  "A federal district court sitting in diversity may exercise personal jurisdiction to the extent authorized by the law of the state in which it sits and to the extent allowed under the Constitution." Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006).  To determine whether this Court may exercise personal jurisdiction over Time Warner, the Court must engage in a two-part

inquiry.  See Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004).

First, the Court must determine "whether the exercise of jurisdiction is appropriate under

[Florida]'s long-arm statute."  Id. (citing Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623,

626 (11th Cir. 1996)).   Second, the Court must consider whether exercising personal

jurisdiction over Time Warner "would violate the Due Process Clause of the Fourteenth

Amendment to the United States Constitution, which requires that the defendant have

minimum contacts with the forum state and that the exercise of jurisdiction over the

defendant does not offend 'traditional notions of fair play and substantial justice.'"  Id.

(quoting Sculptchair, Inc., 94 F.3d at 626).  "Only if both prongs of the analysis are satisfied

may a federal or state court exercise personal jurisdiction over a nonresident defendant."

Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 256 (11th Cir. 1996) (internal quotations

omitted).  Thus, the Court first considers whether Florida's long-arm statute would warrant

an exercise of personal jurisdiction over Time Warner in this action.[3]

## V.    Application

### A.    Florida's Long-Arm Statute

The reach of Florida's long-arm statute is a question of Florida law.  See Meier ex rel.

Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1271 (11th Cir. 2002).  Thus, this Court must

---

[3]      The doctrine of "pendent personal jurisdiction" provides that "a district court has
discretion to exercise personal jurisdiction over a claim that it ordinarily lacks personal jurisdiction
over . . . when that claim arises out of the same common nucleus of operative fact as does a claim
that is within the in personam jurisdiction power of the court."  4A Charles A. Wright & Arthur R.
Miller, Federal Practice and Procedure, §1069.7, at 236 (3d ed. 2002) (Wright & Miller).  In the
Eleventh Circuit, "[i]f the forum's long-arm statute provides jurisdiction over one claim, the district
court has personal jurisdiction over the entire case so long as the claims arose from the same
jurisdiction generating event." Brennan v. Roman Catholic Diocese of Syracuse New York, Inc., 322
F. App'x 852, 854 (11th Cir. 2009).

construe the long-arm statute as would the Florida Supreme Court, and, absent some indication that the Florida Supreme Court would hold otherwise, this Court is bound to adhere to decisions of Florida's intermediate courts.  See id.  The Florida long-arm statute provides in pertinent part:

> (1)  Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
> (a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
> (b) Committing a tortious act within this state.
> (c) Owning, using, possessing, or holding a mortgage or other lien on any real property within this state.
> (d) Contracting to insure any person, property, or risk located within this state at the time of contracting.
> (e) With respect to a proceeding for alimony, child support, or division of property in connection with an action to dissolve a marriage or with respect to an independent action for support of dependents, maintaining a matrimonial domicile in this state at the time of the commencement of this action or, if the defendant resided in this state preceding the commencement of the action, whether cohabiting during that time or not. This paragraph does not change the residency requirement for filing an action for dissolution of marriage.
> (f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
> 1. The defendant was engaged in solicitation or service activities within this state; or
> 2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.
> (g) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.
> (h) With respect to a proceeding for paternity, engaging in the act of sexual intercourse within this state with respect to which a child may have been conceived.
>
> (2) A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise,

is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

Fla. Stat. § 48.193.[4]  This statute provides for two types of jurisdiction.  See Nw. Aircraft Capital Corp. v. Stewart, 842 So. 2d 190, 193-95 (Fla. 5th DCA 2003).  While subparagraph two of section 48.193 confers general jurisdiction over defendants "engaged in substantial and not isolated activity within [Florida]" irrespective of any nexus between the defendant's activity and the cause of action, subparagraph one confers jurisdiction over specific causes of action "arising from" one of the enumerated acts.  See id.  Cableview does not allege or argue that Time Warner is subject to general jurisdiction; instead, it relies on the allegations of Time Warner's conduct giving rise to the asserted causes of action.  See generally Complaint; see also Response to Motion to Dismiss at 3.

With respect to specific jurisdiction, the Court notes that while the term "'arising from'" as used in Florida Statutes section 48.193(1) "does not mean proximately caused by, it does require direct affiliation, nexus, or substantial connection to exist between the basis for the plaintiff['s] cause of action and the defendant['s action falling under the long-arm statute]." Nw Aircraft Capital Corp., 842 So. 2d at 194; see also Glovegold Shipping, Ltd. v. Sveriges Angfartygs Assurans Forening, 791 So. 2d 4, 10 (Fla. 1st DCA 2000).  In response to the Motion to Dismiss, Cableview suggests that Time Warner is subject to personal jurisdiction under the following subsections of section 48.193(1):  (a)—engaging in or carrying on a

---

[4]    Recently, the Florida legislature amended section 48.193 and changed the numbering such that the subsections for section 48.193(1) which used to be 48.193(1)(a)-(h) are now 48.193(1)(a)(1)-(8) and subsection 48.193(1)(a)(9) was added. 2013 Fla. Sess. Law Serv. Ch. 2013-164 (West) (listing a July 1, 2013, effective date).  However the Court, like the parties in their respective briefings, applies the long-arm statute as it stood in March of 2013 when Cableview filed suit.

business in the state, (b)—committing a tort in the state, and (f)1—causing injury in the state at or about the same time as engaging in solicitation or service activities in the state, although it does not substantively address each subsection individually. <u>See</u> Response to Motion at 3-5.[5]  The Wesselman Declaration expressly refutes any suggestion that Time Warner conducts or solicits business in Florida as required for subsections (a) and (f)1 and Cableview points to no factual allegations which would support a contrary inference. <u>See</u> Wesselman Decl. at 2.  Thus, the Court will determine whether specific jurisdiction is appropriate under section 48.193(1)(b).

Section 48.193(1)(b) authorizes the exercise of jurisdiction over a non-resident defendant who commits a tortious act within Florida. <u>See</u> Fla. Stat. § 48.193(1)(b). However, "a defendant's physical presence is not necessary to commit a tortious act in Florida." <u>See</u> <u>Wendt v. Horowitz</u>, 822 So. 2d 1252, 1260 (Fla. 2002).  Rather, a nonresident defendant can commit a tortious act in Florida under section 48.193(1)(b) by way of telephonic, electronic, or written communications <u>into</u> Florida, so long as the tort alleged arises from such communications. <u>See</u> <u>Internet Solutions Corp. v. Marshall</u>, 39 So. 3d 1201, 1208 (Fla. 2010); <u>Wendt</u>, 822 So. 2d at 1253.  In addition, "[a]ccording to precedent binding [in the Eleventh Circuit,] subsection (1)(b) extends long-arm jurisdiction over defendants who commit a tort that results in injury in Florida." <u>Posner v. Essex Ins. Co., Ltd.</u>, 178 F.3d 1209, 1219 (11th Cir. 1999); <u>Licciardello v. Lovelady</u>, 544 F.3d 1280, 1283 (11th Cir. 2008); <u>Estate</u>

---

[5]  In its Motion to Dismiss, Time Warner discusses why it would not be subject to long-arm jurisdiction pursuant to subsection (g)—breaching a contract in the state. <u>See</u> Motion to Dismiss at 12.  As discussed above, the Court has determined that Cableview lacks standing to pursue the breach of contract claim.  Accordingly, the Court does not consider this basis for exercising long-arm jurisdiction over Time Warner.

of Scutieri v. Chambers, 386 F. App'x 951, 955 (11th Cir. 2010).  Notably, "[t]he Florida Supreme Court has provided only limited guidance on the question of when a tort committed out of state but causing injury in Florida is sufficient to give Florida courts personal jurisdiction over the tortfeasor," and Florida's intermediate appellate courts are divided on the issue.  See Estate of Scutieri, 386 F. App'x at 955 (citing Wendt, 822 So. 2d at 1253 n.2); see also Internet Solutions, 39 So. 3d at 1206 n.6 ("We do not decide the broader issue of whether injury alone satisfies the requirement of section 48.193(1)(b).").  Indeed, the Court questions whether section 48.193(1)(b) is properly understood "to encompass all tortious acts which were complete outside Florida but ultimately have consequences here only because a Florida resident suffers damages."  See Korman v. Kent, 821 So. 2d 408, 411 (Fla. 4th DCA 2002) (emphasis added); Arch Aluminum & Glass Co., Inc. v. Haney, 964 So. 2d 228, 232-35 (Fla. 4th DCA 2007); see also Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1168 & n.7 (11th Cir. 2005) (citing Korman, 821 So. 2d at 411, for the proposition that "Wendt cannot be construed to grant jurisdiction under [section 48.193(1)(b)] in every situation where a tort was completed out-of-state but caused injury in Florida").  Nevertheless, "[u]nless and until the Florida Supreme Court rejects [the Eleventh Circuit's] construction of the long-arm statute" this Court is "bound to follow [the] 'firmly established precedent, which interprets subsection (1)(b) to apply to defendants committing tortious acts outside the state that cause injury in Florida.'"  See Estate of Scutieri, 386 F. App'x at 955 (quoting Posner, 178 F.3d at 1217).

