**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

CABLEVIEW COMMUNICATIONS
OF JACKSONVILLE, INC., a Florida
Corporation,

        Plaintiff,

                                              Case No. 3:13-cv-306-J-34JRK

vs.

TIME WARNER CABLE SOUTHEAST, LLC,
a/k/a Time Warner Cable Enterprises, LLC,
f/k/a Time Warner Entertainment Company,
L.P., a/k/a Time Warner Entertainment-
Advance/Newhouse Partnership, d/b/a Time
Warner Cable,

        Defendant.

_____/

**O R D E R**

    **THIS CAUSE** is before the Court on Defendant's challenge to Plaintiff's standing,

an issue which involves several motions.  On May 29, 2015, Defendant Time Warner Cable

Southeast, LLC (Time Warner) filed Defendant TWC-SE's Dispositive Motion to Dismiss

for Lack of Subject-Matter Jurisdiction (Doc. 128; Motion to Dismiss), to which Plaintiff

Cableview Communications of Jacksonville, Inc. (Cableview-Jax) responded on June 22,

2015.  See Plaintiff's Memorandum in Opposition to Defendant TWC-SE's Dispositive

Motion to Dismiss for Lack of Subject-Matter Jurisdiction (Doc. 135; MTD Response).  In

the Motion to Dismiss, Time Warner contends that Cableview-Jax lacks Article III and

prudential standing to pursue this action because the sole damages at issue were incurred

by a separate corporate entity, not Cableview-Jax.  With leave of Court, on September 21,

2015, Time Warner filed Defendant Time Warner Cable Southeast, LLC's Supplemental

Brief in Support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 171; MTD Reply), and on October 16, 2015, Cableview-Jax filed a sur-reply, see Amended Reply to Defendant's Supplemental Brief in Support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 189; MTD Sur-reply).

In addition, on June 30, 2015, Time Warner filed a motion seeking to strike or exclude, inter alia, an affidavit that Cableview-Jax submits in support of its Response to the Motion to Dismiss. See Defendant Time Warner Cable Southeast, LLC's Motion to Strike or Exclude Inadmissible Evidence and Incorporated Memorandum of Law (Doc. 143; Motion to Strike). Specifically, Cableview-Jax attaches the Affidavit of James F. Schieszer (Schieszer Aff.) to its Response as evidence in support of Cableview-Jax's standing to pursue its claims. See MTD Response, Ex. 1. In the Motion to Strike, Time Warner contends that the Schieszer Affidavit is a sham and due to be stricken.[1] Cableview-Jax responded to the Motion to Strike on July 17, 2015. See Plaintiff's Memorandum in Opposition to Defendant's Motion to Strike and Exclude Inadmissable [sic] Evidence (Doc. 149; MTS Response). With the Court's permission, Time Warner filed a reply and Cableview-Jax filed a sur-reply. See Defendant Time Warner Cable Southeast, LLC's Supplemental Brief in Support of Its Motion to Strike the Sham Affidavit of James Schieszer (Doc. 172; MTS Reply); Amended Reply to Defendant's Supplemental Brief in Support of Its Motion to Strike the Affidavit of James Schieszer (Doc. 188; MTS Sur-Reply).

On October 30, 2015, Time Warner moved for sanctions related to the Schieszer Affidavit. See Defendant Time Warner Cable Southeast, LLC's Dispositive Motion for

---

[1] Time Warner also requests that the Court strike other evidence, not pertinent to the dispute over standing. As those challenges are not relevant to the question of standing and the resolution of the Motion to Dismiss, the Court declines to address those arguments at this time.

Terminating Sanctions and Monetary Sanctions Due to Plaintiff Cableview's Fraud on the Court with Incorporated Memorandum of Law (Doc. 192; Motion for Sanctions).   In the Motion for Sanctions, Time Warner seeks dismissal of this case with prejudice, as well as an award of its litigation expenses as a sanction against Cableview-Jax for submitting the purportedly fraudulent Schieszer Affidavit, attempting to cover-up its falsity, and continuing to rely on the Affidavit in subsequent filings.   See Motion for Sanctions at 1-2.   On November 16, 2015, Cableview-Jax filed its response in opposition to the Motion for Sanctions.   See Plaintiff's Memorandum in Opposition to Time Warner's Motion for Terminating Sanctions (Doc. 193; MFS Response).   Accordingly, this matter is ripe for review.

## I.    Background[2]

### A. Generally

Cableview-Jax is one of six affiliated "Cableview" entities that entered into an Asset Purchase Agreement with FTS USA, LLC (FTS) in early 2012.[3]   See Asset Purchase Agreement (Doc. 130-16; APA).  The Cableview Entities are separate Florida corporations, each owned by the same three shareholders: James F. Schieszer, Ronald W. Barnes, and W. Austin Cross (the Shareholders).  See APA ¶ 5.2; MTD Sur-Reply, Ex. 3: April 3, 2015 Deposition of James Schieszer (Schieszer Dep.) at 13.   The Cableview Entities and the Shareholders sold all the assets of the Cableview Entities to FTS, via the APA, for a lump sum amount that was to be allocated between the Cableview Entities.   See APA ¶¶ 1.1.1,

---

[2] The Court previously set forth the complicated factual background to this case in its March 27, 2014 Order (Doc. 38).  Accordingly, the Court will not repeat those factual allegations here.  Rather, the facts set forth herein are those additional facts relevant to resolution of the instant Motions.

[3] The six "Cableview Entities" are: Cableview-Jax, Cableview Communications of Carolina, Inc., Cableview Communications of Florida, Inc., Cableview Communications of Ohio, Inc., Cableview Communications of Virginia, Inc. and Cableview Communications of Texas, Inc.

4.1.  According to the APA, the parties to the Agreement, (FTS, the Cableview Entities and the Shareholders), were to agree on how to allocate the purchase price among the Cableview Entities, and memorialize that agreement in an exhibit to the APA.  Id. ¶¶ 4.1, 4.3.  However, the APA exhibit titled "Percentage Allocation of Purchase Price and Wire Instructions" was left blank.  See APA, Ex. A.  In addition, under the provision of the APA titled "Allocation," the parties to the APA contracted that they would:

> allocate the Purchase Price to the Assets as they may mutually agree.  [The Cableview Entities and the Shareholders] shall file their respective tax returns and any other tax reports, forms, declarations claims and other statements in a manner consistent with such allocation and not make any inconsistent statement or adjustment on any returns or during the course of any Internal Revenue Service or other tax audit.

See APA ¶ 4.3.[4]  As part of the Purchase Price, FTS agreed to pay $1,900,000, identified in the APA as the "Deferred Fixed Amount."  See id. ¶ 4.1.3.  However, as a result of the conduct forming the basis of this lawsuit, the APA includes a provision requiring FTS to pay a portion of the Deferred Fixed Amount to Time Warner Entertainment-Advance/Newhouse Partnership (TWEAN).[5]  Id.  According to these additional terms, FTS agreed to effectuate payment of the Deferred Fixed Amount pursuant to joint wiring instructions issued by the Cableview Entities, Shareholders, and Time Warner.  Id.  The joint wiring instructions later instructed FTS to pay $560,000 of the Deferred Fixed Amount

---

[4] In addition, paragraph 8.5 of the APA provides that "To the extent that any allocation of the Purchase Price required to be made in this Agreement has not been made as of Closing, the parties shall work in good faith following Closing to agree upon a mutually acceptable allocation of the Purchase Price."  See APA ¶ 8.5. The parties have not presented any evidence with respect to whether this good faith conferral ever occurred or whether FTS, the Shareholders, and the Cableview Entities ever reached a "mutually acceptable allocation" of the Purchase Price.

