UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| CABLEVIEW COMMUNICATIONS OF JACKSONVILLE, INC., a Florida Corporation | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:13-cv-306-J-34JRK |
| | ) | |
| TIME WARNER ENTERTAINMENT-ADVANCE/NEWHOUSE PARTNERSHIP d/b/a TIME WARNER CABLE, AND TIME WARNER CABLE SOUTHEAST LLC, d/b/a TIME WARNER CABLE | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DISPOSITIVE MOTION BY DEFENDANTS TIME WARNER CABLE SOUTHEAST LLC AND TIME WARNER ENTERTAINMENT-ADVANCE/NEWHOUSE PARTNERSHIP FOR SUMMARY JUDGMENT, INCORPORATING STATEMENT OF UNDISPUTED MATERIAL FACTS AND SUPPORTING MEMORANDUM OF LAW**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................2

   A.  The 2004 Agreement ......................................................................................2

   B.  McLarty's Accident.........................................................................................3

   C.  McLarty's Injuries and Medical Expenses ....................................................4

   D.  McLarty's Lawsuit Against Duke Power and Enerco...................................4

   E.  Demands for Indemnity and Defense Made by Duke Power and TWC ...................5

   F.  Settlement of the McLarty Action.................................................................5

   G.  TWC's North Carolina Action Filed Against Cableview ............................6

   H.  Settlement of TWC's North Carolina Action Against Cableview ...........................9

   I.  The Post-Closing Amendment of the Settlement Agreement ...............................10

   J.  Cableview Repeatedly States it Has Worked Out and Settled with TWC ..............11

   K.  TWC Never Consented Orally to Assign Any Agreement With Cableview, and Cableview Knew Sieiro Did Not Have Authority to Consent ..................................12

III.  ARGUMENT AND CITATION OF AUTHORITY ..................................................12

   A.  Cableview's Claims Are Barred by the Litigation Privilege ..................................12

   B.  Cableview Has Not Suffered Any Damages As TWC Was Owed the Funds for Indemnity of the McLarty Action ...........................................................13

   C.  Cableview's Claims Are Barred By An Accord and Satisfaction of TWC's Indemnity Claims.......................................................................................18

   D.  Cableview's Claims Are Barred Because of Its Voluntary Payment ...................20

   E.  Cableview's Tortious Interference Claim Fails Because the FTS Transaction Closed and TWC Was a Party to the APA ...........................................................21

   F.  Cableview's Negligent Misrepresentation Claim Fails Because There Was No Justifiable Reliance By Cableview ...................................................................23

   G.  Cableview's FDUTPA Claim Fails Because Payment of TWC's Indemnity Claim Does Not Involve "Trade or Commerce" ...........................................................24

IV.  CONCLUSION.....................................................................................................25

Defendants Time Warner Cable Southeast LLC and Time Warner Entertainment-Advance/Newhouse Partnership (collectively, "TWC") hereby move, pursuant to Fed. R. Civ. P. 56 and Local Rule 3.01, for entry of case dispositive summary judgment in their favor as to each of Plaintiff's claims.[1]

## I. <u>INTRODUCTION</u>

Plaintiff Cableview Communications of Jacksonville, Inc. ("Cableview") sues for recovery of $560,000 paid to TWC from the proceeds of the sale of the assets of multiple "Cableview" entities to FTS USA, LLC ("FTS").  Cableview owed these monies by virtue of its contractual duty to indemnify TWC for defense and settlement of a lawsuit brought by Cableview employee James McLarty, who suffered severe physical injuries when he fell off a pole while stringing cable for Cableview and TWC.  According to the experts retained in this matter by <u>both</u> parties, McLarty's own negligence and OSHA safety violations contributed to this accident.

While the various Cableview entities agreed that the money could be paid to TWC and the money was in fact paid, Cableview now wants the money back, alleging claims for tortious interference with business relations, violation of Fla. Stat. § 501.204 ("FDUTPA"), and negligent misrepresentation.  TWC is entitled to summary judgment as the undisputed material evidence shows that: (1) the litigation privilege protects TWC; (2) TWC was owed the money for indemnity of McLarty's lawsuit; (3) Cableview's claims are barred by an accord and satisfaction; (4) Cableview's claims are barred by the voluntary payment doctrine; (5) Cableview's tortious interference claim fails because

---

[1] TWC respectfully requests oral argument on its Motion, pursuant to Local Rule 3.01(j).  TWC estimates that thirty minutes would suffice for such an argument.

Cableview closed the FTS transaction and TWC was a party to that contract; (6) there was no reasonable reliance by Cableview on any alleged negligent representation by TWC; and (7) Cableview's FDUTPA claim fails as payment of TWC's indemnity claim does not involve "trade or commerce" under the statute.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The 2004 Agreement

1.      Cableview and TWC entered into the 2004 Installation Agreement (the "2004 Agreement") (Docs. 1) on July 19, 2004.   (Second Amended Complaint (DE 222) ("SAC"), ¶ 11, Ex. B, p. 2; Pl.'s Am. Resp. to Def.'s 2nd Req. for Admis. (Docs. 2), Req. No. 2.)[2]  The 2004 Agreement required Cableview to indemnify TWC as follows:

> "**To the fullest extent permitted by law, [Cableview] shall indemnify**, defend, protect, save and hold harmless [**TWC**] **from and against all claims**, damages actions, losses, and expenses **arising out of** or resulting from **the performance of the work**" by Cableview under the 2004 Agreement.[3]

2.      The 2004 Agreement also required Cableview to carry liability insurance covering TWC for "all claims arising from the operations of" Cableview.  (*Id.*, p. 4.)

3.      The 2004 Agreement further required Cableview to be responsible for any of its negligent acts or omissions even if the same was not covered by insurance:

> If Time Warner Cable … suffer[s] or incur[s] any damages not covered by the insurance requirements as provided within or arising from the Contractor's negligent acts, failure to act or omissions in the performance of any of the terms and conditions of any agreement, Time Warner Cable … will be entitled to recover such damages from [Cableview].

---

[2] Citations to evidence and testimony in TWC's Notice of Filing Docs. in Supp. of its Dispositive Mot. for Summ J. (filed concurrently herewith) are to "Docs. __."

[3] (2004 Agreement (Docs. 1), p. 3, ¶ 12 (emphasis added).)  Cableview admits it is standard practice in the cable television industry to require contractors and subcontractors to sign indemnity agreements for the work they perform.  (Cableview Dep. I (Docs. 3), 142:6-9; *see also* Blackwood Dep. (Docs. 4), 132:10-14.)

(*Id.*, p. 8, ¶ 13.)

      4.     The 2004 Agreement also required Cableview to comply with OSHA:

> [Cableview] shall conform to all applicable Federal, State and Local safety codes, including OSHA regulations.  Time Warner Cable shall not be liable for any penalties or suits from whatever source which result from any violations of such safety regulations.

(*Id.*, p. 2, ¶ 6.)

### B.  McLarty's Accident

      5.     James McLarty was an employee of Cableview on June 18, 2008.  (Pl.'s Am. Resp. to Def.'s 1st Req. for Admis. (Docs. 5), Req. No. 1.)