Before the Court addresses whether the allegations in the Complaint support jurisdiction in Florida on the basis that Time Warner committed tortious acts here or caused

injury here, the Court must first determine whether the Complaint states a cause of action. See PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V., 598 F.3d 802, 808 (11th Cir. 2010). In determining whether Cableview has stated a cause of action upon which relief can be granted, the Court must accept the factual allegations set forth in the Complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of Cableview. See Omar ex. rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir. 2003) (per curiam). Nonetheless, Cableview must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the Complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, Cableview must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and

quotations omitted).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth."  See Iqbal, 556 U.S. at 678-79.  Thus, the Court must determine whether the Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'"  Id. at 678 (quoting Twombly, 550 U.S. at 570).  The Court will address each of Cableview's remaining claims in turn.

### 1.      Tortious Interference with a Business Relationship

In Count Two of the Complaint, Cableview alleges a claim for tortious interference with a business relationship.  See Complaint at 10.  Under Florida law, the elements of a claim of tortious interference with an advantageous business relationship are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship."  KMS Rest. Corp. v. Wendy's Int'l, Inc., 194 F. App'x. 591, 603 (11th Cir. 2006) (per curiam) (citing Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985)); see also Border Collie Rescue, Inc. v. Ryan, 418 F. Supp. 2d 1330, 1343 (M.D. Fla. 2006); Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994).  This claim "generally requires 'a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.'"  Sarkis v. Pafford Oil Co., 697 So. 2d 524, 526 (Fla. 1st DCA 1997) (quoting Ethan Allen, 647 So. 2d at 815); see also Dunn v. Air Line Pilots Ass'n, 193 F.3d 1185, 1191 (11th Cir. 1999) (concluding that, in order to establish

a "business relationship," the plaintiff must show "a relationship with a particular party, and not just a relationship with the general business community").

Time Warner argues that Cableview cannot state a claim for tortious interference with a business relationship because it cannot establish the third required element: an intentional and unjustified interference.  See Motion to Dismiss at 22.  A plaintiff may establish that a defendant intentionally interfered with a business relationship by proving that the defendant interfered out of malice.  See Cotton, 463 So. 2d at 1128 ("[W]e see no logical reason why one who damages another in his business relationships should escape liability because his motive is malice rather than greed.").  However, a plaintiff may also establish that the defendant intentionally interfered with a business relationship by proving that the defendant interfered "to secure a business advantage . . . ." Id.

Analysis of the justification element in an interference claim "requires an examination of the defendant's 'conduct, its motive, and the interests it sought to advance.'"  Sec. Title Guarantee Corp. v. McDill Columbus Corp., 543 So. 2d 852, 855 (Fla. 2d DCA 1989) (quoting Smith v. Emery Air Freight Corp., 512 So. 2d 229, 230 (Fla. 3d DCA 1987)).  Under Florida law, "no cause of action for intentional interference exists which is the consequence of a rightful action."  Barco Holdings, LLC v. Terminal Inv. Corp., 967 So. 2d 281, 292-93 (Fla. 3rd DCA 2007) (finding that where a purchaser of property "had a contractual right to exercise its purchase option at any time during the term of the lease, the lawful exercise of the purchase option could not constitute interference as a matter of law").  Accordingly, courts have determined that interference is justified where a defendant acts pursuant to its contractual authority.  See, e.g., Networkip, LLC v. Spread Enters., Inc., 922 So. 2d 355, 358

(Fla. 3d DCA 2006) (finding that because a service provider was within its contractual rights to cancel the contract, the cancellation did not constitute tortious interference).  Moreover, "so long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable."  Ethyl Corp. v. Balter, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980); see also Horizons Rehab., Inc. v. Health Care & Ret. Corp., 810 So. 2d 958, 964 (Fla. 5th DCA 2002) ("Under Florida law, a party is privileged to act, and his actions are non-actionable, if the actions are taken to safeguard or promote the party's own financial interests.");[6] Morris Commc'ns Corp. v. PGA Tour, Inc., 235 F. Supp. 2d 1269, 1287 (M.D. Fla. 2002) (quoting Heavener, Ogier Servs., Inc. v. R.W. Fla. Region Inc., 418 So. 2d 1074, 1076 (Fla. 5th DCA 1982)) ("Florida courts recognize that, 'If a defendant interferes with a contract in order to safeguard a preexisting economic interest of his own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable.'").

On the face of the Complaint, and from the Installation Agreement, it is apparent that Time Warner had a right to consent, or to refuse to consent, to Cableview's assignment of its Installation Agreement to FTS.  See Complaint at ¶20; Installation Agreement at ¶21.[7] Because Time Warner had such a right, Time Warner argues that it was not a stranger to

---

[6] The Court recognizes that the privilege to interfere is qualified and may not protect one whose actions are motivated solely by malice. Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1294 n.9 (11th Cir. 2001). In its Complaint, Cableview does not allege that Time Warner was motivated by malice much less that malice was its sole motivation in withholding its consent to the assignment of the Installation Agreement.

[7] Paragraph 21 of the Installation Agreement provides, "Neither party shall have the right to assign or otherwise transfer this Installation Agreement, or to delegate any right, duty or obligation hereunder to any other party without the express prior written consent of the other party."

the business relationship, and therefore Cableview cannot state a cause of action for tortious interference with that relationship.  See Motion to Dismiss at 22-23.  In response, Cableview asserts that "at no time did Time Warner have any contractual right to approve or disapprove Cableview's transaction with FTS.  Time Warner's right to consent was limited to the Installation Agreement only."  Response to Motion at 11.  Thus, Cableview argues that Time Warner's communications with FTS went beyond merely approving or disapproving of the consent to assign the Installation Agreement and interfered with the buyer-seller relationship FTS and Cableview had, a relationship in which Time Warner had no contractual rights. See id.

Time Warner cites two cases in support of its contention that its actions in withholding its consent were privileged.  See Motion to Dismiss at 22 (citing Burger King Corp. v. H&H Rest., LLC, No. 99-2855, 2001 WL 1850888, at *8 (S.D. Fla. Nov. 30, 2001); Genet Co. v. Annheuser-Busch, Inc., 498 So. 2d 683, 685 (Fla. 3d DCA 1986)).  Both cases are somewhat distinguishable in that they involved the sale or purchase of a franchise or other property over which the defendant had a contractual right to approve or disapprove the entire transaction.  See Burger King Corp, 2001 WL 1850888, at *3, *8; Genet Co., 498 So. 2d at 684-85;  see also Ernie Haire Ford, Inc., 260 F.3d at 1294.  However, these cases are only distinguishable as to the scope of the right to approve of a transaction.  The fact that Time Warner could not approve or disapprove of the overall sale of Cableview does not extinguish Time Warner's privilege under Florida law to exercise its contractual right with respect to the Installation Agreement, even if doing so would have the effect of interfering with another business relationship Cableview had or was attempting to have.  Indeed, there

is no question that Time Warner had the express contractual right to consent or refuse to

consent to the assignment of the Installation Agreement.  Therefore, the question is whether

Cableview alleges in its Complaint that Time Warner withheld its consent using improper

means.

Deciding whether a defendant's conduct was improper, and therefore unjustified,

requires "a balancing of the importance, social and private, of the objective advanced by the

interference against the importance of the interest interfered with, considering all

circumstances among which the methods and means used and the relation of the parties

are important." McCurdy v. Collis, 508 So. 2d 380, 384 (Fla. 1st DCA 1987) (quoting Ins.

Field Servs. v. White & White Inspection Audit Serv., Inc., 384 So. 2d 303, 306-07 (Fla. 5th

DCA 1980)).   The Court considers a number of factors, identified in the Restatement

(Second) of Torts, section 767 (1979):

> In determining whether an actor's conduct in intentionally interfering with a
> contract or a prospective contractual relation of another is improper or not,
> consideration is given to the following factors:
>> (a) the nature of the actor's conduct,
>> (b) the actor's motive,
>> (c) the interests of the other with which the actor's conduct interferes,
>> (d) the interests sought to be advanced by the actor,
>> (e) the social interests in protecting the freedom of action of the actor
>> and the contractual interests of the other,
>> (f) the proximity or remoteness of the actor's conduct to the
>> interference and
>> (g) the relations between the parties.

See also McCurdy, 508 So. 2d at 383 n.1.  Notably, "[w]hen there is room for different views,

the determination of whether the interference was improper or not is ordinarily left to the jury,

to obtain its common feel for the state of community mores and for the manner in which they

would operate upon the facts in question." Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc., 262 F.3d 1152, 1159 (11th Cir. 2001).