[5] As described in more detail in the prior Order, Time Warner procured this payment on the grounds that Cableview-Jax was obligated to indemnify TWEAN for losses incurred in a separate matter.  See Order (Doc. 38) at 2-4.  The disputed duty to indemnify arose out of a 2004 Installation Agreement between Cableview-Jax and TWEAN.  See Amended Complaint, Ex. A.

to TWEAN.  See MTD Response, Ex. 3.  Cableview-Jax alleges that in procuring this payment from the Deferred Fixed Amount, Time Warner tortiously interfered with the APA, violated the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes section 501.211, and made negligent misrepresentations on which Cableview-Jax relied.  See generally Amended Complaint (Doc. 47).  With respect to each claim, Cableview-Jax maintains that it was damaged in the amount of the $560,000 payment that was paid to TWEAN.  See Plaintiff, Cableview Communications of Jacksonville, Inc.'s Third Amended Rule 26(a)(1) Initial Disclosures (Doc. 130-82) at 15.

### B. Payment of Funds

On May 23, 2012, TWEAN and the Cableview Entities issued Joint Wiring Instructions to FTS.  See MTD Response, Ex. 3.  Those instructions directed FTS to wire $560,000 to a Wells Fargo account in the name of Recovery Services International, Inc., for the benefit of TWEAN, and $1,340,000 (the Deferred Payment) to a BBVA Compass account in the name of Cableview Communications of Florida, Inc. (Cableview-Fla), "[f]or the benefit of the Cableview Entities."  Id.  Accordingly, on May 24, 2012, the wired funds were deposited in the Cableview-Fla bank account.  See MTD Reply, Ex. E.  On May 25, 2012, checks were issued from that account to each Shareholder in the amount of $425,000.  Id.

Although the distribution of the funds is now established by the bank records, see id., those facts were previously obscured due to Cableview-Jax's repeated failure to accurately describe how the Cableview Entities distributed the Deferred Payment.  Initially, in Plaintiff's Amended Responses to Defendant's Second Interrogatories to Plaintiff, dated March 13, 2015, Cableview-Jax stated that the Deferred Payment "was allocated to

Cableview Communications of Florida, Inc., a now-inactive Florida corporation that is (and was) a subsidiary and asset of Cableview Communications of Jacksonville, Inc." See MTD Reply, Ex. B at 3.[6]  Schieszer, the President of Cableview-Jax, testified during his deposition on April 3, 2015, that he believed this answer was accurate, and that the Deferred Payment was paid to Cableview-Fla.  See Schieszer Dep. at 9-10.  In addition, when asked whether the $560,000 would have been paid to Cableview-Fla had it not gone to Time Warner, Schieszer responded that he "would assume.  Yeah." Id. at 10.

However, on April 10, 2015, Schieszer verified Plaintiff's Second Amended Responses to Defendant's Second Interrogatories to Plaintiff (Second Amended Responses) in which Cableview-Jax represents that the Deferred Payment "was wired by FTS to Compass Bank on May 25, 2012 and credited to the Cableview Communications of Jacksonville, Inc. account on the same day." See MTD Response, Ex. 2 at 3.  Then, on June 18, 2015, Schieszer signed an Affidavit in which he asserts that the Deferred Payment "was initially wired into an account owned by Cableview Communications of Florida, Inc. and was then subsequently transferred on the same day to the account of [Cableview-Jax]." See Schieszer Aff. ¶ 13.  Upon receipt of this Affidavit, Time Warner sought to obtain the Compass Bank records which would reflect any movement of these funds, and, over the objection of Cableview-Jax, obtained leave of Court to do so. See Order (Doc. 159), entered September 4, 2015.  As described above, the Compass Bank records show that FTS wired the Deferred Payment to an account owned by Cableview-Fla and the funds

---

[6] The statement that Cableview-Fla was a subsidiary and asset of Cableview-Jax is incorrect.  Schieszer later clarified that each of the Cableview Entities is owned by the same three Shareholders.  Schieszer Dep. at 13.  Cableview-Jax was never a shareholder of Cableview-Fla, and as such, Cableview-Fla was not owned by Cableview-Jax. See id.

were then distributed from that account via checks payable to the three Shareholders.  See MTD Reply, Ex. D.

## II.    Motion to Strike

Time Warner moves to strike the Schieszer Affidavit, the Affidavit of Dale Drake, and excerpts from a deposition of James McLarty pursuant to "Fed.R.Civ.P. 56 and Local Rule 3.01."  See Motion to Strike at 1.  Upon review, the Court determines that the Motion to Strike is due to be denied because it is procedurally improper.  See Polite v. Dougherty Cnty. Sch. Sys., 314 F. App'x 180, 184 n.7 (11th Cir. 2008) (finding no error in the district court's denial of a motion to strike an affidavit because "motions to strike are only appropriately addressed towards matters contained in the pleadings; here, the affidavit was submitted as part of the motion for summary judgment, which is not a pleading"); Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC, 845 F. Supp. 2d 1241, 1252-53 (M.D. Fla. 2012).  However, to the extent Time Warner argues in the Motion to Strike that the aforementioned documents are not admissible evidence as required by Rule 56(c), Federal Rules of Civil Procedure (Rule(s)), the Court construes these arguments as evidentiary objections and will consider them, where necessary, in its analysis of the instant Motion to Dismiss and when it takes up consideration of the pending summary judgment motions. See Addison v. Ingles Mkts., Inc., No. 3:11-CV-3 (CAR), 2012 WL 3600844, at *1-2 (M.D. Ga. Aug. 21, 2012); see also Rule 56(c)(2), 2009 advisory committee note ("There is no need to make a separate motion to strike.").

### A. Summary of the Arguments - Schieszer Affidavit

For purposes of resolving the instant Motion to Dismiss, the arguments in the Motion to Strike are relevant only insofar as they pertain to the Schieszer Affidavit.  Time Warner

contends that the Affidavit contradicts Schieszer's prior sworn testimony and is therefore inadmissible as a sham affidavit.  <u>See</u> Motion to Strike at 2.  In addition, Time Warner maintains that statements in the Affidavit are irrelevant and "based on unidentified, unproduced, and unauthenticated records."  <u>Id.</u> at 13-14.  As such, Time Warner argues that these statements are inadmissible hearsay and violate best evidence and discovery rules.  <u>Id.</u>[7]  Moreover, having obtained the Compass Bank records, Time Warner argues that the Affidavit is demonstrably false and amounts to "a perjured fabrication, manufactured in response to—and in an effort to mislead the Court into denying—[the Motion to Dismiss]."  <u>See</u> MTS Reply at 5.  As such, Time Warner contends that Cableview-Jax submitted the Affidavit in bad faith, such that the Court should hold Schieszer, Cableview-Jax, and counsel for Cableview-Jax in contempt, and award Time Warner "all the expenses incurred as a result of Schieszer's affidavit."  <u>Id.</u>

Cableview-Jax responds that Schieszer's deposition testimony and his Affidavit are not inherently inconsistent.  <u>See</u> MTS Response at 2.  According to Cableview-Jax, Schieszer's deposition answers were not "clear and decisive," and the questions asked were ambiguous.  <u>See</u> <u>id.</u> at 3.  Moreover, despite the discrepancy between Schieszer's reference to a "transfer" of funds, and the bank records showing no "transfer" occurred, Cableview-Jax has not withdrawn the Affidavit.  Cableview-Jax explains that Schieszer did not rely on bank records in creating his Affidavit, rather, he relied on internal financial reports, MTS Sur-Reply, Ex. 4, which are purportedly not inconsistent with the Affidavit.  <u>See</u> MTS Sur-Reply at 2-3.  Cableview-Jax further asserts that it produced the internal