      6.     On June 18, 2008, McLarty was injured when a Duke Energy Carolinas, LLC ("Duke Power") pole upon which he was stringing cable television line collapsed. (SAC, ¶ 7.)  McLarty was performing work under the 2004 Agreement at this time. (Docs. 5, Req. No. 2.)

      7.     The parties' experts agree that the injuries suffered by McLarty were caused by the negligence and fault of Duke Power, Enerco Energy Services, Inc. ("Enerco"), McLarty and Cableview.[4]

      8.     The parties' experts further agree that McLarty's failures to follow OSHA safety standards relating to climbing utility poles (including his failure to conduct a prod test) contributed to his accident.  (Brooks Report (Docs. 8), 4-6; Barnes Dep. (Docs. 7),

---

[4] Specifically, the pole was severely decayed in the ground line area.  Had McLarty properly inspected the pole, he would have found the extensive decay and would not have climbed the pole.  As a result, the negligence of both McLarty and his employer Cableview contributed to McLarty's accident and injuries. Duke Power and Enerco were also negligent, as their failure to properly mark the pole for immediate replacement was a contributing cause of McLarty's accident and injuries.  (Barnes Report (Docs. 6, Ex. D), 2-4; Barnes Dep. (Docs 7), 10:7-15, 15:4-12; 31:5-33:7, 55:14-56:21, 60:3-20, 66:7-10, 71:22-72:6, 73:24-75:6; Brooks Report (Docs. 8), 4, 6-8; McLarty Dep. (Docs 9), 67:16-22.)

17:8-24, 56:8-21.)

9.      Cableview has no admissible evidence to contradict these opinions rendered by the parties' experts.  Also, Cableview admits that the negligence of Duke Power contributed to McLarty's accident.  (Cableview Dep. I (Docs. 3), 50:17-51:08).

### C.   McLarty's Injuries and Medical Expenses

10.      McLarty suffered severe physical injuries as a result of his accident, including multiple significant bone fractures (to his right leg and left heel).[5]

11.      McLarty was required to undergo five surgical procedures and incurred at least $192,052 in medical bills.  (Dr. Handy Dep. (Docs. 10), 7:2-23; 13:1-13; 26:21-27:10; 30:6-20; 32:17-33:4; McLarty Dep. (Docs. 9), 25:23-26:5.)

12.      McLarty suffered significant pain over an extended period of time.[6]  He also underwent extensive physical therapy, which was painful and exhausting.  (McLarty Dep. (Docs. 9), 23:1-24:22.)[7]  McLarty is now permanently impaired and will never fully recover from the injuries he suffered.  (*Id.*, 5:7-6:16; 21:9-22:5; Dr. Handy Dep. (Docs. 10), 33:12-34:25.)

### D.   McLarty's Lawsuit Against Duke Power and Enerco

13.      On July 21, 2010, McLarty filed an action for negligence against Duke Power and Enerco, in the Superior Court of Durham County, North Carolina (the "McLarty Action").  (SAC, ¶ 15; McLarty Dep. (Docs. 9), 26:6-20, Ex. 252 (Docs. 9A).)

---

[5] (Cableview Dep. I (Docs. 3), 102:20-103:4; Dr. Handy Dep. (Docs. 10), 6:9-23; 10:24-11:9; McLarty Dep. (Docs. 9), 8:13-19; 8:22-9:7.)

[6] (Dr. Handy Dep. (Docs. 10), 10:6-14; 17:11-19; 24:16-23; 25:24-26:4; 26:12-18; McLarty Dep. (Docs. 9), 9:8-10:11; 14:15-19; 19:19-21:8.)

[7] Also, McLarty was unable to move without the use of a wheelchair, cane or other assistive device for over a year (McLarty Dep. (Docs. 9), 19:2-18), and was unable to work for over a year.  (*Id.*, 5:7-6:16.)

### E.   Demands for Indemnity and Defense Made by Duke Power and TWC

14.   Duke Power and TWC entered into a Pole Attachment Agreement on January 19, 1996 (the "Pole Attachment Agreement").  (Stanley Dep. (Docs. 11), 21:25-23:6, Ex. 2 (Docs. 11A).)  The Pole Attachment Agreement provided as follows:

> [TWC] shall indemnify, defend and save harmless [Duke Power] from and against any and all liability, claims . . . because of: . . . (2) injury or death to persons . . . which may arise out of or be caused by the erection, maintenance, presence, operations or removal of [TWC's] cable or the proximity of [TWC's] cable to the wires and facilities of [Duke Power], or any act of [TWC], its agents or employees, on or in the vicinity of [Duke Power's] poles, excepting, however, damage, injury or loss due to the sole negligence of [Duke Power].

(Pole Attachment Agreement (Docs. 11A), §§ 10.2, 12.)

15.   Duke Power tendered the McLarty Action to TWC for defense and indemnification pursuant to the Pole Attachment Agreement, and TWC accepted the tender from Duke Power.  (SAC, ¶ 17; Williams Dep. (Docs. 12), 74:19-75:8.)

16.   TWC tendered the McLarty Action to Cableview and its insurer, First Mercury Insurance Company ("FMI"), by letter dated September 23, 2010.  (SAC, ¶ 18; Cableview Dep. I (Docs. 3), 123:13-124:25; Ex. 125 (Docs. 3A).)  By letter to TWC's counsel dated October 28, 2010, FMI rejected TWC's tender on behalf of both FMI **and** Cableview.  (SAC, ¶ 20, Ex. C; Cableview Dep. I (Docs. 3), 123:13-124:25.)

### F.   Settlement of the McLarty Action

17.   On February 16, 2012, TWC and Duke Power settled the McLarty Action in exchange for a payment of $362,500 to McLarty.[8]  Given the expected cost of defense of the McLarty Action, the potential liability, McLarty's severe injuries and the risk and

---

[8] (McLarty Dep. (Docs. 9), 26:25-27:20, Ex. 253 (Docs. 9B); Williams Dep. (Docs. 12), 197:25-199:20, Ex. 32 (Docs. 12A).)

uncertainty associated with trying McLarty's claims, the sole expert on this issue opined that the settlement of the McLarty Action was eminently reasonable.  (Williams Dep. (Docs. 12), 237:17-241:10; 245:4-15; 245:16-247:4; 248:10-252:4; 252:11-18; 253:2-14; 254:20-255:8; 258:11-260:12.)[9]

18.    TWC incurred and paid over $200,000 in attorneys' fees and costs to defend the McLarty Action.[10]  Under the circumstances of the case, the sole expert on this issue opined that the attorneys' fees and costs spent in defending the McLarty Action were reasonable.  (Williams Decl. (Docs. 14), at ¶¶ 13-16.)

19.    Cableview admits it has no basis for disputing that TWC paid at least $560,000 to defend and settle the McLarty Action.  (Cableview Dep. I (Docs. 3), 86:13-89:23.)

20.    To the extent that Cableview thought it could have settled the McLarty Action for a lower amount or by spending less on attorney's fees, it could have accepted TWC's request for defense and indemnification.  Instead, Cableview rejected this request. (SAC, ¶ 20, Ex. C; Cableview Dep. I (Docs. 3), 123:13-124:25.)