In its Response to Motion to Dismiss, Cableview does not address the impropriety of Time Warner's conduct, and instead argues only that Time Warner was not a party to its transaction with FTS, and therefore, had no right to consent to or otherwise interfere with the transaction. See Response to Motion to Dismiss at 11.  Nevertheless, in the Complaint, Cableview alleges the following misconduct that could support its claim that Time Warner tortiously interfered with its business relationship with FTS despite Time Warner's right to approve of the assignment of the Installation Agreement: (1) Time Warner initially represented that it would approve of the assignment, (2) Time Warner failed to involve Cableview in settlement negotiations for the McClarty Action, (3) Time Warner waited until the day before the closing to communicate with FTS to notify them of the McClarty Action and demand that FTS assume liability for the settlement as a condition of its assent to the assignment of the Installation Agreement, and (4) Time Warner increased the amount of money sought continuously without justification until it reached $515,000, and later increased this amount again, refusing to provide FTS with the information necessary to provide joint payment unless Cableview agreed to pay $560,000.  The Court finds that the allegations of Time Warner's last minute, non-negotiable demands that, to obtain the consent to assignment critical to closing its sale to FTS, Cableview pay a disputed debt in full (or arguably in an amount in excess of the actual debt) are sufficient to state a plausible claim for tortious interference, particularly in light of the fact that Time Warner is alleged to have made its demands at such a time and in such a way that Cableview would have no

recourse but to agree, and then no way to recover the disputed amount because, as discussed above, Cableview was assigning the Installation Agreement, and thus the right to sue Time Warner for its breach.

While Cableview could certainly have drafted the Complaint better, on its face, the Complaint alleges plausibly improper conduct.  In <u>Morsani v. Major League Baseball</u>, 663 So. 2d 653 (Fla. 2d DCA 1995), the Florida Second District Court of Appeals found that the defendants' alleged use of threats, intimidation and conspiratorial conduct was not privileged because such conduct was not a proper means of securing their financial interests.  <u>Id.</u> at 656-57.  By relying on improper means, the defendants exercised their approval rights outside the context of the proper exercise of their rights.  <u>See id.</u> at 657.  Here, it appears that Time Warner's intent in withholding its consent to the assignment of the Installation Agreement was to secure indemnification for the McClarty Action.  Its conduct in leveraging payment from Cableview over this disputed claim including its escalating monetary demands, and the timing of the demand on the eve of the transaction's closing, as alleged could be improper, and therefore not justified by Time Warner's right to consent in the Installation Agreement.

Because Cableview has alleged sufficient facts to support a claim for tortious interference with a business relationship, the Court can determine whether that claim supports the exercise of personal jurisdiction over Time Warner.  Before doing so the Court will consider whether Cableview's remaining claims, as pled, state a cause of action.

**2.     Negligent Misrepresentation**

In Count Four of its Complaint, Cableview asserts a claim for negligent misrepresentation.  See Complaint at 11-12.  A claim for negligent misrepresentation requires proof of the following elements:

> (1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.

See Gilchrist Timber Co. v. ITT Rayonier, Inc., 127 F.3d 1390, 1393-94 (11th Cir. 1997) (quoting Baggett v. Electricians Local 915 Credit Union, 620 So. 2d 784, 786 (Fla. 2d DCA 1993)); see also Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc., 607 F.3d 742, 747 (11th Cir. 2010).  Here, Cableview alleges that Time Warner misrepresented the fact that it would consent to the assignment of the Installation Agreement to FTS when FTS purchased Cableview and all of its assets.  Complaint at ¶58.  Cableview alleges that Time Warner made these statements knowing that the assignment would ultimately require Time Warner's written consent, and made the statements intending to induce Cableview to continue to negotiate its sale with FTS.  See id. at ¶60.  Then, after Cableview relied on this representation, when the "consummation of the transaction" was "imminent," Cableview alleges that Time Warner forced it to agree to give Time Warner $560,000 to allow the sale of Cableview to continue.  Id. at ¶¶61-62.

Time Warner contends that these allegations are insufficient to state a cause of action for negligent misrepresentation as a matter of law because Cableview cannot have justifiably relied on an oral promise that had to be reduced to writing, pursuant to the contract terms.

See Motion to Dismiss at 24-25.  In response, Cableview argues that Time Warner's argument is misplaced because Time Warner never repudiated its consent in writing nor was its consent plainly and expressly disclaimed by the terms of the Installation Agreement.  See Response to Motion to Dismiss at 12-13.  Therefore, Cableview contends that a jury should determine whether its reliance on the alleged oral misrepresentation was justified.  Id. at 12.

Unlike a claim for fraudulent misrepresentation, "a claim for negligent misrepresentation under Florida law requires a showing that the recipient of the information justifiably relied on the erroneous information." Specialty Marine & Indus. Supplies, Inc. v. Venus, 66 So. 3d 306, 310 (Fla. 1st DCA 2011) (citing Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010)).  In other words, the question is whether the recipient of the misinformation "is justified in relying upon its truth," or whether the recipient knows that the statement is false or the falsity of it is obvious.  Rose v. ADT Sec. Servs., Inc., 989 So. 2d 1244, 1247 (Fla. 1st DCA 2008) (quoting M/I Schottenstein Homes, Inc. v. Azam, 813 So. 2d 91, 94-95 (Fla. 2002)).[8]

---

[8]      In 2010, the Florida Supreme Court clarified that justifiable reliance is not a necessary element for fraudulent misrepresentation or fraud in the inducement.  See Butler, 44 So. 3d at 105.  Despite this clarification, "the law concerning the elements of a claim for fraudulent inducement and/or misrepresentation in Florida remains somewhat murky as an expansive body of case law has developed in both the state and federal courts inserting the element of justifiable reliance into the tort of fraudulent inducement and fraudulent misrepresentation." G Barrett LLC v. Ginn Co., No. 5:09-cv-374-Oc-10TBS, 2011 WL 6752551, at *4 (M.D. Fla. Dec. 13, 2011).  As Cableview has asserted only a negligent misrepresentation claim, it must allege justifiable reliance to state that cause of action.  See Specialty Marine & Indus. Supplies, Inc., 66 So. 3d at 310.  However, the Court notes that it relies on cases interpreting the justifiable reliance element in the context of a fraudulent inducement or misrepresentation claim.  These cases are applicable to the instant action because, to the extent justifiable reliance was mistakenly applied to that fraudulent misrepresentation claims, the element is the same as properly applied to a claim for negligent misrepresentation.  See generally Zarrella v. Pacific Life Ins. Co., 755 F. Supp. 2d 1218, 1226 n.4 (S.D. Fla. 2010).

Where the parties have entered into a written contract, Florida courts have held that a prior oral statement is obviously false where the written contract contradicts that misrepresentation, and it is therefore not actionable as a matter of law. See, e.g., Zarrella, 755 F. Supp. 2d at 1225 (quoting Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc., 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999)); Giallo v. New Piper Aircraft, Inc., 855 So. 2d 1273, 1275 (Fla. 4th DCA 2003); see also Rose, 989 So. 2d at 1247 ("Notwithstanding oral misrepresentations prior to the making of a contract, a party cannot establish justifiable reliance and 'may not recover in fraud for an alleged false statement when proper disclosure of the truth is subsequently revealed in a written agreement between the parties."). Relying on this principle, Time Warner argues that, because the Installation Agreement required Time Warner to give written consent, Cableview was not justified in relying on Time Warner's oral representation that it would consent to the assignment of the Installation Agreement to FTS because the contract required that consent to be in writing. See Motion to Dismiss at 25. Time Warner's argument is misplaced. Here, unlike in the cited cases, Cableview does not rely on an oral promise made before the parties entered into the written contract requiring written consent.

Time Warner also cites Coral Reef Drive Land Development, LLC v. Duke Realty Ltd. Partnership, 45 So. 3d 897 (Fla. 3d DCA 2010) to support its contention.[9] In Coral Reef,

---

[9] Time Warner also quotes Roxton v. Armstrong, 155 So. 755, 755 (Fla. 1934), in which the Florida Supreme Court stated that "where parties intend that their oral agreements shall be reduced to writing, as the evidence of their terms of agreement, there is nothing binding on them until the writing is executed." This rule is inapplicable, however, as Cableview is not seeking to enforce an oral promise intended to be reduced to writing as a separate contract. Instead, it alleges that Time Warner misrepresented its intention to consent to the assignment. Thus, Roxton is not applicable to the instant facts.

Florida's Third District Court of Appeals held that the plaintiff "could not, as a matter of law, justifiably rely on an alleged verbal 'commitment' to exercise the purchase option in the future because they had expressly agreed not to do so.  Written exercise provisions avoid misunderstandings and swearing contests." Id. at 902.  The court based its decision in part on the undisputed fact that the defendant had sent the plaintiff a written default notice that "was squarely inconsistent with any belief that the purchase option would be exercised." Id. at 901.  Here, there was no such contradiction.

Moreover, the Coral Reef court made this determination at summary judgment after development of the relevant facts.  Taking the allegations of the Complaint as true at this stage of the proceeding, Cableview alleges that it entered into the Installation Agreement with Time Warner and, after several years operating under that agreement, entered into negotiations to sell its assets including the Installation Agreement to FTS.  Recognizing that it needed Time Warner's consent, Cableview alleges that it contacted Time Warner to ascertain if Time Warner was willing to give that consent, albeit in writing at a later date.  According to Cableview, Time Warner indicated that it would consent, knowing that Cableview would rely on that representation, and Cableview did so by continuing to negotiate the sale to FTS.  Only on the day before the closing was set to take place did Time Warner indicate that it would not consent to the assignment unless Cableview agreed to pay it over $500,000 from the sale.[10]  At this stage of the proceeding, Cableview has alleged

---

[10]     The Court notes that Cableview alleges in the Complaint that Time Warner's representations that it would consent to assignment were "obviously false." See Complaint at ¶60.  However, in construing the allegations in context and in the light most favorable to Cableview, see Hill, 321 F.3d at 1335; Jackson, 21 F.3d at 1534, the Court interprets the allegation to reflect Cableview's realization in retrospect that Time Warner had no intention of consenting to the

(continued...)

sufficient facts to support a finding that it justifiably relied on Time Warner's representation that it would give written consent to the assignment. As such, Count Four of Cableview's Complaint states a cause of action that could potentially support personal jurisdiction.