---

[7] Time Warner also contends that Schieszer's statements regarding his subjective intent when he entered into the 2004 Installation Agreement with Time-Warner are inadmissible because they violate the parol evidence rule and are irrelevant.  <u>See</u> Motion to Strike at 16-17.  Because this portion of the Schieszer Affidavit is not relevant to the issue of standing, the Court will not address this argument at this time.

financial records on which Schieszer relied in creating the Affidavit to Time Warner prior to Schieszer's April 3, 2015 Deposition.  Id. at 3; MTS Response at 3.  Moreover, Cableview-Jax argues that the Affidavit does not contradict the bank records in that Schieszer does acknowledge that FTS wired the Deferred Payment to the Cableview-Fla account.  See MTS Sur-Reply at 2.  Cableview-Jax asserts that Schieszier's statement regarding the transfer of the wired funds was merely an attempt to "elaborate, providing additional information about the further allocation and internal accounting of the funds."  See id. at 4 (emphasis in original).  In support of the Affidavit, Cableview-Jax files excerpts from Cableview-Fla's internal financial reports and tax returns which it maintains form the basis, and prove the veracity, of Schieszer's statements.  See id., Exs. 3-5.  Accordingly, Cableview-Jax concludes that Time Warner "cannot establish that the affidavit of James Schieszer is a 'sham' or that in executing the affidavit that [sic] Mr. Schieszer committed perjury" such that the Court should deny the Motion to Strike with respect to the Schieszer Affidavit.  Id. at 5.

### B.  Applicable Law

Generally, "[i]n light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition." Kennett-Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir. 1980).[8]

---

[8] In Kennett-Murray, the plaintiff sued a former employee to recover on a promissory note and an employment contract.  Kennett-Murray, 622 F.2d at 889.  The defendant contended that he was fraudulently induced to sign the employment agreement.  Id.  During his seventy-page deposition, the defendant gave inconsistent testimony regarding whether the plaintiff said anything "that could be construed as a fraudulent misrepresentation."  Id. at 890.  In a subsequent affidavit, the defendant "explained parts of his earlier deposition testimony" and provided support for his allegations of fraud.  Id. at 891.  Holding that the district court improperly granted summary judgment, the former Fifth Circuit found that the affidavit was "not inherently inconsistent" with the prior testimony and explained that "[w]hile some statements in [the defendant]'s deposition differ with those in his affidavit, these conflicts present questions of credibility which require jury resolution."  Id. at 894-95.

Nevertheless, in <u>Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.</u>, 736 F.2d 656 (11th Cir. 1984), the Eleventh Circuit recognized an exception to the general rule, allowing the district court, in appropriate circumstances, to disregard a "sham" affidavit that is inherently inconsistent with a party's prior deposition testimony.  <u>See id.</u> at 657-59.[9]  The sham affidavit exception should be applied "sparingly because of the harsh effect [it] may have on a party's case." <u>See</u> <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1530 (11th Cir. 1987).[10] Accordingly, a court must distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence[,]" and an affidavit may be disregarded as a sham only "'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"

---

[9] In <u>Van T. Junkins</u>, the plaintiff alleged that the defendant's agents told plaintiff that a term and condition of a dealership agreement between the parties required plaintiff to purchase one of defendant's buildings. <u>Van T. Junkins</u>, 736 F.2d at 656-57.  The plaintiff sued for fraud and misrepresentation, alleging that it purchased one of defendant's buildings in reliance on these representations but that defendant refused to enter into the dealership contract. <u>See id.</u> at 657.  During the deposition of plaintiff's president, he admitted that he was not told plaintiff had to purchase a building as a term, condition, or prerequisite to becoming a dealer. <u>See id.</u> "The fact that there was no condition attached to his purchasing the building was made crystal clear in three places in the deposition." <u>Id.</u>  Finding it to be a sham, the Eleventh Circuit held that the plaintiff could not avoid summary judgment through its president's later contradictory affidavit in which he stated that one of defendant's representatives "stated to me that if . . . I would purchase one of their buildings then I would be awarded the dealership." <u>See id.</u>

[10] In <u>Rollins</u>, a wrongful discharge case, the Eleventh Circuit considered alleged conflicts between the plaintiff's deposition testimony and affidavit as to evidence of pretext. <u>See</u> <u>Rollins</u>, 833 F.2d at 1529-30. There, after her deposition, the plaintiff, in an affidavit presented to oppose summary judgment, "for the first time . . . reported the [allegedly age-biased] statements" of her supervisor. <u>Id.</u> at 1530-31.  Holding that the affidavit should not be rejected as a sham, the Eleventh Circuit noted that defense counsel "never expressly asked whether [the supervisor] had ever made statements to [the plaintiff] indicating an age bias."  <u>Id.</u> at 1531.  Because the attorneys "did not question [the plaintiff] on this specific point at the deposition, her failure to discuss [the supervisor]'s statements does not prove that they were never made."  <u>Id.</u>  Accordingly, the Eleventh Circuit concluded that failure to discuss the statements at the deposition "may raise an issue regarding [the plaintiff's] credibility, [but] it does not establish that the affidavit is a 'sham' and should be excluded." <u>Id.</u>

Tippens v. Celotex, Corp., 805 F.2d 949, 953-54 (11th Cir. 1986) (quoting Van T. Junkins, 736 F.2d at 657) (alterations in Tippens).[11]  In sum, the Eleventh Circuit requires "a court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit."  Rollins, 833 F.2d at 1530 (citing Tippens, 805 F.2d at 954). Where "no inherent inconsistency exists, the general rule allowing an affidavit to create a genuine issue 'even it if conflicts with earlier testimony in the party's deposition,' governs." Id. (quoting Kennett-Murray Corp., 622 F.2d at 893).

## C. Discussion

Upon careful review of the record in this case, the Court is troubled by Cableview-Jax's shifting answers regarding the allocation and movement of the Deferred Payment. Over the span of four months, Cableview-Jax and Schieszer have responded to Time Warner's repeated inquiries regarding the allocation of these funds by stating that the Deferred Payment: (1) "was allocated to [Cableview-Fla]," as a subsidiary of Cableview-Jax, see MTD Reply, Ex. B, (2) went to Cableview-Fla, see id., Ex. C, (3) "was wired by FTS to Compass Bank . . . and credited to the [Cableview-Jax] account on the same day," see MTD Response, Ex. 2, and (4) "was initially wired into an account owned by

---

[11] In Tippens, the plaintiff, individually and on behalf of her deceased husband, sued the defendant based on allegations that her husband was exposed to asbestos-containing products manufactured and sold by the defendant.  See Tippens, 805 F.2d at 951.  The district court granted defendant summary judgment after declining to consider, as a sham, the affidavit of a non-party, a co-worker of the deceased.  Id. at 951-52.  In Tippens, the witness's affidavit stated that he "used several products, including those of the defendant . . . , while working in close proximity to" the deceased."  Id.  In his deposition, however, the witness, although able to state that he used defendant's products, "was unable to pinpoint any specific instances where he worked in close proximity to [the deceased] while using the defendant's product" and "was also unable to identify any specific instances when he used [the defendant]'s asbestos containing products or to identify which [of defendant's] products contained asbestos."  Id.  Finding "[t]he apparent inconsistency between the affidavit and deposition to be "merely an inability to recall specific times, places, and situations[,]" the Eleventh Circuit held that the witness's affidavit should have been considered: "Although a jury may find this discrepancy in [the witness]'s testimony to affect his credibility or to diminish its persuasiveness, it is not so inherently inconsistent that the court must disregard the previous affidavit as a matter of law."  Id. at 951-52, 954.