### G.  TWC's North Carolina Action Filed Against Cableview

21.    On February 17, 2012, TWC commenced a lawsuit against Cableview by filing an Application and Order Extending Time to File Complaint against Cableview

---

[9] Brian Williams, counsel for TWC and Duke Power in the McLarty Action, has been tendered by TWC as an expert witness competent and qualified to express an opinion regarding the reasonableness of the settlement reached with McLarty.  (*See* TWC Second Am. Expert Designation (Docs. 13), 2-3; Williams Dep. (Docs. 12), 237:17-241:10; 245:4-15.)  Cableview has not tendered an expert witness on this subject. (*See* Docs. 6.)

[10] (Moore Decl. (Docs. 15), at ¶¶ 4-9, Ex. 9 (Docs. 15A); Williams Decl. (Docs. 14), at ¶¶ 2-16, Exs. 34 (Docs. 14A) and Invoices (Docs. 14B); Williams Dep. (Docs. 12), 43:17-44:5, 208:5-211:23, 217:8-223:17; Glenn Decl. (Docs. 16), at ¶¶ 4, 9-17, Ex. 32 (Docs. 16A).)

(the "Application") in the Superior Court for Mecklenburg County, North Carolina (the "North Carolina Action").[11]   A Summons was issued that same day by the court (the "Summons").  (*Id.*)  TWC's outside litigation counsel, Lew Glenn, sent the Application and Summons to Cableview via facsimile that same day (February 17, 2012). (Cableview Dep. I (Docs. 3), 33:2-20; Pl.'s Am. Resp. to Def.'s 2nd Req. for Ad. (Docs. 2), Req. Nos. 3-8.)  The Application granted TWC leave to file a complaint against Cableview until March 8, 2012, for what TWC alleged were violations of Cableview's contractual indemnification obligations to TWC for the McLarty Action.  (Ex. 107 to Cableview Dep. (Docs. 3B).)

22.     Cableview understood from TWC's February 17, 2012 Application that TWC was asserting claims for indemnity against Cableview under the 2004 Agreement for attorneys' fees and other expenses TWC incurred in defending and settling the McLarty Action.  (*See* Cableview Dep. I (Docs. 3), 40:20-41:3.)

23.     On February 28, 2012, TWC Vice President Dianne Blackwood informed Cableview's President James Schieszer by telephone that TWC wanted to be reimbursed for its out of pocket costs incurred in defending and settling the McLarty Action. (Schieszer Dep. II (Docs. 17), 162:11-170:22.)  Blackwood further informed Schieszer that TWC was not going to consent to assignment of the 2011 Field Installation Services Agreement (the "2011 Agreement") between TWC and Cableview Communications of Carolina, Inc. ("Cableview Carolina") to FTS unless TWC's claim for indemnity was resolved.  (*Id.*, 166:6-10; Cableview Dep. I (Docs 3), 11:17-12:10, Ex. 104 (Docs. 3C).)

---

[11] (SAC, ¶ 31, Ex. E; Pl.'s Am. Resp. to Def.'s 2nd Req. for Ad. (Docs. 2), Req. Nos. 3-5; Cableview Dep. I (Docs. 3), 33:2-20; Ex. 107 (Docs. 3B).)

24.    TWC understood from the February 28, 2012 telephone call with Cableview that Cableview was planning on selling its assets to FTS, distributing the sales receipts to its principals and leaving Cableview as an empty shell, which would have the effect of avoiding its indemnification obligation to TWC for the McLarty Action. (Blackwood Dep. (Docs. 4), 63:7-19, 95:21-96:15.)

25.    On March 1, 2012, TWC's outside litigation counsel Lew Glenn sent an email to FTS's General Counsel Kyle Hall (the "Glenn Letter"), and Dianne Blackwood transmitted a letter to Mike Coffee, FTS's Southeast Region Director (the "Blackwood Letter") to inform them that TWC would not consent to assign the 2011 Agreement until its indemnity claim was resolved. (Cableview I Dep. (Docs. 3), 43:15-49:22, Exs. 29 and 109 (Docs. 3D and 3E, respectively).)  The Glenn and Blackwood Letters were the first communications TWC had with FTS regarding TWC's claim for indemnity in the North Carolina Action.  (Cableview I Dep. (Docs. 3), 46:10-47:10; Glenn Decl. (Docs. 16), at ¶ 8; Glenn Dep. (Docs. 18), 112:5-117:16.)  Cableview understood from the Glenn and Blackwood Letters that TWC was seeking its attorneys' fees and other costs incurred in connection with the McLarty Action.  (Cableview I Dep. (Docs. 3), 45:13-46:9.)

26.    It turns out that TWC's concern about being left responsible for the McLarty Action liability was well founded.  On March 1, 2012, TWC received a draft of the "Excluded Liabilities" provision of the Asset Purchase Agreement ("APA") between FTS and Cableview.   (Webb Dep. (Docs. 19), 80:14-81:11, Ex. 30 (Docs. 19A), Glenn Decl. (Docs. 16), ¶¶ 5, 7, Ex. 14 (Docs. 16B).)  This draft showed that Cableview was selling virtually all of its assets to FTS, but was retaining liabilities for the McLarty

Action.  (*Id.*, Schieszer Dep. II (Docs. 17), 239:15-241:17.)[12]  This meant that, should the FTS transaction close without assurances of payment to TWC for the McLarty Action, TWC would be left with trying to obtain payment from Cableview, which at that point would be a shell company with no assets.  (*Id.*)

27.    On March 8, 2012, TWC filed its Complaint against Cableview in the North Carolina Action, which had previously commenced on February 17, 2012. (Cableview Dep. I (Docs. 3), 41:20-43:5, Ex. 108 (Docs. 3F).)[13]

### H.  Settlement of TWC's North Carolina Action Against Cableview

28.    Cableview and TWC settled the North Carolina Action claims prior to the FTS transaction closing.  (Glenn Dep. (Docs. 18), 73:5-80:15.)  TWC agreed to provide a written consent to assignment of the 2011 Agreement and cease prosecution of the North Carolina Action in exchange for reimbursement of its attorneys' fees and costs incurred in defending and settling the McLarty Action (the "Settlement Agreement").  (*Id.*)

29.    The Settlement Agreement was partially memorialized in the APA, which identified TWC as a "third party beneficiary" entitled to payment of certain of the sales proceeds.[14]  The Settlement Agreement was also memorialized in the Consent to Assign

---

[12] TWC was not provided with a copy of the APA until March 9, 2012.  (Webb Dep. (Docs. 19), 115:15-117:12, Ex. 41 (Docs. 19B); Glenn Decl. (Docs. 16), ¶¶ 6-7.)

[13] Cableview's outside counsel agreed to accept service of this Complaint.  (Glenn Dep. (Docs.18), 116:6-117:6; Webb Dep. (Docs. 19), 112:6-24; 117:18-118:2; Ex. 40 (Docs. 19C).)  Glenn served Cableview with a copy of the Complaint in the North Carolina Action, through its counsel Webb, on March 9, 2012. (Glenn Dep. (Docs. 18), 116:6-117:6; Webb Dep. (Docs. 19), 117:13-118:2, Ex. 42 (Docs. 19D).)