### 3. FDUTPA

In Count Three Cableview asserts a claim based on FDUTPA. However, Time Warner argues that Cableview does not have standing to bring a FDUTPA claim because it is not a consumer. <u>See</u> Motion to Dismiss at 23-24. Under FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[11] are hereby declared unlawful." Fla. Stat. § 501.204(1). The statute directs that the Court must liberally construe its provisions to promote several policies, including "protect[ing] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). The statute permits "anyone aggrieved by a violation of this part" to bring an action for declaratory judgment that an act or practice violates FDUTPA and permits "any person who has suffered a loss as a result of a violation of this part" to recover actual damages. Fla. Stat. § 501.211(1)-(2).

Cableview alleges that it has suffered damages because Time Warner

---

[10](...continued)
assignment absent Cableview's acquiescence to Time Warner's demand for payment.

[11]       "Trade or commerce" is defined as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8).

engaged in unethical, unfair and unconscionable behavior with regard to Cableview by utilizing its market dominance and economic power in the cable television industry to extract contract concessions from Cableview in a transaction to which Time Warner was not a party in an effort to effectively strip Cableview of any ability to assert rights and defenses in the McClarty Action.

Complaint at ¶55.  In the Motion to Dismiss, Time Warner argues that, because Cableview was in the process of selling its assets to FTS, Cableview was not a consumer and the alleged tortious conduct is not the result of a consumer transaction.  See Motion to Dismiss at 23.  In rejecting a similar argument, a jurist of this Court in James D. Hinson Electrical Contracting Co. v. Bellsouth Telecommunications, Inc., No. 3:07-cv-598-J-32MCR, 2008 WL 360803 (M.D. Fla. Feb. 8, 2008) explained:

BellSouth's argument that Hinson must be a consumer itself to claim money damages under FDUTPA is contradicted by the 2001 amendments.  Prior to 2001, § 501.211(2), Florida Statutes, provided that "[i]n any individual action brought by a consumer who has suffered a loss as a result of a violation of this part, such consumer may recover actual damages, plus attorney's fees and court costs."  (emphasis added).  However, FDUTPA's 2001 amendments replaced the word "consumer" with the word "person."  See Fla. Stat. § 501.211(2) (2007).  Courts in this district have held that "[t]his amendment demonstrates a clear legislative intent to allow a broader base of complainants who have been injured by violations of FDUTPA to seek damages, not just injunctive relief."  In this circumstance, Hinson, a commercial entity, can bring a FDUTPA claim for damages and injunctive relief.

Id. at *3 (case citations omitted).  Despite this persuasive guidance, and noting that FDUTPA "may extend to protect business entities from unfair and deceptive trade practices," the court in In re Maxim Medical Group, Inc., 434 B.R. 660 (Bankr. M.D. Fla. 2010), held that "FDUTPA has no application to entities complaining of tortious conduct which is not the result of a consumer transaction," with consumer meaning "one engaged in the purchase of goods or services."  Id. at 693.  However, the In re Maxim holding appears to ignore the

intent and effect of the 2001 amendment, to broaden the class of persons and entities that may obtain relief for losses suffered from a defendant's unfair trade practices.[12] Under the amended statute, persons who have suffered damages as a result of a violation of FDUPTA, whether as a consumer or a legitimate business enterprise, a buyer or a seller, have standing to sue to recover those damages. See generally Intercoastal Realty, Inc. v. Tracy, 706 F. Supp. 2d 1325, 1333-35 (S.D. Fla. 2010) (noting authority holding that non-consumers may sue under FDUPTA and finding that plaintiff real estate company selling homes was a legitimate enterprise with standing to seek damages). As such, Cableview has standing to recover damages suffered from a violation[13] of FDUTPA. Because Time Warner raises no other challenges to the sufficiency of this claim, the Court finds that Count Three states a viable cause of action.

### 4. Personal Jurisdiction under § 48.193(1)(b)

Having determined that Cableview has stated a cause of action for tortious interference with a business relationship, negligent misrepresentation, and a violation of FDUTPA, the Court now returns to the issue of personal jurisdiction over Time Warner. The

---

[12] The court in S & B Investments, LLC v. Motiva Enterprises, LLC, No. 03-61993-CIV, 2004 WL 3250306, at *6 (S.D. Fla. Dec. 6, 2004) similarly defined consumer as one purchasing goods or services following the 1993 amendments, but did not mention the 2001 amendments, nor did the two cases the court relied on for that proposition. In Burger King Corp. v. Ashland Equities, Inc., 161 F. Supp. 2d 1331, 1338 (S.D. Fla. 2001), the court dismissed a FDUTPA claim because the plaintiff was trying to sell restaurants, rather than purchase them, and therefore was not a consumer who could recover under the statute, prior to its amendment. The Court finds unpersuasive those non-binding decisions that cite Ashland Equities and other pre-2001 amendment authority without recognizing the amendment to FDUTPA to expand those capable of recovering damages for unfair and deceptive trade practices.

[13] The Florida Supreme Court has concluded that "FDUTPA applies to private causes of action arising from single unfair or deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract." PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 778 (Fla. 2003).

parties do not dispute that Time Warner is not and has not been "present" physically in the State of Florida.  Instead, Cableview contends that the Court is able to exercise personal jurisdiction over Time Warner because Time Warner made the alleged misrepresentation to Cableview, which has remained entirely within Florida throughout the negotiations of its sale to FTS.  See Response to Motion to Dismiss at 4-5; see also Exhibit 1 to Response to Motion to Dismiss, Affidavit of Ronald Wayne Barnes in Support of Memorandum of Law in Opposition to Defendant's Motion to Transfer Venue (Doc. No. 19 at 15-18; Barnes Aff.)[14] As explained above, Florida courts may exercise personal jurisdiction over Time Warner for directing communications to Cableview in this state to the extent that those communications caused injury here and provide the basis for its claim.  See Wendt, 822 So. 2d at 1253, 1260.   Here, Cableview's claims are based on Time Warner's communications with Cableview and with FTS.  Time Warner's initial communication that it would consent to the assignment of the Installation Agreement was made to Cableview in Florida.  Although the Complaint is unclear as to where Time Warner sent the letter to FTS demanding that FTS assume liability for the McClarty Action, even if Time Warner had sent it to Pennsylvania, where FTS is located, Time Warner is alleged to have communicated repeated demands to Cableview in Florida for indemnification, including the frenzied communications from Time Warner to Cableview requiring Cableview to acquiesce to amend the FTS Asset Purchase Agreement to withhold payment of the sum sought by Time Warner.   As these communications were directed to, and intended to reach, Cableview in Florida and are

---

[14]     Cableview also filed the Barnes Affidavit as Exhibit 1 to its Response to the Motion to Transfer (Doc. No. 20 at 12-15).

alleged to have caused injury to Cableview in Florida, Cableview's claim for tortious interference provides a basis for the Court to exercise jurisdiction over Time Warner under Florida's long-arm statute.  Cableview's other claims are based on this same conduct, as such the Court has jurisdiction over those claims as well.  Brennan, 322 F. App'x at 854. For these reasons, the Court is authorized to exercise jurisdiction over Time Warner pursuant to section 48.193(1)(b).

>    **B.    Constitutional Due Process**

Having determined that the exercise of personal jurisdiction over Time Warner in this case is otherwise within the limits of Florida's long-arm statute, the Court must next determine whether doing so "would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" Mut. Serv. Ins. Co., 358 F.3d at 1319 (quoting Sculptchair, Inc., 94 F.3d at 626).

A determination of whether exercising personal jurisdiction comports with the requirements of due process requires a two-part inquiry.  See Sculptchair, Inc., 94 F.3d at 630-31 (11th Cir. 1996).  First the Court looks to see whether Time Warner has sufficient "minimum contacts" with the State of Florida.  See id. at 630. In Licciardello, the Eleventh Circuit explained that:

>    [t]he Constitution prohibits the exercise of personal jurisdiction over a
>    nonresident defendant unless his contact with the state is such that he has
>    "fair warning" that he may be subject to suit there.  This "fair warning"
>    requirement is satisfied if the defendant has "purposefully directed" his
>    activities at residents of the forum, and the litigation results from alleged
>    injuries that "arise out of or relate to" those activities.   In this way, the

> defendant could have reasonably anticipated being sued in the forum's courts
> in connection with his activities there.

Licciardello, 544 F.3d at 1284 (internal citations omitted).  Second, the Court determines whether the exercise of jurisdiction over the defendant "would offend 'traditional notions of fair play and substantial justice.'"  Sculptchair, Inc., 94 F.3d at 630-31 (quoting Robinson, 74 F.3d at 258).  Relevant factors in this inquiry "include 'the burden on the defendant, the interests of the forum . . . , and the plaintiff's interest in obtaining relief.'"  See id. at 631 (quoting Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 113 (1987)).