[Cableview-Fla] and was then subsequently transferred on the same day to the account of Cableview[-Jax]," see Schieszer Aff. ¶ 13.  To the extent Cableview-Jax maintains that its changing answers reflect mere "clarifications" on the movement of the funds, the Court observes that the answers are worded ambiguously such that they do little to clarify the matter.  Moreover, while Cableview-Jax submits internal financial reports as evidence of the truth of Schieszer's statements, in the absence of any testimony explaining the meaning of these reports, the Court is simply unable to draw any firm conclusions about those documents.[12]

As such, while the Affidavit is misleading, it is less clear whether it constitutes an inappropriate sham affidavit or merely presents an issue of credibility.  See Am. Civil Liberties Union of Fla., Inc. v. Dixie Cnty., Fla., 690 F.3d 1244, 1248-50 (11th Cir. 2012). However, the Court need not resolve this issue at this time because, as discussed below, even without considering the Schieszer Affidavit, the Court finds sufficient evidence to establish the existence of a genuine fact issue regarding Cableview-Jax's standing.  The Court notes that Time Warner also requests a finding of contempt and an award of "all the expenses incurred as a result of Schieszer's sham affidavit, pursuant to Rule 56(h)."  See MTS Reply at 2.  Rule 56(h) provides that:

> If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court—after notice and a reasonable time to respond—may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result.  An offending party or attorney may also be held in contempt or subject to other appropriate sanctions.

---

[12] Cableview-Jax attempts to authenticate these records through the affidavits of John R. Leone, the certified public account who generated these reports to prepare the tax returns for the Cableview Entities, and Garry Wilson, the controller to the Cableview Entities who regularly maintained their business records.  See MTS Sur-Reply, Exs. 8-9. However, these affidavits provide no information as to the meaning of these records, and are therefore of little assistance to the Court in interpreting the ledger entries and tax documents.

Cableview-Jax is cautioned that, in declining to reject the Affidavit as a sham at present, the Court is not ruling out the possibility of sanctions.  Indeed, the Court has serious concerns regarding Cableview-Jax's intent in submitting this Affidavit, as worded, to the Court.  Nonetheless, as discussed in Part IV, the Court will defer consideration of whether sanctions are appropriate until a later stage of these proceedings.

## III.  Motion to Dismiss

### A.  Summary of the Arguments

In the Motion to Dismiss, Time Warner contends that Cableview-Jax lacks standing to bring its claims such that the Court should dismiss this action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).  See Motion to Dismiss at 2.  Specifically, Time Warner argues that Cableview-Jax "has not suffered any damage as a result of the payment of $560,000 to TWEAN," because, according to Time Warner, had FTS not paid the $560,000 to TWEAN, those monies would have flowed to Cableview-Fla, an entirely separate corporate entity.  See id. at 8.  Time Warner maintains that since Cableview-Jax would not have received the disputed $560,000, regardless of Time Warner's actions, Cableview-Jax has not suffered an injury-in-fact.  Id.  Moreover, Time Warner asserts that Cableview-Jax may not assert the rights of Cableview-Fla based on prudential standing principles.  Id.

In addition, Time Warner argues that the damages Cableview-Jax seeks in this action, the $560,000 paid to Time Warner, are "entirely coextensive with those sought by Cableview's now dismissed claim for breach of contract."  Id. at 10.  As such, Time Warner maintains that the remaining tort and statutory claims "are really 'dressed up' claims for breach of contract" and are due to be dismissed for the same reasons the Court previously

dismissed Cableview-Jax's breach of contract claim. Id. Regardless, Time Warner contends that these claims were sold to FTS as "intangible assets" under the APA. Id. Time Warner maintains that, as a result, Cableview-Jax is not the real party in interest and lacks standing to prosecute these claims. Id. at 11.

In its Response, Cableview-Jax argues that it did suffer an injury-in-fact because "all proceeds received by Cableview under the APA ultimately flowed to [Cableview-Jax] prior to the final distribution by [Cableview-Jax] to its corporate shareholders." See MTD Response at 2. According to Cableview-Jax, Time Warner's position that the disputed funds would have flowed to Cableview-Fla is speculative "and has no basis in fact." Id. Cableview-Jax maintains that it is the proper plaintiff in this action because it was: (1) the party to the 2004 Installation Agreement that contains the indemnification clause from which the dispute over the funds arose; (2) the named insured on the insurance policy pertaining to the 2004 Installation Agreement; (3) the employer of the individual whose injuries gave rise to the purported indemnification obligation; and (4) one of the corporate sellers in the APA. Id. at 2-3. Cableview-Jax again emphasizes that "all proceeds from the APA ultimately flowed to [Cableview-Jax] prior to distribution to its corporate shareholders." Id. at 3.

With respect to Time Warner's argument that Cableview-Jax's claims are merely "dressed-up" breach of contract claims, Cableview-Jax responds that "Cableview did not suffer the $560,000 due to disappointed economic expectations flowing from [Time Warner's] breach of the Installation Agreement but arose from [Time Warner's] interference in a commercial transaction between Cableview and FTS." Id. at 3. As such, Cableview-Jax contends that its damages stem from Time Warner's breach of a duty apart from the

Installation Agreement, and are not economic damages flowing from that contract.   Id. Last, Cableview-Jax contends that, in its March 27, 2014 Order (Doc. 38), "[t]he Court has already read the APA to exclude Cableview's tort and statutory claims against [Time Warner]."   Id. at 4.   As such, Cableview-Jax argues that the Court should reject Time Warner's contention the claims raised in this action were assigned to FTS, and find that Cableview-Jax has standing to pursue the asserted causes of action against Time Warner. Id. at 3-4.

### B.  Standard of Review

The party invoking federal jurisdiction bears the burden of proving standing, and must establish each element of standing "'in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation.'"   See Bischoff v. Osceola Cnty., Fla., 222 F.3d 874, 878 (11th Cir. 2000) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).   As such, "when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing."   Id. However, when faced with a challenge to standing on summary judgment, "the plaintiff can no longer rest on 'mere allegations,'" and "must 'set forth by affidavit or other evidence specific facts, . . . which for purposes of the summary judgment motion will be taken to be true.'"   Id. (quoting Lujan, 504 U.S. at 561) (alternation in Bischoff) (collecting cases).

Although Time Warner moves to dismiss this action under Rule 12(b)(1), Time Warner's challenge to Cableview-Jax's standing is not premised on the allegations of the Amended Complaint.   Rather, Time Warner submits answers to interrogatories, documentary evidence, and deposition testimony as evidence that Cableview-Jax did not

suffer an injury-in-fact, contrary to the allegations of the Amended Complaint, and therefore lacks standing. See Motion to Dismiss at 2-5. Despite its reliance on evidence outside the Amended Complaint, Time Warner asserts that its challenge to subject matter jurisdiction is properly brought under Rule 12(b)(1). Id. at 5-6. Time Warner maintains that the Court may consider this evidence to resolve the Motion, may weigh the evidence, and need not view the evidence in the light most favorable to Cableview-Jax. Id. In support, Time Warner relies on Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009), and characterizes its Motion as a "factual attack" on subject matter jurisdiction, properly raised under Rule 12(b)(1). See Motion to Dismiss at 6. The Court acknowledges the line of Eleventh Circuit authority instructing that challenges to the Court's subject matter jurisdiction should be brought under Rule 12(b)(1), United States v. Blue Cross & Blue Shield of Ala., Inc., 156 F.3d 1098, 1101 n.7 (11th Cir. 1998), and recognizing the asserted standards for "factual attacks" on subject matter jurisdiction. See Morrison v. Amway Corp., 323 F.3d 920, 924-25 & n.5 (11th Cir. 2003); Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A., 104 F.3d 1256, 1260-61 (11th Cir. 1997); Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990) (citing Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. May 20, 1981)[13]). Nonetheless, upon careful review, the Court finds that the standard applied to a Rule 12(b)(1) "factual attack" on subject matter jurisdiction does not apply under the circumstances of this case.