[14] (Glenn Dep. (Docs. 18), 74:4-13, 75:18-77:3; Cableview Dep. I (Docs. 3), 21:18-23:18, Ex. 106 (Docs. 3G), §§ 4.1.3 and 12.13.)

the 2011 Agreement executed on March 2, 2012.[15]  TWC ceased prosecution of the North

Carolina Action as promised, which was then dismissed (on October 18, 2012).[16]

30.     The various Cableview entities agreed to amend the APA to allow for

payment to TWC because Cableview thought its insurance carrier (FMI) was going to

make good on the existing policy and reimburse Cableview for the payment to TWC.

(Cableview Dep. I (Docs. 3), 74:4-15; 74:18-76:14.)

### I.     The Post-Closing Amendment of the Settlement Agreement

31.     The Settlement Agreement was later amended by Joint Wiring Instructions

executed months after the FTS transaction closed, by which TWC was to be paid

$560,000 of over $600,000 owed on the indemnity obligation.[17]

32.     Cableview authorized execution of the Joint Wiring Instructions so

Cableview's shareholders "could get [their] money."   (Cableview Dep. I (Docs. 3),

97:15-98:12; Ex. 113A (Docs. 3I).)   Specifically, Cableview's shareholders wanted to

"get something out of the sale of the company, because to [that] point [they] hadn't got

anything."  (Cableview Dep. I (Docs. 3), 97:15-98:12.)  In addition, Cableview continued

to believe that its insurance carrier (FMI) would ultimately reimburse Cableview for this

payment to TWC.  (*Id.*, 74:4-15; 74:18-76:14.)

---

[15] (Glenn Dep. (Docs. 18), 75:25-76:21; *see* Cableview Dep. I (Docs. 3), 13:12-14:18, Ex. 105 (Docs. 3H).)

[16] (Glenn Dep. (Docs. 18) 166:20-167:24, 170:16-171:1; Cableview Dep. I (Docs. 3), 92:18-93:1; Dismissal (Docs. 20).)

[17] (Glenn Dep. (Docs. 18), 197:7-199:22, Ex. 31 (Docs. 18A); Moore Decl. (Docs. 15), at ¶¶ 4-9, Ex. 9 (Docs. 15A).)

**J.    Cableview Repeatedly States it Has Worked Out and Settled with TWC**

33.    Cableview has described the Settlement Agreement as follows:

- Referring to the Blackwood Letter, Schieszer informed various individuals at FTS via an email sent on March 1, 2012 that: "This is an 08 insurance claim and it is outlined in the closing docs. **We have this worked out**." (Cableview Dep. I (Docs. 3), 74:18-76:14, Ex. 110 (Docs. 3J) (emphasis added).)[18]

- Schieszer stated in an email to FTS dated February 28, 2012 that: "I spoke with Tony [Sieiro] from [TWC] today and they have blessed the transfer to FTS.  There is an open liability claim from an accident in 2008 [the McLarty accident].  **We agreed that CVC will be solely responsible to resolve the issue and that FTS will in no way be held accountable.**  It is from the law suit where the pole broke on our installer and we paid all workers comp claims, but he sued Duke Power and light [sic]." (Cableview Dep. I (Docs. 3), 70:5-71:9, Ex. 23 (Docs. 3K) (emphasis added).)

- Schieszer stated in an email sent to Cableview's litigation counsel in this case (Jack Webb) on February 28, 2012 that: "Here is the contact info for the attorney for TWC Greensboro NC.  Please make sure he approves the closing documents and that they are satisfied with all the wording **pertaining to the settlement**." (Cableview Dep. I (Docs. 3), 71:21-72:10, Ex. 24 (Docs. 3L) (emphasis added).)

- Webb stated in an email to FTS and Schieszer on May 23, 2012 that:  "**Cableview and TW have worked this matter out**. Their attorney, Lew Glenn and I have drafted a joint letter detailing the wiring instructions including the agreed upon amounts to be distributed to both parties. I anticipate receiving the fully executed version in an hour or so." (Webb Dep. (Docs. 19), 140:15-141:9, Ex. 60 (Docs. 19E) (emphasis added).)

34.    At no point during the parties' negotiations did Cableview ever inform TWC that it intended the Settlement Agreement to be non-final or temporary, or that Cableview was going to later ask for its money back.  (Cableview Dep. I (Docs. 3), 89:24-90:10; Webb Dep. (Docs. 19), 107:7-19, 114:17-25.)

---

[18] Schieszer later testified in the Rule 30(b)(6) deposition of Cableview that by his statement in this email that "we have this worked out" he meant:

 A:  I spoke with Diane Blackwood. I explained to her that we had the insurance company, that everything should be and go through the insurance company, and **I would leave it up to the attorneys to work out the wording in the closing settlement so that when all the documents were done Time Warner would be satisfied, and they were**.

(Cableview Dep. I (Docs. 3), 75:15-25 (emphasis added).)

11

35.     Moreover, Cableview admits that it cannot give back the consideration TWC gave to it in exchange for the parties' settlement, since Cableview cannot undo the assignment of the 2011 Agreement to FTS or the dismissal of the North Carolina litigation.  (Cableview Dep. I (Docs. 3), 93:11-20.)

### K.  TWC Never Consented Orally to Assign Any Agreement With Cableview, and Cableview Knew Sieiro Did Not Have Authority to Consent

36.     Cableview falsely alleges that in early 2012, Anthony Sieiro, TWC's Director of Technical Operations, consented orally to "the Cableview-FTS Transaction." (SAC, ¶ 26.)  Cableview admits, however, that it _never_ asked Sieiro or anyone at TWC for consent to assign _any_ agreement with Cableview, and that no one at TWC gave such consent.  (Cableview Depo. I (Docs. 3), 18:2-19:16; _see_ Gravely Decl. (Docs. 21), ¶¶ 4-6.)

37.     Cableview knew that Sieiro was not authorized to consent to the assignment of the 2011 Agreement (or any other contract between TWC and Cableview). (Gravely Decl. (Docs. 21), at ¶¶ 4-5.)

### III.  ARGUMENT AND CITATION OF AUTHORITY[19]

### A.  Cableview's Claims Are Barred by the Litigation Privilege

All of Cableview's claims in this action arise from efforts by TWC to recover on its claim for indemnity asserted in the North Carolina Action.  Specifically, Cableview's allegation that TWC refused to consent to assignment of the 2011 Agreement so as to disrupt the transaction with FTS and compel Cableview to pay TWC's claim for

---

[19] The Court set forth the applicable standard for analyzing a summary judgment motion under Fed. R. Civ. P. 56 in _McDuffie c. City of Jacksonville, Fla._, No. 3:12-CV-1283-J-34JRK, 2015 WL 791141, *7 (M.D. Fla. Feb. 25, 2015).  TWC hereby incorporates that statement of the applicable motion standard.

indemnity is an essential component of all three Counts asserted in Cableview's SAC. (*See generally*, SAC, Counts I-III.)  Indeed, all of the conduct that Cableview alleges impeded its transaction occurred **after** TWC commenced the North Carolina Action on February 17, 2012, when it filed the Application and caused a Summons to issue from the North Carolina Court.[20]  (SUMF, ¶¶ 21-25.)  Moreover, Cableview admits that TWC's communications with FTS all related to recovery of the indemnity claim asserted in the North Carolina Action.  (*Id.*, ¶ 25.)  Thus, Cableview's claims are barred by the litigation privilege because they are all based on TWC's actions and communications aimed at resolving its claim for indemnity asserted in the North Carolina Action.[21]

### B.  Cableview Has Not Suffered Any Damages As TWC Was Owed the Funds for Indemnity of the McLarty Action

The only compensatory damages sought by Cableview herein are the $560,000 paid to TWC out of the proceeds of the FTS transaction.  (Cableview's Am. Initial Disclosures (Docs. 22, 15; Cableview Dep. I (Docs. 3), 93:11-13.)  The undisputed facts, however, show that Cableview owed this money to TWC under the 2004 Agreement.