Turning first to the "minimum contacts" prong, "[j]urisdiction may be constitutionally asserted over the nonresident defendant whenever he has by his own purposeful conduct created a 'substantial connection' with the forum state."  Licciardello, 544 F.3d at 1285.  Indeed, even a single act can support jurisdiction, "so long as it creates a substantial connection with the forum."  Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).  Significantly, "[i]ntentional torts are such acts, and may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum."  Id. (citing Calder v. Jones, 465 U.S. 783, 790 (1984)).  In such intentional tort cases, the Eleventh Circuit evaluates the defendant's connection with the forum using the "effects test" set forth by the Supreme Court in Calder.  See Licciardello, 544 F.3d at 1288 (finding that allegations of "the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum" satisfied the Calder "effects test"); Calder, 465 U.S. at 788-89; see also Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d

1210, 1220 n.28 (11th Cir. 2009); <u>Brennan</u>, 322 F. App'x at 856.[15]  Specifically, to satisfy the "minimum contacts" prong, the <u>Calder</u> "effects test" requires a plaintiff to demonstrate that the defendant committed a tort that was: "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state."  <u>See</u> <u>Licciardello</u>, 544 F.3d at 1286.

The only contacts Time Warner has with the State of Florida as reflected in the record before the Court are its interactions and business relationship with Cableview, a Florida corporation.  <u>See</u> Response to Motion to Dismiss at 5; Barnes Aff. at ¶¶3-9.  Time Warner does not have any bank accounts, employees, customers, offices or other property in the State of Florida.  <u>See</u> Wesselman at ¶¶7-11.  However, throughout all of the negotiations alleged in the Complaint, particularly Time Warner's demands for payment from Cableview on the eve of FTS's purchase of Cableview, Cableview's vice president and other principals remained in Florida and, therefore, Time Warner's communications demanding that they acquiesce to payment were directed to Cableview here.  <u>See</u> Barnes Aff. at ¶¶3-9.  Despite these interactions, Time Warner argues that it did not have fair warning and could not reasonably anticipate being subject to suit in Florida because the Installation Agreement contains a forum selection and governing law clause.  <u>See</u> Motion to Dismiss at 13-14.

---

[15]  On the other hand, in cases of negligence, the Court applies a different test: "Minimum contacts are constitutionally sufficient for specific personal jurisdiction when (1) there 'exist[s] some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . ., thus invoking the benefits and protections of its laws[,]' and 'the defendant's contacts with the forum . . . relate to the plaintiff's cause of action or have given rise to it.'" <u>Ellis v. Jackson Nat'l Life Ins. Co.</u>, No. 2:11-cv-1064-WKW, 2012 WL 3777150, at *6 n. 6 (M.D. Ala. Aug. 30, 2012) (alterations in original).

Upon review of the applicable language, the Court finds Time Warner's reliance on the language in the Installation Agreement to be misplaced.  Preliminary, the Court notes that the cited language is not a straightforward, mandatory forum-selection clause.  It states:

> This Agreement shall be construed, and the relationship between the parties interpreted, in accordance with the laws of the State of North Carolina and/or Virginia applicable to Agreements to be made and performed in such state. Either state or federal courts within such state shall have jurisdiction over the subject matter of any dispute arising between the parties hereto.

Installation Agreement at 10 ¶22.  While this provision dictates that either North Carolina or Virginia law should apply to those agreements made and performed in each state, it does not require that an action must be brought in either state.[16]  Instead, the clause provides the courts of Virginia and North Carolina with jurisdiction to hear the claims, but not to the exclusion of Florida.  Moreover, the Court has concluded that Cableview's breach of contract claim is due to be dismissed, and therefore makes no findings as to personal jurisdiction based on this claim.  Rather, the Court determines whether Time Warner has sufficient minimum contacts to be called to Florida to answer Cableview's tort and FDUTPA claims using the <u>Calder</u> "effects test."

Cableview alleges that Time Warner committed an intentional tort—intentionally interfering with the sale of Cableview to FTS.  Accordingly, the first prong of the "effects test" is satisfied.  With respect to the second prong, whether the conduct was "aimed at the forum state," the Court finds the analysis in <u>IMO Industries, Inc. v. Kiekert AG</u>, 155 F.3d 254 (3d

---

[16]     For the reasons discussed in section VII, the Court rejects Time Warner's representation that "the Forum Selection Clause provides that any dispute arising between the parties 'shall' <u>be adjudicated</u> in North Carolina or Virginia. . . ."  Motion to Dismiss at 14 (emphasis added).

Cir. 1998) to be instructive.   In <u>IMO Industries</u>, the Third Circuit considered the <u>Calder</u>

"effects test" and explained that:

> <u>Calder</u> did not change the fact that even in intentional tort cases the
> jurisdictional inquiry "focuses on the relations among the defendant, the forum,
> and the litigation."   Nor did <u>Calder</u> carve out a special intentional torts
> exception to the traditional specific jurisdiction analysis, so that a plaintiff could
> always sue in his or her home state.   What <u>Calder</u> did was recognize that,
> under certain circumstances, the "plaintiff's residence in the forum may,
> because of defendant's relationship with the plaintiff, enhance defendant's
> contacts with the forum. [P]laintiff's residence may be the focus of the activities
> of the defendant out of which the suit arises."   That is, the unique relations
> among the defendant, the forum, the intentional tort, and the plaintiff may
> under certain circumstances render the defendant's contacts with the
> forum—which otherwise would not satisfy the requirements of due
> process—sufficient.

<u>IMO Indus.</u>, 155 F.3d at 265 (internal citations omitted) (quoting <u>Keeton v. Hustler Magazine,</u>

<u>Inc.</u>, 465 U.S. 770, 780 (1984)).   Thus, the court reasoned that "the <u>Calder</u> 'effects test' can

only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant

<u>expressly aimed</u> its tortious conduct at the forum, and thereby made the forum the focal

point of the tortious activity."   <u>IMO Indus.</u>, 155 F.3d at 265.   As such, "[s]imply asserting that

the defendant knew that the plaintiff's principal place of business was located in the forum

would be insufficient in itself to meet this requirement."   <u>Id.</u>

Upon review of the Complaint, the Court finds that Cableview sufficiently alleges that

Time Warner "expressly aimed" its tortious conduct at Florida.   Time Warner is alleged to

have sent a letter to FTS, which is located in Pennsylvania, intending to force Cableview in

Florida to pay Time Warner for the McClarty Action.   Time Warner is then alleged to have

engaged in last-minute discussions with Cableview, demanding that Cableview make the

payment and allegedly increasing the amount several times without justification.   Time

Warner is alleged to have intended to interfere with the FTS transaction to secure payment from Cableview, and thus, to have aimed its conduct at causing injury to Cableview in Florida.  Intending to and actually causing injury in Florida, Time Warner is alleged to have made Florida the focal point of its conduct.

This case is analogous to Brennan, in which the Eleventh Circuit reversed a dismissal for lack of sufficient contacts to the State of Florida.  Brennan, 322 F. App'x at 857.  In doing so the court noted that the plaintiff alleged that the defendant breached an oral agreement to pay for his treatment in Florida, and further, with respect to the plaintiff's intentional tort claims, that the harm allegedly caused by the intentional torts directed at plaintiff in Florida was felt by the plaintiff in Florida.  Id.  Time Warner's actions in this case are also comparable to the defendants' actions in Licciardello and Calder.  In Licciardello, the Florida plaintiff claimed that the defendant, although acting in Tennessee, intentionally infringed his trademark by using his name, photograph and apparent endorsement on the defendant's website, which could be accessed in Florida, without the plaintiff's authorization causing the plaintiff to suffer harm in his home state of Florida.  See Licciardello, 544 F.3d at 1282.  Similarly, in Calder, the California plaintiff asserted causes of action for libel, invasion of privacy, and intentional infliction of emotional harm as a result of an article about the plaintiff, written and edited by the defendants in Florida, but published nationwide, including in the plaintiff's home state of California.  See Calder, 465 U.S. at 785.  In both cases, the tortious acts themselves, though committed in other states, were specifically focused on, and targeted at, the respective plaintiffs in their home states and causing harm to the plaintiffs in their home states.  See Calder, 465 U.S. at 788-89; Licciardello, 544 F.3d at 1287-88.

As such, the defendants could not credibly claim to be surprised that the plaintiffs were injured in their home states.  See Licciardello, 544 F.3d at 1288 ("The unauthorized use of Carman's mark therefore, individually targeted Carman in order to misappropriate his name and reputation for commercial gain. . . . [B]ecause his intentional conduct in his state of residence was calculated to cause injury to Carman in Florida[,] Lovelady cannot now claim surprise at being haled into court here."); Calder, 465 U.S. at 789-90.

Here, based upon Cableview's allegations, Time Warner directed its alleged tortious conduct to Cableview, knowing that Cableview was located in Florida, and knowing that Cableview would suffer damages from its actions in Florida.  On these allegations, Cableview has pled that Florida is the focal point of both Time Warner's conduct and the harm suffered such that Time Warner cannot claim surprise at being haled into court in Florida.  See Calder, 465 U.S. at 789-90 ("An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause injury in California.").  Accordingly, Cableview has satisfied the second and third prongs of the "effects test," and the Court finds that Time Warner has sufficient minimum contacts with Florida such that it is subject to jurisdiction in the state to answer for its conduct against Cableview.  See Licciardello, 544 F.3d at 1287-88.