The Eleventh Circuit Court of Appeals discussed the procedural mechanisms by which a district court may address standing in Bischoff. In that case, the court cited to

---

[13] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Haase v. Sessions, 835 F.2d 902 (D.C. Cir. 1987) as providing a helpful summary of those

methods.  See Bischoff, 222 F.3d at 878.  The Bischoff court explained, quoting Haase,

that:

> [A] defendant's challenge to a plaintiff's standing can take two forms: a
> motion to dismiss, which is based exclusively on plaintiff's pleadings, and a
> motion for summary judgment, in which evidence, not pleadings, pertinent
> to standing are evaluated by the district court.  In both instances, disputed
> facts must be construed in the light most favorable to plaintiff.  In addition
> to these two party-initiated motions, the court on its own initiative may
> undertake evidentiary hearings, even in the context of a motion to dismiss.

See id. (quoting Haase, 835 F.2d at 904) (alteration in original); see also Region 8 Forest

Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 806 (11th Cir. 1993).  When the

court undertakes its own review of standing, it "is not restricted to the face of [the]

complaint—it is free to rely on affidavits submitted by the plaintiff in support of the

complaint."  See Alcock, 993 F.2d at 806 (emphasis added); see also Haase, 835 F.2d at

906 ("'[I]t is within the trial court's power to allow or to require the plaintiff to supply, by

amendment to the complaint or by affidavits, further particularized allegations of fact

deemed supportive of plaintiff's standing.'" (quoting Warth v. Seldin, 422 U.S. 490, 501-02

(1975))).

Based on the foregoing, it appears that a "factual attack" at the motion to dismiss

stage, wherein a defendant submits evidence challenging jurisdiction, is not appropriate in

the context of standing.  See Haase, 835 F.2d at 910 ("We underscore that, at the pleading

stage of the standing inquiry, the [defendant] cannot challenge any of the affidavits or other

material that [plaintiff] might introduce . . . .").  As explained in Haase, where a defendant

wishes to challenge the evidentiary basis of the allegations on standing, "[i]t does so by

filing a motion for summary judgment for want of standing."  See Haase, 835 F.2d at 903.

The Court notes that the cases in the line of authority on which Time Warner relies do not involve a subject matter jurisdiction challenge based on standing.  See, e.g., Carmichael, 572 F.3d at 1275 (affirming a district court decision finding the suit non-justiciable on political question grounds); Morrison, 323 F.3d at 924 (discussing the argument that the court lacked jurisdiction under the FMLA because the plaintiff was not an "eligible employee"); Garcia, 104 F.3d at 1261 (considering contention that court lacked jurisdiction under ADEA because defendant not an "employer" covered by statute); Lawrence, 919 F.2d at 1528-29 (addressing a challenge that the court lacked jurisdiction because the government employee was not acting within the scope of his employment within the meaning of the FTCA).  Notably, these cases rely on Williamson v. Tucker for the standard by which a motion to dismiss for lack of subject matter jurisdiction should be decided, a case which the Haase court distinguished from its discussion of standing.  Specifically, in Haase, the Court of Appeals for the D.C. Circuit explained that:

> Williamson spoke of subject matter jurisdiction in general, not standing in particular.  Moreover, Williamson involved the district court's resolution of disputed factual issues.  A motion to dismiss under 12(b)(1) for lack of standing, by contrast, involves an examination of the face of the complaint, which does not depend upon discovery.

See Haase, 835 F.2d at 908 (internal citations omitted).  Indeed, contrary to a Rule 12(b)(1) "factual attack" on subject matter jurisdiction generally, "[i]n considering standing under 12(b)(1), only the court, not the plaintiff (or defendant), can elicit information outside the pleadings.  This permits the court to undertake an independent investigation to assure itself of its own subject matter jurisdiction."  Id.

In light of the foregoing, the Court finds that Time Warner's challenge to Cableview-Jax's standing, premised on the evidence adduced in discovery, is more properly raised

as a motion for summary judgment.[14]  See Haase, 835 F.2d at 906-07, 910.  Moreover,

unlike a motion premised on Rule 12(b)(6), the Court may not simply "convert" the instant

Motion into a summary judgment motion.  See Bischoff, 222 F.3d at 878 n.4; Haase, 835

F.2d at 906-07; Alcock, 993 F.2d at 807 n.8.  Nonetheless, the Court notes that Time

Warner also incorporated its challenge to Cableview-Jax's standing into a motion for

summary judgment.  See Defendant Time Warner Cable Southeast LLC's Dispositive

Motion for Summary Judgment, Incorporated Statement of Undisputed Material Facts and

Supporting Memorandum of Law (Doc. 129; Motion for Summary Judgment) at 18.

Cableview-Jax responded by incorporating its Response to the Motion to Dismiss into

Plaintiff's Memorandum Opposition to Defendant Time Warner Cable Southeast LLC's

Dispositive Motion for Summary Judgment, Incorporated Statement of Undisputed Material

Facts and Supporting Memorandum of Law (Doc. 136; MSJ Response).  As such, because

the matter of Cableview-Jax's standing is raised and fully briefed on summary judgment,

the Court finds it appropriate to address these arguments in that context.  Therefore, the

Court will deny the Motion to Dismiss as moot, and take up Time Warner's Motion for

Summary Judgment at this time solely as to the issue of standing.  As such, Cableview-

---

[14] The Court notes that in the line of authority cited by Time Warner, the Eleventh Circuit cautions that "the district court should only rely on Rule 12(b)(1) '[i]f the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action.'"  See Morrison, 323 F.3d at 925 (quoting Garcia, 104 F.3d at 1261). When a defendant's jurisdictional attack also implicates an element of the cause of action: "'the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.'"  See Lawrence, 919 F.2d at 1529 (quoting Williamson, 645 F.2d at 412). In such cases, the court is to "treat[ ] the motion as a summary judgment under Rule 56 and refrain[ ] from deciding disputed factual issues."  Morrison, 323 F.3d at 925.  Because Time Warner's challenge is based on whether Cableview-Jax suffered damages, it implicates an element of the causes of action and therefore, even under this line of cases, should be treated as a summary judgment motion.  See Barrett Computer Servs., Inc. v. PDA, Inc., 884 F.2d 214, 219 (5th Cir. 1989) ("[I]n cases in which the merits of the claims asserted are intertwined with the jurisdictional issue of standing, challenges to standing are frequently resolved in summary judgment proceedings—where the nonmovant is granted all reasonable factual inferences and the movant cannot succeed unless the court finds that no genuine issue of material fact exists—or at a trial on the merits.  In such cases, to compel a preliminary factual inquiry into the plaintiff's standing would force the party bringing the suit to prove merit issues in order to establish jurisdiction.").

Jax must establish its standing through specific facts, demonstrated by affidavit or other evidence, which for purposes of the instant Motion will be taken to be true.  See Lujan, 504 U.S. at 561.

### C. Applicable Law

The standing requirement "serves to identify those disputes which are appropriately resolved through the judicial process."  See Jacobs v. The Fla. Bar, 50 F.3d 901, 903 (11th Cir. 1995).  In order to establish standing to sue, a plaintiff must show a "personal injury fairly traceable to the defendant's allegedly unlawful conduct."  Id. at 904.  In other words, "'a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  White's Place, Inc. v. Glover, 222 F.3d 1327, 1329 (11th Cir. 2000); see also KH Outdoor, LLC v. Clay County, Fla., 482 F.3d 1299, 1303 (11th Cir. 2007); Pittman v. Cole, 267 F.3d 1269, 1282 (11th Cir. 2001).  These requirements are the constitutional minimums of the Article III case or controversy requirement, which is a core component of standing.  See KH Outdoor, 482 F.3d at 1303; Wilson v. State Bar of Ga., 132 F.3d 1422, 1427-28 (11th Cir. 1998); see also Nat'l Alliance for the Mentally Ill v. Bd. of County Comm'rs of St. Johns County, 376 F.3d 1292, 1294 (11th Cir. 2004) (opining that "[t]he most significant case-or-controversy doctrine is the requirement of standing").