---

[20] *See* N.C. R. Civ. P. 3(a) ("A civil action may also be commenced by the issuance of a summons when: (1) A person makes application to the court stating the nature and purpose of [its] action and requesting permission to file [its] complaint within 20 days and (2) The court makes an order stating the nature and purpose of the action and granting the requested permission.").

[21] *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1274-77 (11th Cir. 2004) (tortious interference claims arising from settlement discussions barred by Florida's litigation privilege); *see also*, *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994) (tortious interference claim barred by litigation privilege because "participants in litigation must be free to engage in unhindered communication . . . without fear of having to defend their actions in a subsequent civil action for misconduct."); *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 384 (Fla. 2007) ("we hold that the litigation privilege applies in all causes of action, whether for common-law torts or statutory violations."); *Mummies of the World Touring Co. LLC v. Design and Prod., Inc.*., No. 5:12-cv-754-BO, 2013 WL 3490535, at * 3 (E.D.N.C. July 11, 2013) (tort claim arising from correspondence copying a third party with whom plaintiff was doing business in an attempt to collect judgment barred by litigation privilege under North Carolina law).

At the outset, it is important to note that TWC gave Cableview prompt notice of the claim asserted by Duke Power arising from the McLarty Action, and demanded that Cableview provide a defense and indemnity.  (SUMF, ¶ 16.)  Cableview, however, rejected TWC's tender of the McLarty Action and failed and refused to defend the case.  (*Id.*)  Moreover, TWC's claim for indemnity against Cableview arose from a written indemnity agreement (rather than under the common law).  (SUMF, ¶ 1.)  As a result, Cableview is **conclusively bound** by the settlement reached by TWC of the McLarty Action, so long as the settlement is not the result of fraud or collusion (of which there has been no suggestion in this case).[22]

At most, to be indemnified, TWC is only required to show that it was "potentially liable" to Duke Power under the indemnity provision of the Pole Attachment Agreement and, in turn, to McLarty for Duke Power's negligence.  *See Camp, Dresser, McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1079-1080 (Fla. 5th DCA 2003) (indemnitee need only establish "potential liability" to recover from indemnitor based on settlement of underlying action where claim based on written contract of indemnity and indemnitor was given notice of claim and opportunity to defend); *White Springs Agric. Chems., Inc. v. Gaffin Indus. Servs., Inc.*, No. 3:11-cv-998, 2014 WL 905577, at *7 (M.D.Fla. Mar. 7, 2014) (same and noting that "showing of actual liability is only required if the indemnitor is not given notice and an opportunity to assume the defense or responsibility of the

---

[22] *Bagley v. W. Cas. Sur. Co.*, 505 So. 2d 678, 680 (Fla. 5th DCA 1987) ("An indemnitor, to become bound by a settlement agreement in a suit against the indemnitee, must have (1) notice of the claim, and (2) an opportunity to appear and defend the claim."); *Cont'l Cas. Co. v. Godur*, 476 So. 2d 242, 243-44 (Fla. 3rd DCA 1985) (indemnitor conclusively bound by settlement of action brought against indemnitee where indemnitor had notice of underlying action and opportunity to defend long before the settlement).

underling plaintiff's claim.").  TWC was plainly responsible for defending Duke Power

and holding it harmless against McLarty's claims under the unambiguous indemnity

provision of the Pole Attachment Agreement.[23]  (SUMF, ¶ 14.)  Moreover, it is

undisputed that Duke Power's negligence (and that of Enerco, McLarty and Cableview)

contributed to McLarty's accident and injuries.  (*Id.*, ¶¶ 7-9.)  Thus, TWC's potential

liability to Duke Power and, in turn, to McLarty is indisputable.

Similarly, Cableview's obligation under the 2004 Agreement to indemnify and

defend TWC "[t]o the fullest extent permitted by law . . . from and against all claims,

damages actions, losses, and expenses arising out of or resulting from the performance of

the work" could not be clearer.  (SUMF, ¶ 1.)[24]  Moreover, Cableview agreed that TWC

"shall not be liable for any penalties or suits **from whatever source** which result from

any violations of [OSHA] regulations."  (*Id.*, ¶ 4 (emphasis added).)  Cableview also

agreed to obtain liability insurance for TWC for "all claims arising from the operations

of" Cableview.  (*Id.*, ¶ 2.)  And if the insurance did not provide coverage for a claim

arising from the negligent performance of Cableview's work, TWC was entitled under

the 2004 Agreement to recover those damages from Cableview.  (*Id.*, ¶ 3.)  Given that the

accident which gave rise to the McLarty Action occurred while he was working for

---

[23] Cableview is foreclosed from arguing that this provision did not apply because Duke Power was "solely negligent" in causing McLarty's injuries given the conclusions reached by the expert witnesses tendered by Cableview and TWC in this action that the negligence of McLarty and Enerco also directly contributed to causing the accident that resulted in McLarty's injuries.  (SUMF, ¶ 7.)

[24] Any argument that the McLarty Action did not "arise out of" Cableview's "work" under the 2004 Agreement has been uniformly rejected by the courts.  *See, e.g.*, *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1217 (5th Cir. 1986) (explaining breadth of "arising out of" language); *BBL-McCarthy, LLC v. Baldwin Paving Co.*, 646 S.E.2d 682, 687 (Ga. Ct. App. 2007) ("Similar to our interpretation of the phrase 'arising out of' in insurance policies, we construe this phrase in an indemnity clause to mean 'had its origins in' or 'grew out of' and to encompass 'almost any causal connection or relationship.'").

Cableview and was in part due to the admitted failure of Cableview's employee (McLarty) to comply with applicable OSHA regulations, Cableview's obligation to indemnify TWC is beyond dispute.  (*Id.*, ¶¶ 7-9.)

Cableview argues that the 2004 Agreement obligates it to indemnify TWC only for tort claims and not for contract claims arising from Cableview's operations.  But the 2004 Agreement requires Cableview to indemnify TWC "from and against **all claims** … arising out of or resulting from the performance of [Cableview's] work," and this obligation expressly is not limited to tort claims (or any other particular type of claim).  (SUMF, ¶ 1 (emphasis added).)  A court examining virtually identical language held that an obligation to indemnify against "all claims" "evidences a clear intent" to include the indemnitee's contractual obligations to a third party in a separate contract.[25]  Specifically in *Vey*, New York's highest court held that a "contractual provision requiring the subcontractor to 'hold [the contractor] harmless and to indemnify and protect [the contractor] against **all** damages, **claims** or demands arising out of the work covered by this contract' **requires indemnification when the contractor is held liable to the owner under an indemnification clause in a separate contract**."[26]  *Vey* is directly on point and compels the conclusion that Cableview's indemnification obligations extend to tort and contract claims which arise out of Cableview's work, such as the McLarty Claim.