Finally, upon weighing the respective burdens and interests in this case, the Court determines that exercising personal jurisdiction over Time Warner does not "offend 'traditional notions of fair play and substantial justice.'" Sculptchair, Inc., 94 F.3d at 630-31 (quoting  Robinson, 74 F.3d at 258).  Time Warner's argument to the contrary is based on the fact that it "would be a substantial burden" to defend this suit away from its principal

place of business. Motion to Dismiss at 15. However, such an argument could be made by any nonresident defendant, and does not render the exercise of jurisdiction unconstitutional. "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp., 471 U.S. at 477. Additionally, Time Warner's arguments as to the interests of North Carolina in resolving a dispute that arose due to events taking place in North Carolina and the potential application of North Carolina law are not sufficient to render the exercise of jurisdiction unconstitutional. See id. at 483 n.26 ("[M]inimum-contacts analysis presupposes that two or more States may be interested in the outcome of a dispute, and the process of resolving potentially conflicting 'fundamental substantive social policies.'"). Because Time Warner is alleged to have knowingly caused injury to Cableview in Florida, "Florida has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in Florida." Brennan, 322 F. App'x at 857 (quoting Licciardello, 544 F.3d at 1288). In consideration of all the circumstances and interests, the Court determines that Time Warner has "minimum contacts with [Florida] and that the exercise of jurisdiction over [it] does not offend 'traditional notions of fair play and substantial justice'" Mut. Serv. Ins. Co., 358 F.3d at 1319 (quoting Sculptchair, Inc., 94 F.3d at 626). Accordingly, the exercise of jurisdiction over Time Warner complies with the constitutional requirements of due process. See id. (citing Sculptchair, Inc., 94 F.3d at 626).

## VI.     Additional arguments for dismissal

In addition to seeking dismissal of the Complaint based on the arguments discussed above (standing, lack of personal jurisdiction, and failure to state a claim), Time Warner also seeks dismissal because it argues that Cableview entered into a settlement agreement with Time Warner.  See Motion to Dismiss at 17-21.  "[I]n order to dismiss claims for failure to state a claim because of the existence of affirmative defenses, the allegations of the complaint must contain the information necessary to show that an affirmative defense bars recovery."  See Superior Energy Servs., LLC v. Bonconco, Inc., No. CA 09-0321-KD-C, 2010 WL 1267173, at *6 (S.D. Ala. Mar. 29, 2010) (citing Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008)).  Although the Complaint alleges that Cableview paid Time Warner an amount which Time Warner believed that Cableview was obligated to pay, the Complaint does not indicate that such payment was made pursuant to a settlement agreement or that Cableview agreed to release any claims it had against Time Warner to recover the payment.  Indeed, the Complaint suggests that Cableview strongly objected to paying Time Warner any sum of money, as liability for the McClarty Action was the subject of an ongoing dispute.  Complaint at ¶¶35, 37.  The Complaint specifically alleges that Cableview was "forced to acquiesce to Time Warner's demands" or lose the money FTS was to pay for the sale of Cableview that Cableview desperately needed to pay its financial obligations.  See Complaint at ¶¶32, 34, 39.  These allegations do not show or even suggest that the parties reached a settlement agreement that would bar further action by Cableview.  See Superior Energy Servs., 2010 WL 1267173, at *6.  Thus, the existence of a settlement agreement barring recovery is not apparent from the face of the Complaint.

Time Warner also argues that the Complaint should be dismissed because the voluntary payment doctrine bars its claims. <u>See</u> Motion to Dismiss at 21.  However, in the Complaint, Cableview alleges that the payment was made under protest.  "[A]s the relevant case authorities make plain, the issue of voluntary payment often entails a fact-based inquiry and is not suited for resolution at the dismissal stage." <u>United States v. Cayman Village Condo. Ass'n, Inc.</u>, No. 12-61797-Civ, 2013 WL 1665846, at *1 (S.D. Fla. Apr. 17, 2013).  Thus, the voluntary payment doctrine does not warrant dismissal at this the motion to dismiss stage of the proceedings.  In light of the foregoing, the Motion to Dismiss is due to be denied as to these additional arguments.

## VII.   28 U.S.C. § 1404(a)

Having determined that Cableview's Complaint is not due to be dismissed, the Court turns to the parties' dispute regarding the proper venue for this action.  Citing 28 U.S.C. § 1404, Time Warner seeks a transfer of this action to the Middle District of North Carolina, and Cableview opposes the transfer.

In considering whether to transfer a case pursuant to § 1404(a), the district court must engage in a two-step inquiry. <u>See</u> <u>Eye Care Int'l, Inc. v. Underhill</u>, 119 F. Supp. 2d 1313, 1318 (M.D. Fla. 2000); <u>Mason v. Smithkline Beecham Clinical Labs.</u>, 146 F. Supp. 2d 1355, 1359 (S.D. Fla. 2001).  The court must first determine, as a threshold matter, whether the case might have been filed in the proposed district, or whether all parties have consented to suit in that district. <u>See</u> <u>Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.</u>, No. 8:06-CV-1746-T-27MAP, 2006 WL 3333718, at *1 (M.D. Fla. Nov. 16, 2006); <u>see also</u> <u>Colo. Boxed Beef Co. v. Coggins</u>, No. 8:07-cv-00223-T-24MAP, 2007 WL 917302, at *3 (M.D. Fla. Mar.

23, 2007); 28 U.S.C. § 1404(a) (2011).  Next, the court must consider "whether the transfer

would be for the convenience of the parties and witnesses and in the interest of justice."

Eye Care Int'l, Inc., 119 F. Supp. 2d at 1318; see also Bookworld Trade, Inc., 2006 WL

3333718, at *1.  In doing so, the court evaluates a number of factors.[17]  See Stewart Org.,

Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); Colo. Boxed Beef Co., 2007 WL 917302, at *3

(detailing the factors to be considered in determining whether a transfer is appropriate under

§ 1404(a)) (quoting Manuel, 430 F.3d at 1135 n.1).  Under § 1404(a), a trial court has broad

discretion in determining whether a transfer is appropriate.  See Stewart Org., Inc., 487 U.S.

at 29; Am. Aircraft Sales Int'l, Inc. v. Airwarsaw, Inc., 55 F. Supp. 2d 1347, 1351 (M.D. Fla.

1999).

        It is the party seeking the transfer who bears the burden of establishing that a case

should be transferred to the suggested forum in the interests of convenience and justice.

See In re Ricoh Corp., 870 F.2d 570, 573 (11th Cir. 1989) ("[T]he burden is on the movant

to establish that the suggested forum is more convenient."); Colo. Boxed Beef Co., 2007 WL

917302, at *3.  Moreover, "[i]n determining the propriety of transfer, the Court must give

considerable weight to Plaintiff's choice of forum.  Only if the Plaintiff's choice is clearly

---

[17]    These factors include the following:

"(1) the convenience of the witnesses; (2) the location of relevant documents and
the relative ease of access to sources of proof; (3) the convenience of the parties;
(4) the locus of operative facts; (5) the availability of process to compel the
attendance of unwilling witnesses; (6) the relative means of the parties; (7) a
forum's familiarity with the governing law; (8) the weight accorded a plaintiff's
choice of forum; and (9) trial efficiency and the interest of justice, based on the
totality of the circumstances."

Colo. Boxed Beef Co., 2007 WL 917302, at *3 (quoting Manuel v. Convergys Corp., 430 F.3d
1132, 1135 n.1 (11th Cir. 2005)).

outweighed by considerations of convenience, cost, judicial economy, and expeditious discovery and trial process should this Court disregard the choice of forum and transfer the action." Response Reward Sys., L.C. v. Meijer, Inc., 189 F. Supp. 2d 1332, 1339 (M.D. Fla. 2002) (internal citations omitted); see also In re Ricoh Corp., 870 F.2d at 573 ("[F]ederal courts traditionally have accorded a plaintiff's choice of forum considerable deference."); Robinson, 74 F.3d at 260 ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.").

In addition to the factors enumerated above, the Court must consider whether the parties entered into a valid and enforceable forum-selection clause.  Indeed the existence of a forum-selection clause has a significant impact on the calculus of the 1404(a) analysis. When presented with a forum-selection clause, the Court first determines whether the clause is mandatory or permissive.  Trafalgar Capital Specialized Inv. Fund (In Liquidation) v. Hartman, 878 F. Supp. 2d 1274, 1282 (S.D. Fla. 2012) (citing Slater v. Energy Servs. Grp. Int'l Inc., 634 F.3d 1326, 1330 (11th Cir. 2011)).  "A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere.  A mandatory clause, in contrast, 'dictates an exclusive forum for litigation under the contract.'"  See Global Satellite Commc'n Co. v. Starmill U.K. Ltd., 378 F.3d 1269, 1272 (11th Cir. 2004) (quoting Snapper, Inc. v. Redan, 171 F.3d 1249, 1262 n. 24 (11th Cir. 1999)).  While mandatory clauses use specific terms of exclusion, such as the word "shall," "permissive clauses 'contain[ ] no mandatory language to indicate that the parties meant to foreclose litigation anywhere else.'" LFR Collections LLC v. Taylor, No. 8:11-cv-1117-T24EAJ, 2011 WL 4736360, at *2 (M.D.