However, there are also prudential principles that must be considered in determining whether the Court has subject matter jurisdiction over the claims.  See KH Outdoor, 482 F.3d at 1303; see also Granite State Outdoor Advertising, Inc. v. City of Clearwater, Fla.,

351 F.3d 1112, 1116 (11th Cir. 2003). "The prudential considerations include: '1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches;[15] and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.'" Bischoff, 222 F.3d at 883; see also Warth, 422 U.S. at 499; CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1270 (11th Cir. 2006).

### D. Discussion

Cableview-Jax's claims stem from Time Warner's conduct in obtaining a $560,000 payment from the proceeds of the APA between the Cableview Entities and FTS. Specifically, Cableview-Jax contends that Time-Warner unreasonably interfered in the APA, forcing it to pay $560,000 to Time Warner, see Amended Complaint at 9-10, used unfair and deceptive practices "to extract concessions," from Cableview-Jax, i.e., the $560,000 payment, id. at 10-11, and made negligent misrepresentations to Cableview-Jax such that it had to agree to pay Time Warner the $560,000. Id. at 11-12. Cableview-Jax maintains that Time Warner's unfair practices and negligent misrepresentations deprived Cableview-Jax of the ability to assert its rights and defenses in a dispute between Cableview-Jax and Time Warner regarding Cableview-Jax's purported indemnification obligations. Id. at 10-12.

---

[15] This prudential concern has also been articulated as: "when the asserted harm is a generalized grievance shared in substantially equal measure by all or a large class of citizens." CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1270 (11th Cir. 2006); see also Warth, 422 U.S. at 500.

Time Warner maintains that Cableview-Jax has not suffered an injury-in-fact because FTS wired the Deferred Payment to a bank account in the name of Cableview-Fla, a separate corporate entity which is not a party to this lawsuit. See Motion to Dismiss at 8; MTD Reply, Ex. D. Moreover, Time Warner provides evidence that had Time Warner not received the $560,000 portion of the Deferred Fixed Amount, those funds would have been sent to the Cableview-Fla account as well. See Schieszer Dep. at 10. According to Time Warner, this evidence demonstrates that Cableview-Jax lacks standing because a plaintiff "does not suffer injury-in-fact as a result of damages sustained by a separate legal entity." Id. at 8. While the Court agrees that Cableview-Jax does not have standing to recover damages sustained by the other Cableview Entities, see 24/7 Records, Inc. v. Sony Music Entm't, Inc., 566 F. Supp. 2d 305, 314 (S.D.N.Y. 2008), eLandia Int'l, Inc. v. Koy, No. 09-20588-Civ, 2010 WL 2179770, at *6 (S.D. Fla. Feb. 22, 2010), the Court is not convinced, when viewing the evidence in the light most favorable to Cableview-Jax, that Cableview-Jax has suffered no injury.

To establish an injury in fact, Cableview-Jax must demonstrate that Time Warner "invaded one of [Cableview-Jax's] 'legally protected interest[s].'" See Cook v. Trinity Universal Ins. Co. of Kansas, 297 F. App'x 911, 913 (11th Cir. 2008) (quoting AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 494 F.3d 1356, 1360 (11th Cir. 2007)); Bochese v. Town of Ponce Inlet, 405 F.3d 964, 980 (11th Cir. 2005). "The interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right." Vermont Agency of Natural Res. V. United States ex rel. Stevens, 529 U.S. 765, 772 (2000). To support its contention that Cableview-Jax lacks standing, Time Warner relies on cases in which a plaintiff sought damages stemming from the invasion of

a contract to which the plaintiff was not a party.  See, e.g., Cook, 297 F. App'x at 913-14; eLandia Int'l, Inc., 2010 WL 2179770, at *8; Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co., Ltd., 861 F. Supp. 179, 180-81 (E.D.N.Y. 1994).  However, unlike those cases, Cableview-Jax is a specifically named party to the APA, and thus seeks to vindicate its own legal interest against the tortious interference with that Agreement.  Moreover, it is Cableview-Jax which allegedly owed TWEAN the indemnity obligation, such that it is Cableview-Jax whose ability to raise its defenses to indemnification was forestalled by the alleged unfair practices and misrepresentations.  Accordingly, on the current record, the Court finds that Cableview-Jax does seek to vindicate its own interests.

However, Time Warner maintains that Cableview-Jax did not suffer any actual harm from the alleged violations.  Indeed, "[a] federal court's jurisdiction . . . can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action."  See Warth, 422 U.S. at 499 (internal quotation omitted); see also Bochese, 405 F.3d at 984-85.  Because the Deferred Payment actually was wired to an account owned by Cableview-Fla, and then paid from that account to the shareholders of the Cableview Entities, Time Warner maintains that Cableview-Jax would not have received the disputed funds regardless of Time Warner's actions.  While the bank records demonstrate that Cableview-Fla received those funds for purposes of distribution to the Shareholders, the Court cannot conclude, based on this evidence alone, that Cableview-Fla is the only Cableview Entity that had any legal entitlement to those funds.[16]  Cf. United

---

[16] The Court acknowledges that in its Amended Responses, Cableview-Jax stated that the Deferred Payment was "allocated" to Cableview-Fla.  See MTD Reply, Ex. B at 3.  However, Cableview-Jax subsequently amended its Responses to remove the reference to "allocation."  See MTD Response, Ex. 2.  Moreover, the Court is not convinced from Schieszer's Deposition testimony about the Amended Responses that he understood his answer to mean the allocation of the funds among the assets of the Cableview Entities within the meaning of the APA, as opposed to where the funds were sent for distribution to the Shareholders.

Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd., 988 F. Supp. 367, 372, 374 (S.D.N.Y. 1997) ("[T]he Wharf's receipt of funds in its bank account does not constitute an enforceable interest.  Rather, the Wharf held the funds and credited them to Krikler, its wholly owned subsidiary.").  Indeed, the Joint Wiring Instructions, which direct FTS to wire the funds to that account, specifically state that the wire was "[f]or the benefit of the Cableview Entities."  See MTD Response, Ex. 3.  Likewise, the terms of the APA indicate that the Deferred Fixed Amount was to be allocated among the assets of the Cableview Entities in amounts agreed to by the parties to the APA.  Although the parties to the APA failed to document the agreed-to allocation, if any existed, the APA also contemplates that the allocation of the Purchase Price would be reflected in the relevant tax filings.  See APA ¶ 4.3.  The record does contain some excerpts from the tax filings of Cableview-Jax and Cableview-Fla, but without any testimony about these documents and what they reflect, the Court is unable to draw any conclusions from them regarding the allocation of the assets.  See MTS Sur-Reply, Exs. 1, 5.  Nonetheless, because Cableview-Jax was a party to the APA and was entitled to a percentage of the Deferred Fixed Amount, the Court finds sufficient evidence to create an issue of fact as to whether Cableview-Jax owned some or all of those funds.[17]  The fact that the Deferred Payment was wired to a Cableview-Fla account "for the benefit of the Cableview Entities" and then distributed to the Shareholders

---

[17] In addition, the Court notes that the $560,000 diverted from the Deferred Fixed Amount was to cover an indemnification obligation allegedly owed solely by Cableview-Jax.  Thus, Cableview-Jax has standing to bring these claims seeking to recover the funds it was allegedly forced to pay as a result of that obligation, regardless of whether Cableview-Jax obtained the money to pay the disputed debt from its corporate affiliates.  Cf. Astra Oil Trading v. PRSI Trading Co. LP, 794 F. Supp. 2d 462, 471-72 (S.D.N.Y. 2011).  Indeed, if the Cableview Entities did honor their separate corporate identities in allocating the funds to the assets of those Entities, presumably the proceeds used to pay the alleged liability of Cableview-Jax would therefore be money either allocated to Cableview-Jax, or borrowed from the other Entities to pay Cableview-Jax's purported debt.

of all the Cableview Entities does not convince the Court that those funds were solely allocated to Cableview-Fla.