The Supreme Courts of two other states have similarly held that an indemnity obligation for "all claims" includes contract and other claims, and is not limited just to

---

[25] *Vey v. Port Authority*, 429 N.E.2d 762, 764 (N.Y. Ct. App. 1981).

[26] *Id.* at 763 (emphasis added).

tort claims. In *Cambridge Townhomes, LLC v. Pacific Star Roofing, Inc.*, 209 P.3d 863, 871 (Wash. 2009), the Washington Supreme Court held:

> P.J. Inc. claims the indemnity clause in the contract between it and Polygon is intended to encompass only tortious actions. This is not a reasonable reading. The first paragraph of the clause specifically states that the subcontractor shall indemnify the contractor " 'from any and all claims, demands, losses and liabilities to or by third parties arising from, resulting from, or connected with, services performed or to be performed' " under the contract by the subcontractors. [Citation omitted.] It defies the plain language of the contract to read this provision as restricting such claims to tortious acts.

*See also*, *Doster Const. Co., Inc. v. Marathon Elec. Contracts., Inc.*, 32 So. 3d 1277, 1284 (Ala. 2009) (contract claims indemnified because "[t]he indemnity clause contains no language excepting from [indemnitor's] indemnity obligation any loss or liability that may be suffered by [indemnitee] only by virtue of [indemnitee's] own contractual undertakings, e.g., [indemnitee's] own indemnity agreement with a third party").[27]

While not at issue here since this is a contractual indemnity obligation, the reasonableness of the settlement paid by TWC to McLarty ($362,500) cannot seriously be questioned. McLarty suffered life-altering injuries as a result of his accident. (SUMF, ¶¶ 10-12.) McLarty's medical bills alone were at least $192,052. (*Id.*) Taking into account the cost of defense, the potential liability, the severe injuries suffered by McLarty and the uncertainty and risk associated with trying McLarty's claims, TWC's settlement

---

[27] The instant case is unlike *Lynn v. Detroit Edison*, in which the court found that the indemnity clause did not cover indemnification for contractual liability, where that liability was not premised on the fault of the indemnitor. 2006 WL 1408443, * 1 (Mich. Ct. App. May 23, 2006). Here, there is no dispute that Cableview's employee, McLarty, was negligent and at fault for the accident which resulted in Duke Power's tender of the McLarty Action to TWC. (SUMF No.7.) Moreover, as explained by the *Vey*, *Cambridge Townhomes* and *Doster* decisions, the fault of the indemnitor should not matter, as long as the event giving rise to the claim occurred in the course of the work being performed by the indemnitor.

of the McLarty Action was unquestionably reasonable.  (SUMF, ¶¶ 17-19).[28]
Importantly, Cableview has presented no contrary evidence or expert analysis to create
any material factual dispute regarding this issue.

Also, the over $200,000 in attorneys' fees and costs spent by TWC to defend the
McLarty Action were also reasonable.  (*Id.*)  Therefore, the undisputed material facts
demonstrate that Cableview owed TWC at least $560,000 pursuant to the indemnity
provision in the 2004 Agreement.  Consequently, Cableview cannot establish that it
suffered any "damages" as a result of paying TWC monies that were due and owing, and
TWC is entitled to summary judgment as to **all** of Cableview's claims.

## C.   Cableview's Claims Are Barred By an Accord and Satisfaction of TWC's Indemnity Claims

"Settlement agreements are governed by the same legal principles applied to other
contracts."[29]  Like other contracts, settlement agreements "should not be invalidated . . .
unless there is (1) failure of the agreement to satisfy required elements for a contract, (2)
illegality, (3) fraud, (4) duress, (5) undue influence, or (6) mistake."[30]

The undisputed facts show that Cableview and TWC reached a settlement agreement

---

[28] *See Tokio Marine v. Macready*, 803 F. Supp. 2d 193, 203-04 (E.D.N.Y. 2011) ("courts routinely find
settlements to be 'reasonable' when the recovery at trial could have been greater" and granting summary
judgment to indemnitee where accident that spawned litigation caused "serious injuries" and indemnitor did
"not come forward with any evidence to suggest that the settlement was unreasonable.") (citations omitted);
*Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 225-26 (S.D.N.Y. 2010) (same and noting that
indemnitee need not show absence of disputed facts as to underlying litigation, but rather only with respect
to its "potential liability."); *see also Am. Soc'y. For Testing & Materials v. Corrpro Cos., Inc.*, 478 F.3d
557, 578-579 (3rd Cir. 2007) (affirming declaratory judgment on claim for indemnity where indemnitor
failed to present any expert testimony to rebut expert testimony submitted by indemnitee on
"reasonableness" of settlement); *Scottsdale Ins. Co. v. Am. Empire Surplus Lines, Ins. Co.*, 791 F. Supp.
1079, 1083 (D. Md. 1992) (awarding summary judgment to indemnitee where indemnitor failed to oppose
indemnitee's expert testimony on "reasonableness" of settlement with contrary expert testimony).

[29] *Cirrus Design Corp. v. Sasso*, 95 So. 3d 308, 312 (Fla. 4th DCA 2012) (citations omitted).

[30] *Lotspeich Co. v. Neogard Corp.*, 416 So. 2d 1163, 1165 (Fla. 3d DCA 1982).

(or an "accord and satisfaction"[31]) with respect to the claim for indemnity asserted by TWC in the North Carolina Action. (SUMF, ¶¶ 28-35.) Specifically, Cableview agreed to reimburse TWC for the monies expended by TWC to defend and settle the McLarty Action in exchange for TWC's agreement to execute a written assignment of the 2011 Agreement and to cease prosecution of the North Carolina Action. (*Id.*) The only possible basis Cableview asserts for undoing this fully performed agreement is the allegation that Cableview entered into the agreement under "duress."

"Duress involves a step beyond mere illegality and implies that a person has been unlawfully constrained or compelled by another to perform an act under circumstances which prevent the exercise of free will."[32] "What constitutes duress is a matter of law."[33] In order to establish duress, a party "must demonstrate (1) that one side involuntarily accepted the terms of another, (2) that circumstances permitted no other alternative, and (3) that said circumstances were the result of coercive acts of the opposite party."[34] **"There can be no legal duress, however, unless the act of the party compelling the obedience of another is unlawful or wrongful**."[35] Moreover, **"[b]usiness compulsion is not established merely by proof that consent was secured by the pressure of**

---

[31] "An accord and satisfaction results when: (1) the parties mutually intend to effect a settlement of an existing dispute by entering into a superseding agreement; and (2) there is actual performance in accordance with the new agreement." *Cirrus Design*, 95 So. 3d 308 at 311. A party to an accord and satisfaction "is bound to each of the attached conditions to the new agreement and abandons the rights previously held." *Id.* at 312.