Oct. 7, 2011) (alteration in original) (quoting <u>Stateline Power Corp. v. Kremer</u>, 148 F. App'x 770, 771 (11th Cir. 2005)).

Significantly, courts have "refuse[d] to dismiss a suit or transfer an action to the stated forum when the clause is deemed permissive." <u>Snapper</u>, 171 F.3d at 1262 n.24; <u>Fla. Polk Cnty. v. Prison Health Servs.</u>, 170 F.3d 1081, 1084 n.8 (11th Cir. 1999) ("[W]e have analyzed these clauses under a 'mandatory/permissive' test, enforcing only those clauses that unambiguously designate the forum in which the parties must enforce their rights under the contract."). Unlike permissive clauses "such as those in which one agrees to submit to jurisdiction in a certain venue," mandatory clauses are given considerable weight in the § 1404(a) analysis. <u>Hartman</u>, 878 F. Supp. 2d at 1282-83 (internal quotation omitted). Indeed, the Supreme Court has instructed that, when the parties have agreed to a mandatory forum-selection clause, a court evaluating a potential transfer under § 1404(a) does not give any weight to the plaintiff's choice of forum or consider the parties' interests. <u>See</u> <u>Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.</u>, 134 S. Ct. 568, 581-82 (2013). Instead, a court considers only arguments about public-interest factors which rarely will be sufficient to defeat a motion to transfer to the agreed upon forum. <u>Id.</u> at 582.

The construction of a forum-selection clause is a matter of federal common law. <u>See</u> <u>Cornett v. Carrithers</u>, 465 F. App'x 841, 842 (11th Cir. 2012) ("[T]he construction of forum selection clauses by federal courts is a matter of federal common law, not state law of the state in which the federal court sits."); <u>Emerald Grande, Inc. v. Junkin</u>, 334 F. App'x 973, 975 (11th Cir. 2009); <u>but</u> <u>see Rucker v. Oasis Legal Fin., L.L.C.</u>, 632 F.3d 1231 (11th Cir. 2011) (applying the <u>Erie</u> doctrine to determine whether federal or state law governed the

enforceability of a forum-selection clause); <u>Martinez v. Bloomberg LP</u>, 740 F.3d 211, 220 (2d Cir. 2014) ("To ensure that the meaning given to a forum selection clause corresponds with the parties' legitimate expectations, courts must apply the law contractually chosen by the parties to interpret the clause.").[18]  Federal common law, in turn, provides that "forum selection clauses are to be interpreted by reference to 'ordinary contract principles.'" <u>Cornett</u>, 465 F. App'x at 842. Additionally, forum-selection clauses are to be construed broadly. <u>See</u> <u>Gen. Pump & Well, Inc. v. Laibe Supply Corp.</u>, No. CV607-30, 2007 WL 4592103, at *3 (S.D. Ga. Dec. 28, 2007) (citing <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 810 F.2d 1066, 1070 (11th Cir. 1987) (en banc), <u>aff'd and remanded on other grounds</u>, 487 U.S. 22 (1988)); <u>see also</u> <u>Digital Envoy, Inc. v. Google, Inc.</u>, 319 F. Supp. 2d 1377, 1380-81 (N.D. Ga. 2004).

As to the first question of the two-step inquiry the Court readily concludes that this suit could have been brought in North Carolina, where Time Warner resides. <u>See</u> 28 U.S.C. § 1391(b)-(c).  Thus, the Court turns to the question of whether Time Warner has shown that a transfer is in the interests of convenience and justice.  Time Warner's central argument is that the Installation Agreement contains a mandatory forum-selection clause and thus, the case must be transferred to North Carolina.  <u>See</u> Motion to Transfer at 2, 10, 13-14. However, as discussed above, the Court has determined that Cableview does not have

---

[18]     The Court notes that the Installation Agreement contains a choice of law provision which states that the Installation Agreement "shall be construed, and the relationship between the parties interpreted, in accordance with the laws of the state of North Carolina and/or Virginia applicable to Agreements to be made and performed in such state." Installation Agreement at 10. However, both parties briefed the construction of the forum-selection clauses applying only federal law. <u>See</u> Motion at 3-4; Response at 2-4. In light of the parties' apparent agreement that federal law applies, and because they do not suggest that there are any significant differences between federal and North Carolina and/or Virginia law on this issue, the Court will assume that federal law applies to the interpretation of the forum-selection clause in this case. <u>See</u> Bailey v. ERG Enters., LP, 705 F.3d 1311, 1320 (11th Cir. 2013); <u>see also</u> Martinez, 740 F.3d at 223.

standing to pursue a breach of contract claim under the Installation Agreement. Therefore, the Court must determine whether the remaining claims are subject to the forum-selection clause. "Whether tort claims are governed by forum selection provisions depends upon the intention of the parties as reflected by the wording of the particular clauses and the facts as to each case." See Digital Envoy, Inc., 319 F. Supp. 2d at 1380. The language of the forum-selection clause at issue here is relatively broad, stating that the state or federal courts of North Carolina or Virginia "shall have jurisdiction over the subject matter of any dispute arising between the parties" to the Installation Agreement. Installation Agreement at 10 (emphasis added). The use of the words "any dispute" suggests that the forum selection clause applies to all disputes between the parties. Pods, Inc. v. Paysource, Inc., No. 8:05-cv-1764-T-27EAJ, 2006 WL 1382099, at *2 n.1 (M.D. Fla. May 19, 2006). Thus the forum-selection clause would appear to encompass Cableview's remaining claims, all of which relate to the Installation Agreement and Time Warner's right to consent to its assignment. Therefore, these claims are subject to the forum-selection clause.[19] See id. at *3; see also Digital Envoy, 319 F. Supp. 2d at 1380-81 (citing Stewart Org., Inc., 810 F.2d at 1070). As the parties entered into a forum-selection agreement which applies to the

---

[19]    The same is not true for the choice of law provision, which states that the Installation Agreement "shall be construed, and the relationship between the parties interpreted, in accordance with the laws of the state of North Carolina and/or Virginia applicable to Agreements to be made and performed in such state." Installation Agreement at 10. Florida courts give such clauses narrow interpretations, and the law of the forum state generally controls tort claims rather than the choice of law provision in a contract. See Razi v. Razavi, No. 5:12-cv-80-Oc-34PRL, 2012 WL 7801361, at *6 (M.D. Fla. Dec. 21, 2012). The instant choice of law provision in the Installation Agreement appears to apply only to contractual claims. Therefore, to the extent that Time Warner suggests that the application of North Carolina law favors transfer to a North Carolina court, see Motion to Transfer at 15, this suggestion is without merit.

-45-

claims at issue, the Court next considers whether the forum-selection clause is mandatory or permissive.

"[C]ourts in this circuit have required specific language before concluding that a forum selection clause is mandatory, such that a clause dictates an 'exclusive forum' for litigation under the contract." Land-Cellular Corp. v. Zokaites, No. 05-23168-CIV, 2006 WL 3039964, at *5 (S.D. Sept. 26, 2006) (citing Snapper, 171 F.3d at 1262 n.24).  A review of the language of the clause discloses that while it authorizes jurisdiction in either North Carolina or Virginia, it does not require that suit be filed there.  See Installation Agreement at 10 ¶22. Time Warner contends that the use of the word "shall" is indicative of the mandatory nature of the forum-selection clause in the Installation Agreement.  However, the clause does not contain any terms suggesting that the states of North Carolina and/or Virginia are the exclusive states of jurisdiction.[20]  See Citro Florida, Inc. v. Citrovale, S.A., 760 F.2d 1231, 1231-32 (11th Cir. 1985).  Therefore, the forum-selection clause here is permissive.  See Wai, 315 F. Supp. 2d at 1270-73 (collecting cases and finding that a forum selection clause was permissive where the parties to a contract consented to a jurisdiction but did not waive jurisdiction in all other forums).  When a forum-selection clause is permissive rather than mandatory, the Court considers it only as one of several factors weighing in favor or against transfer and the burden remains on Time Warner as the moving party to establish that North Carolina is a more convenient forum than this Court.  See Taylor, Bean & Whitaker Mortg.

---

[20]      As Time Warner drafted the agreement, any ambiguity as to the forum-selection clause should be construed against Time Warner.  Barnes Aff. at ¶4; Wai v. Rainbow Holdings, 315 F. Supp. 2d 1261, 1272-73 (S.D. Fla. 2004).

Corp. v. GMAC Mortg. Corp., No. 5:05-cv-260-Oc-10GRJ, 2006 WL 4990903, at *4 (M.D. Fla. June 15, 2006).