However, the Court cautions Cableview-Jax to carefully consider its financial records before deciding whether to continue in this case.  The Court has made the instant findings based on a limited record, and Time Warner is free to challenge those findings in the event this case proceeds to trial.  Indeed, before any judgment on the merits, the Court will be required to resolve this factual dispute and Cableview-Jax will have to prove its standing.  See Am. Civil Liberties Union of Fla., Inc., 690 F.3d at 1249; Fed. Deposit Ins. Corp. v. Pearl, No. 8:12-cv-1813-T-30TBM, 2013 WL 5944192, at *4 (M.D. Fla. Nov. 6, 2013) ("To be clear, the [court] is not concluding that [plaintiff] has affirmatively proven an injury in fact sufficient to establish standing, only that the evidence on the record creates a genuine issue of material fact which precludes granting summary judgment in favor of the [d]efendant.").  Moreover, should this case proceed to trial, Cableview-Jax will only be able to recover the portion of the disputed funds which it can establish are properly allocated to it.

Last, Time Warner contends that Cableview-Jax lacks standing because "it sold its contract claims to FTS, and its remaining claims merely seek contract damages."  See Motion to Dismiss at 9-10.  Time Warner contends that Cableview-Jax's alleged damages for its tortious interference, FDUTPA, and negligent misrepresentations claims are "co-extensive" with the damages it sought for the breach of contract claim that this Court previously dismissed.  Id.  Specifically, the Court found that Cableview-Jax had assigned its rights in the 2004 Installment Agreement to FTS, and therefore, the breach of contract claim raised in the original complaint and premised on this Agreement belonged to FTS.

25

See Order (Doc. 38) at 6-8.   Time Warner now contends that the remaining tort and statutory claims are merely "dressed up" breach of contract claims, and therefore the Court should find that these claims belong to FTS as well.   See Motion to Dismiss at 10. Alternatively, Time Warner argues that even if the remaining claims are not "coextensive" with the dismissed breach of contract claims, those claims were sold to FTS as "intangible assets" in the APA and therefore, Cableview lacks standing to assert them.   Id. at 10-11.

With respect to Time Warner's argument that the tort and statutory claims are "dressed up" breach of contract claims because the damages are the same, Time Warner cites no authority to support this proposition.   Although the damages are the same, the legal duties forming the basis of these claims do not arise out of the 2004 Installation Agreement.[18]   Thus, in the absence of any citation to authority, the Court is not persuaded that the overlap in damages transforms these statutory and tort claims into a breach of contract claim.   Moreover, as to Time Warner's contention that the tort and statutory claims were sold to FTS in the APA, the Court observes that Time Warner previously raised this argument in a prior motion to dismiss.   See Defendant's Motion to Dismiss and Incorporated Memorandum of Law (Doc. 14) at 16.   In its  March 27, 2014 Order (Doc. 38), the Court held that the tort and statutory claims were not part of the assets sold in the APA, and denied Time Warner's motion to dismiss those claims.   See Order (Doc. 38) at 6-8. Time Warner now reasserts this contention and bolsters its previous argument by specifically referencing the sale of "intangible assets" as the language in the APA encompassing these claims.   Because this supplemental argument is premised entirely on

---

[18] To the extent this argument vaguely refers to Florida's economic loss rule, the Court notes that the Florida Supreme Court has limited the application of the economic loss rule to cases involving products liability.   See Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Co., Inc., 110 So. 3d 399, 407 (Fla. 2013).

the terms of the APA, there is no reason why Time Warner could not have articulated this position in its earlier motion.  Having previously determined that those claims were not included in the APA, and in the absence of any basis for reconsideration, the Court declines to revisit its decision.[19]

## IV.    Motion for Sanctions

In the Motion for Sanctions, Time Warner requests that the Court enter an order, pursuant to its inherent authority and 28 U.S.C. § 1927, dismissing this action with prejudice and awarding Time Warner its attorneys' fees and costs as a sanction for Cableview-Jax's conduct in allegedly "committing, attempting to cover up, and then lying about its egregious fraud on this Court."  See Motion for Sanctions at 1.  Time Warner contends that Cableview-Jax committed a fraud on the Court by submitting a "perjured affidavit," i.e., the Schieszer Affidavit, in an attempt to avoid dismissal for lack of standing. See id.  According to Time Warner, the Compass Bank records conclusively establish that the Affidavit was a fraud, and that all of the principals of Cableview-Jax were aware of its falsity.    Id.    Moreover, Time Warner argues that sanctions are warranted because Cableview-Jax has failed to withdraw the Affidavit and continues to mislead the Court about its meaning.  Id.

---

[19] Regardless, the Court is unpersuaded by Time Warner's contention that the instant claims were part of the intangible assets sold in the APA.  The APA covered the intangible assets that were in existence as of the date of closing.  See APA ¶ 1.1.1 ("Purchaser shall purchase and acquire . . . all of the assets, properties and rights of the Business of every nature, kind and description . . . tangible and intangible . . . as the same shall exist on the Closing Date.").  The APA defined the closing date as March 2, 2012. Id. ¶ 3.1.  However, Cableview-Jax's claims against Time Warner did not accrue until execution of the Joint Wiring Instructions diverting $560,000 to Time Warner, when Cableview-Jax actually sustained the alleged injury.  As such, these claims accrued on May 23, 2012, and were not included in the sale of any intangible assets existing as of March 2, 2012.  See Fla. Stat. § 95.031(1) ("A cause of action accrues when the last element constituting the cause of action occurs."); see, e.g., HRCC, Ltd. v. Hard Rock Café Int'l (USA), Inc., No. 6:14-cv-2004-Orl-40KRS, 2015 WL 3498610, at *7 (M.D. Fla. June 2, 2015).

## A.  Applicable Law

A federal court has inherent power to impose sanctions, including the outright dismissal of a lawsuit, for conduct which abuses the judicial process.  See Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991).  However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."  Id. at 44.  "'The key to unlocking a court's inherent power is a finding of bad faith.'"  See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1306 (11th Cir. 2009) (quoting Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998)); Spolter v. Suntrust Bank, 403 F. App'x 387, 390 (11th Cir. 2010).  A court may find bad faith where "'an attorney [or a client] knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.  A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.'"  See Byrne v. Nezhat, 261 F.3d 1075, 1121 (11th Cir. 2001) (quoting Barnes, 158 F.3d at 1214) (alteration in original) abrogated on other grounds as recognized by Douglas Asphalt Co. v. QORE, Inc., 657 F.3d 1146, 1151 (11th Cir. 2011).  However, "false statements alone do not indicate bad faith."  See Byrne, 261 F.3d at 1125.  Indeed, in Byrne, the Eleventh Circuit explained that "[s]tanding alone, a false or inconsistent statement in a deposition does not compel the conclusion of bad faith."  Id.  Rather, a false statement demonstrates bad faith where, for example, "there is other evidence in the record indicating that the statement was made for a harassing or frivolous purpose."  Id.  Moreover, "'[t]he dismissal of a party's complaint . . . is a heavy punishment,' appropriate 'only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders.'"  See Eagle Hosp. Physicians, LLC, 561 F.3d at 1306 (quoting In re Sunshine Stores, 456 F.3d 1291, 1306 (11th Cir. 2006)).