[32] *Woodruff v. TRG-Harbour House, Ltd.*, 967 So. 2d 248, 250 (Fla. 3d DCA 2007) (citations omitted).

[33] *Burton v. McMillan*, 42 So. 849, 852 (Fla. 1907) (citations omitted).

[34] *Woodruff*, 967 So. 2d at 250 (citations omitted).

[35] *Corporacion Peruana de Aeropuertos y Aviacion Comercial v. Boy*, 180 So. 2d 503, 505 (Fla. 2d DCA 1965) (emphasis added).

**financial circumstances . . . The doctrine of business compulsion cannot be predicated upon a demand which is lawful, upon doing or threatening to do that which a party has a legal right to do**."[36] Cableview cannot establish duress.

First, while Cableview may contest whether it owed TWC an indemnity, it cannot show that TWC's efforts to seek recovery on its claim were "unlawful" or "improper." As demonstrated *supra,* TWC was well within its rights in pursuing its claim. Second, Cableview cannot establish "duress" or that it was "compelled into obedience" by any conduct of TWC given Cableview's admissions that: (a) Cableview agreed to have the APA require payment to be made to TWC on its indemnity claim because Cableview was convinced that its insurance carrier (FMI) would ultimately foot the bill; and (b) Cableview signed off on the Joint Wiring Instructions months after the FTS transaction had already closed because the owners of the various Cableview entities wanted to be paid. (SUMF, ¶¶ 30-32.) Therefore, the Settlement Agreement (accord and satisfaction) entered into and fully performed by the parties precludes Cableview's claims.

### D. **Cableview's Claims Are Barred Because of Its Voluntary Payment**

Cableview's agreement to the wire transfer of $560,000 to TWC months after the FTS transaction closed also bars its claims under the voluntary payment doctrine. "Florida's voluntary payment doctrine provides that where one makes a payment of any sum under a claim of right with knowledge of the facts, such a payment is voluntary and cannot be recovered." *Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F.

---

[36] *Kohen v. H. S. Crocker Co.*, 260 F.2d 790, 792 (5th Cir. 1958) (citations omitted) (emphasis added); *accord Coral Gables Imported Motorcars, Inc. v. Fiat Motors of N. Am., Inc.*, 673 F.2d 1234, 1239-40 (11th Cir.), modified *on other grounds on reh'g sub nom. Coral Gables Imported Motorcars v. Fiat Motors of N. Am., Inc.*, 680 F.2d 105 (11th Cir. 1982); *Spillers v. Five Points Guar. Bank*, 335 So. 2d 851, 852-3 (Fla. 1st DCA 1976).

Supp. 2d 1215, 1223 (S.D. Fla. 2008) (citations omitted).  The doctrine bars Cableview's claims because the 2004 Agreement required Cableview to indemnify TWC for the costs TWC incurred in defending and settling the McLarty Action.[37]

### E. Cableview's Tortious Interference Claim Fails Because the FTS Transaction Closed and TWC Was a Party to the APA

Cableview's claim for tortious interference has two main components.  First, Cableview claims that TWC blocked the FTS transaction by refusing to consent to assignment of the 2011 Agreement.  (*See generally*, SAC, Count I.)  Second, Cableview claims that after it executed the APA with FTS and closed on the transaction, TWC again interfered by refusing to sign joint wiring instructions unless Cableview agreed to pay additional sums incurred by TWC in defense of the McLarty Action.  (*Id.*)

It is unclear from Cableview's SAC whether it is asserting a claim for tortious interference with prospective business relations or tortious interference with an existing contract.  (*Id.*)  Nonetheless, Cableview cannot prevail under either theory.

First, to the extent that Cableview claims TWC tortiously interfered with its prospective business relations with FTS, that claim fails because Cableview ultimately closed the transaction with FTS.  A claim for tortious interference with prospective relations cannot stand where the complaining party succeeds in consummating the transaction at issue.  *Anthony Distribs., Inc. v. Miller Brewing Co.*, 941 F. Supp. 1567, 1572 (M.D.Fla. 1996) ("[t]o prove interference, [plaintiff] must show that [defendant's] actions induced or caused a **breach or termination of a business relationship or**

---

[37] *See Hall v. Humana Hosp. Daytona Beach*, 686 So. 2d 653, 658 (Fla. 5th DCA 1996) (Section 725.04, Florida Statutes only limits voluntary payment doctrine where "the contract on its face does not call for payment, or the contract on its face excuses the payment.").

**expectancy**" and expressly rejecting argument that "relationship need not be terminated to constitute interference.") (emphasis added).  Moreover, a mere delay or a reduction in the profitability of the transaction is not enough to sustain such a claim.[38]  Thus, the undisputed fact that Cableview closed its transaction with FTS necessarily defeats any claim for tortious interference with prospective business relations.

Second, to the extent Cableview claims that TWC interfered with an existing contract with FTS (i.e., the APA), Cableview must establish that TWC's conduct caused FTS to breach the contract.[39]  There simply is no evidence (or even allegation) that FTS breached the APA, much less as a result of any conduct by TWC.  Moreover, given that TWC was an express third party beneficiary of the APA, TWC is not a "stranger" that can tortiously interfere with the APA.[40]

Third, TWC did not use any improper means to recover on its claim for indemnity asserted in the North Carolina Action.  TWC was plainly entitled to indemnity from Cableview.  Moreover, upon learning that Cableview was selling all of its assets and

---

[38]   *See BCD LLC v. BMW Mfg. Co.*, 360 F. App'x. 428, 436 (4th Cir. 2010) ("A claim for prospective interference cannot stand where the plaintiff is able to consummate a contract with another party. . . . [P]laintiff cannot recover on a theory that the [executed agreement] was less profitable to him than it would have been without [defendant's] interference."); *see also Marvel-Schebler Aircraft Carburetors, LLC v. Avco Corp.*, No. 1:10CV745, 2012 WL 3637674, at *7 (M.D.N.C. Aug. 22, 2012) (mere delay in consummation of contract insufficient to support tortious interference with economic advantage).

[39]   *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998) ("Under Florida law, the elements of a cause of action for tortious interference with a contractual relationship are:(1) The existence of a contract, (2) The defendant's knowledge of the contract, (3) The defendant's intentional procurement of the contract's breach,(4) Absence of any justification or privilege, and (5) Damages resulting from the breach.") (Citation omitted).

[40]   *See Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001) ("Under Florida law, a claim for tortious interference with contract cannot lie where the alleged interference is directed at a business relationship to which the defendant is a party."); *see also Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 503 S.E.2d 278, 283 (Ga. 1998) ("The intended third-party beneficiary of a contract, legally authorized to enforce the contract, cannot be held liable for tortious interference since he is not a stranger to the contract.").

retaining liability for TWC's indemnity claim, as confirmed by a draft of the "Excluded Liabilities" provision of the proposed APA provided on March 1, 2012, TWC did what any reasonable business would do and put FTS on notice of TWC's pending indemnity claim.  (SUMF, ¶¶ 23-26.)  Further, despite its prior representations to the Court, Cableview knew all along the basis for the amounts sought by TWC (the settlement paid to McLarty, plus fees and expenses incurred in that action) and never had any reasonable basis for challenging the amounts sought.  (*Id.*, ¶¶ 23, 25, 31.)  Thus, summary judgment must issue with respect to this claim.