Turning to the convenience factors, the Court recognizes that if "transfer would merely shift the inconvenience from one party to the other, or if the balance of all factors is but slightly in favor of the movant," then transfer is inappropriate. Folkes v. Haley, 64 F. Supp. 2d 1152, 1154 (M.D. Ala. 1999) (quotations and alterations omitted); see also Taylor, Bean & Whitaker Mortg. Corp., 2006 WL 4990903, at *5.  Time Warner contends that the convenience of potential witnesses in this matter strongly supports transferring this case because "North Carolina was the site of all of the events and conduct referenced in the Complaint."  Motion to Transfer at 11.  This statement is simply inaccurate.  The Complaint references several different discussions or communications between Time Warner, Cableview, and/or FTS via phone or e-mail, with each party remaining in their respective states of residence.  The Complaint reflects that the closing of the sale between FTS and Cableview was to take place in Jacksonville, Florida.  Time Warner's focus on the underlying McClarty Action ignores the basis for the claims in this suit:  Time Warner's actions in withholding its consent to the assignment of the Installation Agreement and demanding immediate payment of the disputed debt out of the funds to close the sales transaction.[21]

---

[21]     Time Warner similarly contends that "none of the documents potentially at issue are located in Florida," and because the Installation Agreement provided for services to be performed in North Carolina and the McClarity Action arose and was litigated in North Carolina, most of the documents at issue in the case are "likely" to be there.  Motion to Transfer at 12.  Time Warner again confuses the instant litigation as being one solely concerned with resolving ultimate responsibility for the McClarity Action, instead of one relating to Time Warner's conduct towards Cableview, who has always remained in Florida.  One of the important documents, the Installation Agreement, has already been attached to the Complaint, as has the Asset Purchase Agreement and electronic communications between the parties and/or FTS.  Time Warner provides no means for the Court to determine the total volume of documents relevant to this cause of action or whether a

(continued...)

As to the convenience of witnesses, Time Warner cites to <u>Laffal v. Overseas Adventure Travel Partners, Inc.</u>, No. 3:99-cv-1113-J-21A, 2000 WL 362017 (M.D. Fla. Mar. 31, 2000) to support its argument that it will have to expend substantial sums to make its employee-witnesses available in Florida.  Motion to Transfer at 11.  However, in <u>Laffal</u>, the court noted that the plaintiff was his only necessary witness and the defendant had shown via affidavit that it would have at least five witnesses, all of whom resided in Massachusetts and not all of whom were employees.  <u>Laffal</u>, 2000 WL 362017, at *2.  After noting that the defendant was a larger corporation, and therefore, generally more likely to be able to bear the cost of litigating away from home, the court also considered the fact that the plaintiff was a self-employed photographer who could work anywhere and would only suffer the cost of travel to litigate in Massachusetts.  <u>Id.</u> at *3.  Given the factual differences, <u>Laffal</u> is of little assistance here.

Notably, Time Warner has not identified any non-employee witnesses that reside in North Carolina, and has not indicated that its business will be disrupted by having its

---

[21](...continued)
larger volume of those documents are located in North Carolina such that it would be unduly burdensome to produce any relevant documents in Florida. Time Warner's citation to <u>Jewelmasters, Inc. v. May Department Stores Co.</u> 840 F.Supp. 893, 896 (S.D. Fla. 1993) is inapposite.  There documents located in California covered the parties' fourteen year relationship.  In contrast, much of the evidence in this case will likely relate to the relatively short time period between the time Cableview notified Time Warner of its intent to assign the Installation Agreement in early 2012 and March 2, 2012, when the closing sale of Cableview was to take place, as well as the preceding discussions regarding the McClarity Action.  <u>See</u> Complaint at ¶¶20, 29-39.  Additionally, any earlier documents related to this action are likely to consist of communications between the parties which they already possess.  To the extent that a number of documents related to the settlement of the McClarty Action are located in North Carolina, the Court also notes that the location of records is generally given "little weight due to the advances in copying technology and the ease of transporting documents."  <u>Silong v. United States</u>, No. 5:05-cv-55-Oc-10GRJ, 2006 WL 948048 at *3 (M.D. Fla. Apr. 12, 2006) (citing cases); <u>see also</u> <u>Mason</u>, 146 F. Supp. 2d at 1364 ("[I]n light of technological advancements in document imaging, management, and retrieval, it is unlikely that document production will be unduly burdensome if transfer is denied.").  Based on these considerations, the location of relevant documents and ease of access is relatively neutral.

employees travel to Florida.  The convenience of some non-party witnesses is entitled to

lesser weight.  For example, the convenience of expert witnesses is less pressing as similar

experts usually can be obtained in or near the transferee forum.  See Suomen Colorize Oy

v. DISH Network L.L.C., 801 F. Supp. 2d 1334, 1339 (M.D. Fla. 2011); Silong, 2006 WL

948048, at *3 n.20.  Further, the convenience of a witness is less significant when the

witness is an employee of a party, as the employer-party can secure the witness's presence

at trial. See Trinity Christian Ctr. of Santa Ana, Inc. v. New Frontier Media, Inc., 761 F. Supp.

2d 1322, 1327 (M.D. Fla. 2010); Silong, 2006 WL 948048, at *2; Mason, 146 F. Supp. 2d

at 1361.  Indeed, in Silong, the court explained,

> Even assuming, however, all of the government medical providers testified at
> trial, that fact is not sufficient to weigh in favor of transferring this action.
> Defendant does not suggest that these witnesses would not be available for
> trial in the Middle District of Florida.  Moreover, the Court should generally
> assign little weight to the location of an employee-witness when weighing the
> convenience of witnesses.  Less consideration is given to the employee-
> witnesses because these witnesses are under the control of their employer
> and may be produced for trial without the necessity of subpoenas.

Silong, 2006 WL 948048, at *2 (footnotes omitted).  The court in Silong also relied on the

fact that there, as in the instant case, the defendant failed to identify the nature, extent, and

details of the knowledge of the witnesses.  Id.  As to employees of FTS that may be material

witnesses, the fact that they might have to travel somewhat farther to come to Florida does

not weigh in favor of transfer to North Carolina, where they will still be inconvenienced and

outside of the court's subpoena power.  See generally id. at *3.  Moreover, Time Warner

does not give any indication that the employees of FTS would not be willing to testify at trial

absent compulsory service.  See Mason, 146 F. Supp. 2d at 1361-62 ("[W]hen considering

this factor, it is not so much the convenience of the witnesses but the possibility of having

their testimony at the trial that is important. . . [Transfer] may also be denied where the movant does not show that the witnesses would be unwilling to testify and that compulsory process would be necessary.").

Relying on the forum-selection clause as a waiver of "any convenience-based opposition to transfer," Time Warner also failed to present any evidence or argument as to the relative convenience of the parties.  Motion to Transfer at 13.  It does argue that "both TWC and Plaintiff are corporations with the means to ensure their rights are protected throughout this litigation" such that no disparity would disfavor transfer. Id. at 14.  However, Time Warner provides no information about the relative size and capabilities of the parties and their ability to send representatives to either venue.  As Time Warner presented no evidence as to the relative means of the parties, this factor does not favor transfer.[22]

A plaintiff's choice of forum is given considerable deference such that it should be disregarded only where that choice is "clearly outweighed by considerations of convenience, cost, judicial economy, and expeditious discovery and trial process."  Response Reward Sys., L.C., 189 F. Supp. 2d at 1339 (internal citations omitted); see also Ricoh Corp., 870 F.2d at 573 ("[F]ederal courts traditionally have accorded a plaintiff's choice of forum considerable deference."); Robinson, 74 F.3d at 260 ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.").  Here as it is Time Warner that seeks a transfer, Time Warner bears the burden of establishing that the relevant factors warrant the Court's disregard of Cableview's chosen forum.  In consideration of the

---

[22]    Time Warner presents no arguments regarding trial efficiency or the overall interests of justice.  The Court determines this factor to be neutral and as such not weighing in favor of transfer.

parties arguments, the Court finds that the majority of the convenience factors do not favor transfer, and none strongly favor transfer. Thus, Time Warner has not met its burden to show that North Carolina is significantly more convenient than Cableview's choice of forum. Accordingly, the Motion to Transfer is due to be denied.

## VIII.   Conclusion

Having assigned the Installation Agreement to FTS, Cableview does not have standing to assert its claim for breach of contract. Therefore, Count One of the Complaint is due to be dismissed. Counts Two, Three and Four of the Complaint, however, state claims for relief, and the Court has personal jurisdiction over Time Warner as to those claims. Time Warner's request for the dismissal of the remaining counts is therefore due to be denied. Additionally, Time Warner has not met its burden to show that convenience and the interests of justice strongly favor the transfer of this case from Cableview's choice of forum. Thus, the Motion to Transfer is also due to be denied.

Accordingly, it is hereby **ORDERED:**

1.      Defendant's Motion to Dismiss and Incorporated Memorandum of Law (Doc. No. 14) is **GRANTED, in part, and DENIED, in part** as follows:

a.      The Motion is **GRANTED** to the extent that Count One of the Complaint (Doc. No. 1) is **DISMISSED**.

b.      Otherwise, the Motion is **DENIED**.

2.      Defendant's Motion to Transfer Venue to the Middle District of North Carolina and Incorporated Memorandum of Law (Doc. No. 15) is **DENIED**.

     3.     In light of this Order, the parties are directed to file a Second Amended Joint Case Management Report no later than **April 18, 2014**.

     **DONE AND ORDERED** in Jacksonville, Florida, this 27th day of March, 2014.

MARCIA MORALES HOWARD
United States District Judge

lc16
Copies to:
Counsel of Record