Nonetheless, "[w]hen a party fabricates evidence purporting to substantiate its claims, federal case law is well established that dismissal is appropriate." See McDowell v. Seaboard Farms of Athens, Inc., No. 95-609-CIV-ORL-19, 1996 WL 684140, at *2 (M.D. Fla. Nov. 4, 1996) (collecting cases).

In addition, a court may impose sanctions under § 1927 which provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." See 28 U.S.C. § 1927. "'To justify an award of sanctions pursuant to section 1927, an attorney must engage in unreasonable and vexatious conduct; this conduct must multiply the proceedings; and the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct.'" See Peer v. Lewis, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting Schwartz v. Million Air, Inc., 341 F.3d 1220, 1225 (11th Cir. 2003)).   The Eleventh Circuit has consistently instructed that "an attorney multiplies proceedings 'unreasonably and vexatiously' within the meaning of the statute only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'" See Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1239 (11th Cir. 2007) (quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991)).   Bad faith in this context "turns not on the attorney's subjective intent, but on the attorney's objective conduct." Id.   To find conduct "unreasonable," the Court must "compare the attorney's conduct against the conduct of a 'reasonable' attorney and make a judgment about whether the conduct was acceptable according to some objective standard." Id. at 1239-40. Likewise, the term "vexatious" requires an "evaluation of the attorney's objective conduct." Id. at 1240.  Indeed, reckless conduct, defined as "conduct that grossly deviates

from reasonable conduct," is sufficient to warrant sanctions, "even if the attorney does not act knowingly and malevolently." Id. at 1240-41.  However, "negligent conduct, standing alone, will not support a finding of bad faith under § 1927—that is, an attorney's conduct will not warrant sanctions if it simply fails to meet the standard of conduct expected from a reasonable attorney." Id. at 1241-42.

### B. Discussion

As discussed in Part II, the Court has concerns about the veracity of the Schieszer Affidavit.  To the extent the Affidavit was meant to address the movement of funds through bank accounts, it is demonstrably false.  If, instead, Schieszer intended the Affidavit to address how the Cableview Entities accounted for the funds as it contends is purportedly reflected in their internal accounting records, the Affidavit is misleading and its meaning is far from apparent on the face of the document.  The Affidavit states that it is based on Schieszer's "personal knowledge and upon [his] review of records created in the transactional business affairs of [Cableview-Jax]." See Schieszer Aff. ¶ 1.  This broad reference to "records created in the transactional business affairs" neither specifically points to internal accounting ledgers, nor discounts a reliance on bank records.  Moreover, Schieszer's statement that the funds were "wired into an account" and then "subsequently transferred" to a different account employs language that certainly suggests the actual movement of funds between bank accounts.  Only a strained interpretation of these statements would read this language to mean that the money was "wired into" an account existing in the company's internal records.  If Schieszer meant that the money was wired into Cableview-Fla's bank "account," and then "transferred," on paper only, to a Cableview-Jax "account" within company records, he fails to employ any language which would alert

the reader that he intended a different meaning for the word "account" within the same sentence.

Even accepting Cableview-Jax's assertion that the Affidavit is premised on the internal records, it is unclear whether those documents actually support Schieszer's description of how the funds were distributed.  For example, Schieszer references a subsequent transfer of funds, after the receipt of the wire, from one account to another. See Schieszer Aff. ¶ 13.  However, to the extent the records may indicate that the funds were deposited in Cableview-Fla's bank account, but credited to Cableview-Jax, the records do not appear to reflect any "transfer" of funds from one account to another.  See MTD Sur-Reply, Ex. 1 at 8-9.  Nonetheless, in the absence of any explanation from Schieszer on how he interpreted those documents, or any testimony on the meaning of the ledgers and tax returns, it is impossible for the Court to determine the ultimate merit and import of Schieszer's statements.  As such, the Court is not prepared, on the current record, to make a finding of Cableview-Jax's bad faith.  Although the Court is convinced that the Schieszer Affidavit is misleading, it is unclear whether this reflects reckless or intentional deception on the part of Cableview-Jax, or the negligent interpretation of the documents and careless drafting by Cableview-Jax's attorney.  To resolve the matter, the Court will need to conduct a hearing and provide counsel for Cableview-Jax and Schieszer an opportunity to further explain this troubling series of events. See Amlong & Amlong, P.A., 500 F.3d at 1242 ("Plainly, an attorney threatened with sanctions under § 1927 is entitled to a hearing."); White v. Thyssenkrupp Steel USA, LLC, Civil Action 09-0286-WS-N, 2010 WL 653582, at *1 (S.D. Ala. Feb. 18, 2010) ("[W]hen exercising inherent judicial authority, 'attorney's fees certainly should not be assessed lightly or without fair notice and an

opportunity for a hearing on the record.'" (quoting Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980))).

Regardless, the Court is not convinced that the extreme sanction of dismissal with prejudice would be warranted.  See Eagle Hosp. Physicians, LLC, 561 F.3d at 1306 (describing dismissal as a sanction of last resort); see also Betty K Agencies, Ltd. v. M/V MONADA, 432 F.3d 1333, 1337-38 (11th Cir. 2005) ("[T]he harsh sanction of dismissal with prejudice is thought to be more appropriate in a case where a party, as distinct from counsel, is culpable.").  Rather, in the event the Court does make a finding of bad faith conduct on the part of Schieszer or Cableview-Jax's counsel, the Court finds that the imposition of the attorney's fees and costs incurred as a result of this conduct would be a more appropriate sanction.  Thus, the Court will allow this case to proceed, and after resolution of the merits, the Court will determine whether counsel and/or his client acted in bad faith, and if so, the appropriate sanction.  Accordingly, the Court will deny the motion without prejudice to renewal at the conclusion of this case.  In making these findings, the Court cautions Cableview-Jax and its attorneys to carefully review the evidence.  Although Cableview-Jax's claims will survive the instant Motions, if this case proceeds to trial and the evidence presented demonstrates that Schieszer or his counsel acted knowingly or recklessly in creating the misleading Affidavit, or otherwise acted in bad faith to multiply these proceedings, the Court will not hesitate to impose an appropriate sanction.  Accordingly, it is

**ORDERED**:

1. Defendant Time Warner Cable Southeast, LLC's Motion to Strike or Exclude Inadmissible Evidence and Incorporated Memorandum of Law (Doc. 143) is

**DENIED**.   The Court will consider Time Warner's evidentiary objections when it takes up the relevant motions.

2. Defendant TWC-SE's Dispositive Motion to Dismiss for Lack of Subject-Matter Jurisdiction (Doc. 128) is **DENIED, as moot.**

3. Defendant Time Warner Cable Southeast LLC's Dispositive Motion for Summary Judgment, Incorporated Statement of Undisputed Material Facts and Supporting Memorandum of Law (Doc. 129) is **DENIED, in part, and TAKEN UNDER ADVISEMENT, in part.**

   A. The Motion is **DENIED** to the extent Time Warner moved for summary judgment on the basis of standing.

   B. In all other respects, the Motion is **TAKEN UNDER ADVISEMENT.**

4. Defendant Time Warner Cable Southeast, LLC's Dispositive Motion for Terminating Sanctions and Monetary Sanctions Due to Plaintiff Cableview's Fraud on the Court with Incorporated Memorandum of Law (Doc. 192) is **DENIED, in part, and DENIED without prejudice, in part**.

   A. The Motion is **DENIED** to the extent Time Warner requests that the Court dismiss this case with prejudice.

   B. In all other respects, the Motion is **DENIED without prejudice** to renewal at the conclusion of these proceedings.

**DONE AND ORDERED** at Jacksonville, Florida on January 11, 2016.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record