### F.  Cableview's Negligent Misrepresentation Claim Fails Because There Was No Justifiable Reliance By Cableview

Reliance on an alleged negligent misrepresentation must be justifiable in order to prove the claim.[41]  Here, there is a complete lack of justifiable reliance by Cableview on any alleged oral representation that TWC approved the FTS transaction.  (SAC, ¶ 26.)  First, Cableview admits that it never asked TWC for consent to assign any agreement with Cableview, including the 2011 Agreement, and that no one at TWC gave such consent.  (SUMF, ¶ 36.)  Second, even if Sieiro had consented to the FTS transaction (as falsely alleged in the SAC), Cableview's reliance was not justifiable because Cableview knew that Sieiro did not have the authority to consent to the assignment of the 2011 Agreement (or any other contract with Cableview).  (SUMF, ¶ 37.)  Third, Cableview knew that any consent to assign the 2011 Agreement had to be in a writing executed by TWC, as the 2004 Agreement states that "[n]either party shall have the right to assign"

---

[41] *Coral Reef Drive Land Dev. LLC v. Duke Realty Ltd. Partnership*, 45 So.3d 897, 902 (Fla. 3rd DCA 2010) (Plaintiffs "could not, as a matter of law, justifiably rely on an alleged verbal 'commitment' to exercise the purchase option in the future because they had expressly agreed not to do so.  Written exercise provisions avoid misunderstandings and swearing contests.").

the contract "without the express prior written consent of the other party."  (2004

Agreement (Docs. 1), p., 10, ¶ 21.)  Consequently, any reliance by Cableview on Sieiro's

alleged oral approval of the FTS transaction is not justifiable as a matter of law.

### G.  Cableview's FDUTPA Claim Fails Because Payment of TWC's Indemnity Claim Does Not Involve "Trade or Commerce"

Cableview's FDUTPA claim fails because TWC's demand for payment in

satisfaction of Cableview's indemnity obligation does not involve "trade or commerce"

under Fla. Stat. § 501.230(8).  The FDUTPA prohibits "unfair or deceptive acts or

practices in the conduct of any trade or commerce."  Fla. Stat. 501.204(1) (emphasis

added).  "Trade or commerce" "means the advertising, soliciting, providing, offering, or

distributing, whether by sale, rental, or otherwise, of any good or service, or any property,

whether tangible or intangible, or any . . . thing of value . . . ."  Fla. Stat. § 501.230(8).

Cableview's FDUTPA claim alleges that TWC extracted $560,000 as a condition of

its consent to assign the 2011 Agreement to FTS.  (SAC, ¶ 57.)  But TWC's demand for

payment satisfying its indemnity claim against Cableview does not constitute "soliciting

… any good or service, or any … thing of value," and thus does not constitute "trade or

commerce" necessary for the application of FDUTPA.  Instead, TWC exercised its legal

and contractual remedies to obtain collection on the debt owed, for which it had already

filed a lawsuit against Cableview.  "An attempt to collect a debt by exercising one's legal

remedies does not constitute 'advertising, soliciting, providing, offering, or distributing'

as those terms are used in Fla. Stat. § 501.203(8).  Therefore, the Defendants were not

engaged in 'trade or commerce' when they sent demand letters and otherwise engaged in

debt collection efforts, and the Plaintiff has failed to state a claim for violation of

24

FDUTPA." *Acosta v. James A. Gustino, P.A.*, Case No. 6:11-cv-1266-Orl-31GJK, 2012 WL 4052245, *1 (M.D. Fla. Sept. 13, 2012).[42]  TWC's exercise of its contractual and legal rights to refuse to consent to the assignment absent satisfaction of the indemnity obligation thus is not "trade or commerce" under the FDUTPA.  *Economakis*, 2014 WL 820623, *3; *Begelfer*, 409 N.E.2d at 176.[43]

## IV.    CONCLUSION

TWC respectfully requests that the Court grant summary judgment as to all of Cableview's claims against TWC.

Respectfully Submitted,

**WARGO & FRENCH, LLP**

/s/ Mark L. Block
MARK L. BLOCK

---

[42] *Accord*, *Kelly v. Palmer, Reifler, & Assoc.*, 681 F. Supp. 2d 1356, 1375-76 (S.D. Fla. 2010) (pre-suit demand letters are not "the equivalent of soliciting or offering a 'thing of value'" and thus has "zero connection whatsoever to any 'trade or commerce'" under FDUTPA); *Economakis v. Butler & Hosch, P.A.*, Case No. 2:13-cv-832-38DNF, 2014 WL 820623, * 3 (M.D. Fla. March 2, 2014) (inaccurate mortgage reinstatement letters do not involve "trade or commerce" under the FDUTPA).  "Courts have also held that '[a] person is not engaged in trade or commerce merely by the exercise of contractual or legal remedies.'" *Economakis*, 2014 WL 820623, *3 (quoting *Begelfer v. Najarian*, 409 N.E.2d 167, 176 (Mass. 1980)).

[43] Moreover, it is undisputed that the 2004 Agreement involved the sale of Cableview's services to TWC (not the other way around).  (SUMF, ¶ 1.)  Because Cableview was the "seller" and not the "purchaser" under the 2004 Agreement, it cannot be characterized as a "consumer" of any goods or services sold by TWC.  Many courts which have examined the legislative history of FDUTPA following the 2001 amendments thereto conclude that only "consumers" of goods and services have standing to pursue a claim under FDUTPA.  *E.g.*, *Taft v. Dade County Bar Assoc., Inc.*, No. 1:15-CV-22072-KMM, 2015 WL 5771811, *3-4 (S.D. Fla. Oct. 2, 2015); *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1349-50 (S.D. Fla. 2009); *Leon v. Tapas & Tintos, Inc.*, 51 F. Supp. 3d 1290, 1296-97 (S.D. Fla. 2014); *but see Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*, 169 So.3d 164 (Fla. 4th DCA 2015) (holding that one does not have to be a "consumer" to have standing to sue under FDUPTA).  Indeed, the FDUTPA's test for determining whether an act or practice is "unfair" depends on whether it has substantial injurious effect on "consumers."  *See Porsche Cars North America, Inc. v. Diamond*, 140 So.3d 1090, 1096-98 (Fla. 3rd DCA 2014) (FDUTPA is modeled on § 45 of the Federal Trade Commission Act, and borrows the FTC's definition of "unfair" in its 1980 Policy Statement); 15 U.S.C. § 45(n) (an act or practice is not unfair under the statute "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.").

California Bar No. 115457
(Admitted *Pro Hac Vice*)
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: (310) 853-6355
Facsimile: (310) 853-6333
E-mail: mblock@wargofrench.com

MICHAEL S. FRENCH
Georgia Bar No. 276680
(Admitted *Pro Hac Vice*)
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1511
E-mail: mfrench@wargofrench.com

RYAN BOLLMAN
Florida Bar No. 093553
201 S. Biscayne Boulevard, Suite 1000
Miami, Florida 33131
Telephone: (305) 777-6000
Facsimile: (305) 777-6001
E-mail: rbollman@wargofrench.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 30, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Mark L. Block*___
MARK L. BLOCK