**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CABLEVIEW COMMUNICATIONS
OF JACKSONVILLE, INC., a
Florida Corporation,

                Plaintiff,

vs.                                                    Case No.  3:13-cv-306-J-JRK

TIME WARNER CABLE SOUTHEAST,
LLC, a/k/a Time Warner Cable Enterprises,
LLC, f/k/a Time Warner Entertainment
Company, L.P., a/k/a Time Warner
Entertainment-Advance/Newhouse
Partnership, d/b/a Time Warner Cable, and
TIME WARNER ENTERTAINMENT-
ADVANCE/NEWHOUSE PARTNERSHIP,
d/b/a Time Warner Cable,

                Defendants.

_____/

# O R D E R[1]

## I.  Status

    Plaintiff Cableview Communications of Jacksonville, Inc. ("Cableview") initiated this

action on March 21, 2013 to recover damages stemming from its payment of $560,000 to

Defendants (collectively, "Time Warner") in May 2012 for a disputed indemnity debt that

arose out of a workplace injury in June 2008.[2]  Cableview's operative complaint includes

---

[1]    The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Joint Stipulation and Consent for Reference of This Action to a United States Magistrate Judge for All Purposes (Doc. No. 265), filed September 8, 2016; Reference Order (Doc. No. 266), entered September 9, 2016.

[2]    The two Time Warner entities in this case are Time Warner Cable Southeast, LLC ("TWC-SE") and Time Warner Entertainment-Advance/Newhouse Partnership ("TWEAN").  Initially, only TWC-SE was named as a defendant.  See Complaint (Doc. No. 1), filed March 21, 2013.  For reasons that are unimportant here, TWEAN was added as a defendant on January 29, 2016, upon the filing of Cableview's Second Amended Complaint (Doc. No. 222).

    Disputes have arisen, during this case, regarding whether the particular corporate entities named as parties are indeed the appropriate parties for the claims asserted—as opposed to other, affiliated Cableview
(continued...)

three counts, all concerning how Time Warner went about collecting the payment: tortious interference with business relations (Count I); violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211 ("FDUTPA") (Count II); and negligent misrepresentation (Count III).  See Second Amended Complaint (Doc. No. 222), filed January 29, 2016, at 10-13.  Time Warner contests these claims, states various affirmative defenses, and asserts three counterclaims against Cableview: breach of an indemnity provision (Count I); breach of an insurance provision (Count II); and breach of a settlement agreement (Count III).  See Defendants' Answer to Second Amended Complaint and Defendant Time Warner Entertainment-Advance/Newhouse Partnership's Counterclaims (Doc. No. 224), filed February 17, 2016, at 1-13 ("Time Warner's Answer"); Defendant Time Warner Entertainment-Advance/Newhouse Partnership's Amended Counterclaims (Doc. No. 230; "TWEAN's Counterclaims"), filed March 30, 2016; Defendant[ Time Warner Cable Southeast, LLC's] Second Amended Answer and Affirmative Defenses to Amended Complaint and Second Amended Counterclaims (Doc. No. 102), filed April 3, 2015, at 12-19 ("TWC-SE's Counterclaims"); see also Defendants' Notice of Withdrawal of Fourteenth Affirmative Defense – Statute of Limitations (Doc. No. 231), filed March 31, 2016; Plaintiff, Cableview Communications of Jacksonville, Inc.'s Answer and Affirmative Defenses to Defendant Time Warner Entertainment-Advance/Newhouse Partnership's Amended Counterclaims (Doc. No. 238), filed April 20, 2016.[3]

---

[2](...continued)
or Time Warner entities.  Those disputes are not at issue in the matters now before the Court.

[3]        The two Time Warner Defendants—TWC-SE and TWEAN—separately filed counterclaims against Cableview, but they both assert basically the same three counterclaims.  Counterclaims aside, Time Warner's Answer (Doc. No. 224) is the operative Answer for both Time Warner Defendants.

Currently pending before the Court are the parties' motions for summary judgment; the responses in opposition thereto; a reply and sur-reply filed in relation to one of the motions; and Time Warner's objections to certain evidence filed in support of Cableview's motion for summary judgment:

1.    Dispositive Motion by Defendants Time Warner Cable Southeast LLC and Time Warner Entertainment-Advance/Newhouse Partnership for Summary Judgment, Incorporating Statement of Undisputed Material Facts and Supporting Memorandum of Law (Doc. No. 257; "Time Warner's Motion"), filed August 30, 2016; Plaintiff's Response in Opposition to Dispositive Motion by Defendants Time Warner Cable Southeast LLC and Time Warner Entertainment-Advance/Newhouse Partnership for Summary Judgment, Incorporating Statement of Undisputed Material Facts and Supporting Memorandum of Law (Doc. No. 271; "Cableview's Response"), filed September 23, 2016; Defendants' Reply in Support of Their Dispositive Motion for Summary Judgment (Doc. No. 280; "Time Warner's Reply"), filed October 14, 2016; Plaintiff's Sur-Reply to Defendants' Reply in Support of Their Dispositive Motion for Summary Judgment (Doc. No. 284; "Cableview's Sur-Reply"), filed October 28, 2016.

2.    Plaintiff's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. No. 256; "Cableview's Motion"), filed August 30, 2016; Opposition by Defendants Time Warner Cable Southeast LLC and Time Warner Entertainment-Advance/Newhouse Partnership to Plaintiff's Motion for Summary Judgment (Doc. No. 269; "Time Warner's Response"), filed September 23, 2016.

3.    Defendants' Objections and Motion to Strike or Exclude Inadmissible Evidence Filed by Plaintiff in Connection with Dispositive Summary Judgment Motions, and

Incorporated Memorandum of Law (Doc. No. 276; "Time Warner's Objections"), filed October 4, 2016; Response in Opposition to Defendants' Motion to Strike (Doc. No. 283; "Response to Objections"), filed October 24, 2016.

In addition, multiple documents were filed in support of each motion. <u>See</u> Notices of Filing Exhibits by Defendants Time Warner Cable Southeast LLC and Time Warner Entertainment-Advance/Newhouse Partnership in Support of Their Dispositive Motion for Summary Judgment (Doc. Nos. 258, 259, 260, 261, 262), filed August 30, 2016; Notice of Filing Exhibits by Defendants Time Warner Cable Southeast LLC and Time Warner Entertainment-Advance/Newhouse Partnership in Support of Their Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 270), filed September 23, 2016; Cableview's Notices of Filing (Doc. Nos. 272, 273, 274), filed September 23, 2016; Declaration of Mark L. Block in Support of Defendants' Objections and Motion to Strike or Exclude Inadmissible Evidence Filed by Plaintiff in Connection with Dispositive Summary Judgment Motions (Doc. No. 279), filed October 5, 2016.

The Court held oral argument on November 9, 2016 and heard from counsel of record for all parties. <u>See</u> Minute Entry (Doc. No. 288); Transcript (Doc. No. 289; "Tr."). These matters are ripe for resolution.

## II. Facts

### A. Introduction

Essentially, Cableview filed this case to recoup a $560,000 payment to Time Warner that was made as a result of Time Warner's efforts to collect on a disputed indemnity claim against Cableview. The source of the disputed claim was a 2010 action ("McLarty Action") brought by a Cableview employee, James McLarty, against Duke Energy Carolinas, LLC ("Duke"). Mr. McLarty was injured in June 2008 while performing work for Time Warner on

a utility pole owned by Duke.  Time Warner defended and indemnified Duke in the McLarty

Action, accruing substantial fees and expenses.  In Time Warner's view, Cableview owed a

contractual duty to indemnify Time Warner for those fees and expenses.

On settling the McLarty Action in February 2012, Time Warner sought to collect on

its indemnity claim against Cableview.  Around the same time, Cableview was finalizing an

asset purchase agreement ("APA") with another company, FTS USA, LLC/Unitek Global

Services, Inc. ("FTS"), to sell most of Cableview's assets and to assign its service agreement

with Time Warner.  Assigning the service agreement required Time Warner's written consent.

Time Warner refused to give its consent unless the indemnity claim was resolved.

Subsequently, payment for Time Warner's indemnity claim was worked into the APA, and

Time Warner was eventually paid $560,000 from the proceeds of Cableview's APA

transaction with FTS.

Based on the documents submitted by the parties in support of their respective

motions for summary judgment, the largely undisputed facts of the case are set out in detail

below.

**B.  Indemnity Agreements**

On January 19, 1996, Time Warner entered into an agreement with Duke that enabled

Time Warner to access and use Duke's utility poles for Time Warner's cables.  See Doc. No.

256-2 ("Pole Attachment Agreement").  The Pole Attachment Agreement imposed the

following obligation on Time Warner:

> [Time Warner] shall indemnify, defend and save harmless [Duke] from and
> against any and all liability, claims, demands, loss, costs and expenses, to
> include attorney's fees, and any judgment for actual or punitive damages
> because of: . . . (2) injury or death to persons . . .  which may arise out of or be
> caused by the erection, maintenance, presence, operation or removal of [Time
> Warner's] cable or the proximity of [Time Warner's] cable to the wires and
> facilities of [Duke], or any act of [Time Warner], its agents or employees, on or

in the vicinity of [Duke's] poles, excepting, however, damage, injury or loss due to the sole negligence of [Duke].

Pole Attachment Agreement at 17.[4]

On July 19, 2004, Cableview entered into an agreement with Time Warner to provide cable television installation services in the Greensboro, North Carolina area. See Doc. No. 258-1 ("2004 Installation Agreement"). The 2004 Installation Agreement required Cableview to carry liability insurance covering "all claims arising from [Cableview's] operations." Id. at 4.[5] The Agreement also included the following indemnity provision:

> To the fullest extent permitted by law, [Cableview] shall indemnify, defend, protect, save and hold harmless [Time Warner] . . . from and against all claims, damages actions, losses, and expenses arising out of or resulting from the performance of the work as defined in the contract performed by [Cableview], and Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable. The indemnity provided hereunder shall not be limited by the insurance requirements listed [in the 2004 Installation Agreement].

Id. at 3. Under the Agreement, moreover, Cableview was liable for its own negligence even for acts and omissions not covered by its insurance:

> If Time Warner Cable . . . suffer[s] or incur[s] any damages not covered by the insurance requirements as provided within or arising from [Cableview's] negligent acts, failure to act or omissions in the performance of any of the terms and conditions of any agreement, Time Warner Cable . . . will be entitled to recover such damages from [Cableview].

Id. at 8. The Agreement additionally provided that Time Warner was not liable for any of Cableview's violations of Occupational Safety and Health Administration (OSHA) regulations.

Id. at 2.

---

[4]     Unless otherwise indicated, citations to exhibits refer to the page numbers assigned by the Court's Electronic Case Filing System.

[5]     Citations to the 2004 Installation Agreement refer to the page numbers indicated on the lower right corners, beside the word "Page."

Evidently, the 2004 Installation Agreement was later superseded by a new agreement signed by Time Warner and Cableview in 2011. <u>See</u> Doc. No. 258-6 ("2011 Installation Agreement"), at 11.

## C. McLarty Action

On June 18, 2008, Cableview employee James McLarty was hanging a cable television line for Time Warner, under the 2004 Installation Agreement, when a utility pole collapsed, injuring Mr. McLarty. <u>See</u> Doc. No. 258-17 (Cableview's responses to first requests for admission), at 2-3; Doc. No. 259-2 (McLarty deposition, April 1, 2015), at 7. Mr. McLarty filed a workers' compensation claim against Cableview, which was settled by Cableview's workers' compensation insurance carrier in January 2010. <u>See</u> Doc. No. 256-4 (settlement documents). On July 21, 2010, Mr. McLarty filed an action for negligence against Duke, the utility pole's owner, in the Superior Court of Durham County, North Carolina ("McLarty Action"). <u>See</u> Doc. No. 272-6 (Mr. McLarty's complaint). Another defendant, Enerco Energy Services, Inc. ("Enerco"), a pole inspection company hired by Duke, was later added in an amended complaint. <u>See</u> Doc. No. 259-3 (Mr. McLarty's amended complaint).

Mr. McLarty did not bring any claims against Cableview, nor did he allege in any pleadings that his injuries were caused by any negligence of Cableview or himself. During litigation in the McLarty Action, on August 2, 2011, Mr. McLarty testified that before climbing the pole at issue, he conducted various tests on the pole, including a vertical test, a hammer test, and a probe test, and he testified Cableview had trained him to conduct these tests. Doc. No. 256-25 (McLarty deposition, August 2, 2011), at 15-18; Doc. No. 272-4 (McLarty deposition, August 2, 2011), at 6-9 (deposition transcript pages 52-64). Mr. McLarty's testimony differed in a later deposition, on April 1, 2015, when he said he did a hammer test ("a spot check" on the pole by hitting it with his hammer) but did not conduct a probe test,

and he stated that Cableview had never trained him to do a probe test.  Doc. No. 284-14

(McLarty deposition, April 1, 2015), at 4, 19 (deposition transcript pages 7, 67, and 68).

Experts retained in the present case by Time Warner and Cableview opined Mr.

McLarty failed to conduct the proper tests on the pole and that, if the proper tests had been

done, Mr. McLarty would not have climbed the pole.  Time Warner's expert, F.M. Brooks,

P.E., stated, "It is obvious that [Mr. McLarty] did not properly test the pole before climbing the

ladder," as the pole's "significant" decay "would have been readily detectable to any

experienced communication technician who performed even cursory probing at the ground

line of the pole."  Doc. No. 259-1, at 5; see id. at 5-7.  Mr. Brooks further concluded

Cableview was also at fault by failing to properly train Mr. McLarty.  Id. at 7-9.  Cableview's

expert, H. Michael Barnes, Ph.D., testified in his opinion that Mr. McLarty did not use the

proper techniques to assess the pole before climbing it.  See Doc. No. 258-19 (May 20, 2015

deposition), at 6; see also Doc. No. 258-18 (Plaintiff's Expert Disclosures).  According to Dr.

Barnes, had Mr. McLarty conducted the proper tests, he would not have climbed the pole and

gotten injured.  Doc. No. 258-19, at 6, 10; see also Doc. No. 258-18, at 42 (Dr. Barnes's

expert report).  Dr. Barnes agreed with Dr. Brooks's report that Mr. McLarty did not conduct

a prod test, a hammer test, or a horizontal push test.  Doc. No. 258-19, at 7, 8, 13-14.

Moreover, Brian Williams, counsel for Time Warner in the McLarty Action, testified that,

during the McLarty Action, "there was evidence Mr. McLarty was contributorily negligent

based on his testimony, the pictures, and the work performed by [an expert in the case]."

Doc. No. 259-8 (Williams deposition, March 11, 2015), at 32-33.  Mr. Williams also stated

that other evidence showed Cableview was at fault for failure to follow required procedures

and regulations.  Id. at 33.

After the McLarty Action was filed, Duke tendered the case to Time Warner, demanding that Time Warner defend and indemnify Duke pursuant to the Pole Attachment Agreement, and Time Warner accepted Duke's tender. Id. at 7-8; Doc. No. 256-7 (letters from Duke to Time Warner regarding tender). Time Warner then tendered the McLarty Action to Cableview and Cableview's insurer, First Mercury Insurance Company ("First Mercury"), on September 23, 2010, for defense and indemnification pursuant to the 2004 Installation Agreement.[6] See Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 44-45; Doc. No. 256-8 (September 23, 2010 letter from Time Warner's counsel to Cableview). In doing so, Time Warner stated that if Cableview did not respond by October 4, 2010 agreeing to "defend Duke's interests," then Time Warner would "begin defending Duke and [would] submit any defense costs to [Cableview] for reimbursement." Doc. No. 256-8, at 3.

In the ensuing months, Time Warner and First Mercury corresponded about the indemnity matter. On October 28, 2010, First Mercury rejected the McLarty Action tender. Doc. No. 256-10. Writing on behalf of First Mercury and Cableview, First Mercury asserted that because Mr. McLarty's injuries were caused by Duke's defective pole, the matter did not "arise out of the performance of the insured work" so as to trigger the defense and indemnity obligations in either the insurance policy or the 2004 Installation Agreement. Id. at 2-3. On November 3, 2010, Time Warner asked First Mercury to reconsider its rejection, stating, "If First Mercury does not accept the tender and provide Duke with a defense, then we will pursue all legal remedies." Doc. No. 256-11, at 2. Time Warner also stated, "Plaintiff's counsel has already served discovery on Duke. Because the case cannot continue to sit idle,

---

[6]     Cableview suggests, in its Response to Time Warner's Motion, that the action was tendered to a different Cableview entity, see Cableview's Response at 12, but Cableview made clear at the hearing that it does not dispute that it received notice of the McLarty Action, see Tr. at 44-45.

Time Warner Cable will provide a defense for Duke. Those defense costs will be included as part of Time Warner Cable's claim to First Mercury." Id. at 2. On December 10, 2010, First Mercury affirmed its decision to reject the tender. Doc. No. 256-15 (letter). After Mr. McLarty filed an amended complaint, Doc. No. 259-3, Time Warner apparently asked First Mercury again, on November 9, 2011, to reconsider its rejection, and First Mercury responded on December 19, 2011, again rejecting the tender. See Doc. No. 256-16 (December 19, 2011 letter from First Mercury to Time Warner's counsel).

In light of First Mercury's rejections, Time Warner agreed to defend and indemnify Duke in the McLarty Action. See Doc. No. 272-12 (emails between Duke and Time Warner on November 5 and 17, 2010). In exchange, Duke agreed to waive conflicts regarding the representation, including as to potential third-party claims Duke may have had against Time Warner in the McLarty Action. See id.

On February 16, 2012, Time Warner and Duke settled the McLarty Action in exchange for a payment of $362,500 to Mr. McLarty. See Doc. No. 259-2 (McLarty deposition, April 1, 2015), at 19; Doc. No. 259-4 (settlement agreement); Doc. No. 259-9 (check for $362,500 to Mr. McLarty and his attorneys for "final settlement of 6/18/08 accident" (capitalization omitted)). In addition to this amount, Time Warner paid more than $200,000 in attorneys' fees and costs to defend the McLarty Action. See Doc. No. 261-2 (declaration of Colleen Moore, director of claims management for Time Warner), at 3-4; Doc. No. 261-3 (report of Time Warner's expenses paid for defending and settling McLarty Action); Doc. Nos. 260-1 (declaration of Brian Williams, Time Warner's counsel); Doc. No. 261-4 (declaration of Lew Glenn, Time Warner's counsel), at 4-5; Doc. Nos. 260-2, 261-3, 261-5 (time sheets and invoices). Mr. Williams, Time Warner's counsel in the McLarty Action, testified that in his

expert opinion, the McLarty settlement was reasonable.  Doc. No. 259-8 (Williams deposition, March 11, 2015), at 28.

## D.  The APA and North Carolina Indemnity Action

In early 2012, Cableview was involved in negotiations to sell most of its assets and assign its service agreements with Time Warner to another company, FTS.  Cableview and FTS were scheduled to close their deal by signing the APA (asset purchase agreement) on March 2, 2012.  See Doc. No. 274-10, at 2 (February 14, 2012 email from Chris Perkins (chief executive officer for FTS) to Tony Sieiro (director of technical operations for Time Warner) and Jim Schieszer (president of Cableview), among others, regarding FTS's "acquisition of Cableview"; stating that "[w]e have a set close date of March 2nd").  Assignment of Cableview's and Time Warner's operative 2011 Installation Agreement required Time Warner's written consent.  See Doc. No. 258-6 ("2011 Installation Agreement"), at 11.

There is conflicting evidence in the record as to the extent and substance of Cableview's early-2012 communications with Time Warner about the impending transaction with FTS—and in particular, whether Time Warner initially indicated that it would consent to assignment of the 2011 Installation Agreement.[7]  This evidence involves January 2012 communications between Glenn Gravley, Cableview's system coordinator, and Tony Sieiro, Time Warner's director of technical operations; it also involves February 2012 communications between Mr. Schieszer and Mr. Sieiro.

Mr. Gravley wrote to Mr. Schieszer on January 11, 2012 that he "spoke with Tony Sieiro this morning about the company changes."  Doc. No. 274-8, at 2.  The email does not

---

[7]     This disputed fact is immaterial to the Court's resolution of the motions.

specifically mention the FTS transaction or assignment of any agreement between Cableview and Time Warner.  Discussing his conversation with Mr. Sieiro, Mr. Gravley wrote, "Overall after talking with Tony he has a positive outlook and welcomes the improvement to our job site."  Id.  Mr. Gravley later attested (in a declaration dated March 17, 2015) that in early 2012, he "informed Mr. Sieiro that a company called FTS would be taking over the Greensboro, North Carolina operations of Cableview."  Doc. No. 262-6, at 2.  But, according to Mr. Gravley, he never asked Mr. Sieiro or anyone else at Time Warner for Time Warner's consent to the assignment of the 2011 Installation Agreement (or any other Time Warner contract), and no such consent was ever given.  Id. at 2-3.  Mr. Gravley asserts he understood Mr. Sieiro lacked authority to give such consent or approval.  Id. at 2.

Mr. Schieszer testified, "I met with Tony Sieiro in mid to early February [2012] and asked him if he would approve the sale of our assets to Time Warner, and [Mr. Sieiro] said yes."  Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 9.  In this meeting, according to Mr. Schieszer, the 2011 Installation Agreement was not specifically referenced, but Mr. Schieszer claims he "asked [Mr. Sieiro] if we could transfer the operation to FTS, and [Mr. Sieiro] said yes."  Id. at 9-10.  On February 14, 2012, FTS C.E.O. Mr. Perkins emailed Mr. Sieiro and Mr. Schieszer, among others, about FTS's "acquisition of Cableview," stating, "Please be patient as we begin transitioning this business to a TWC compliant model."  Doc. No. 274-10, at 2.  The email ends, "Thank you again for the opportunity!"  Id.  Mr. Sieiro testified at his deposition that he did not recall ever seeing this email, and he denied having any communications with Cableview before February 14, 2012 about transitioning Cableview's contracts to FTS.  See Doc. No. 274-11 (Sieiro deposition, December 11, 2014), at 5-7.

As additional evidence suggesting Time Warner (and Mr. Sieiro in particular) was in communication with Cableview in January and early February 2012 about the transaction with FTS, there is a January 31, 2012 email sent to Mr. Gravley from Mr. Sieiro's executive assistant, Britt White, stating, "I have attached our New Vendor Set Up form.  We will need to have this completed so we can have you set up as a new vendor. .  Please complete and sen[d] it back to me. . .  We will also need a W9 and a certificate of insurance."  Doc. No. 274-9, at 3-4 (ellipses in original).  Subsequent emails indicate that the email, with the attached form, was forwarded to FTS for the form to be filled out and returned.  Id. at 2-3.

On February 17, 2012, Time Warner asserted its indemnity claim against Cableview in North Carolina court.  Specifically, Time Warner filed an Application and Order Extending Time to File Complaint against Cableview in the Superior Court for Mecklenburg County, North Carolina ("North Carolina Application"), and the court issued a summons that same day.  See Doc. No. 258-2 (Cableview's responses to second requests for admission), at 3-4; Doc. No. 258-5 (North Carolina Application, summons, and Cableview emails regarding the documents).  The North Carolina Application granted Time Warner leave to file a complaint against Cableview by March 8, 2012, for what Time Warner alleged were violations of Cableview's contractual indemnity obligations to Time Warner for the McLarty Action.  Doc. No. 258-5, at 6.  Cableview received a copy of the North Carolina Application and the summons on February 17, 2012.  Doc. No. 258-2 (Cableview's responses to second requests for admission), at 2.  This was the first communication since September 23, 2010 that Cableview had received from Time Warner regarding indemnity for the McLarty Action.  Id. at 5.

On February 28, 2012, Time Warner assistant vice president Diane Blackwood spoke on the phone with Cableview president Mr. Schieszer about Time Warner's indemnity claim.[8] Doc. No. 261-7 (Schieszer deposition, October 16, 2014), at 5-7.   During their phone conversation, according to Mr. Schieszer's deposition testimony, Ms. Blackwood told Mr. Schieszer that Time Warner would not consent to the assignment of the 2011 Installation Agreement to FTS unless the McLarty Action issue was resolved.[9]  Id. at 8.  Mr. Schieszer testified, "I told [Ms. Blackwood] on that first call that I would look into it and I would make sure that the insurance company got involved and I would do everything possible. I needed to—you know, to make her happy."  Id. at 9.  Mr. Schieszer also testified he told Ms. Blackwell "that we had the insurance company, that everything should be and go through the insurance company, and I would leave it up to the attorneys to work out the wording in the closing settlement so that when all the documents were done Time Warner would be satisfied, and they were."  Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 31.

At 2:47 p.m. on February 28, 2012, Mr. Schieszer wrote the following email to FTS C.E.O. Mr. Perkins:

---

[8]     Ms. Blackwood's apparently contemporaneous handwritten notes indicate that an initial conversation with Mr. Schieszer took place at 12:25 p.m., and then a "Follow-up call" discussing payment took place at 4:15 p.m.  Doc. No. 273-5, at 2, 4.

[9]     Cableview has obliquely suggested Ms. Blackwood did not tell this to Mr. Schieszer, but Cableview has not raised a genuine dispute on this point, particularly in light of Mr. Schieszer's clear testimony to the contrary.  Specifically, Cableview states in its Response that Ms. Blackwood's "contemporaneous notes from the February 28, 2012 telephone calls do not reflect any discussion of assignment of the 2011 Field Installation Services Agreement."  Cableview's Response at 5 (citation omitted); see Doc. No. 273-5 (Ms. Blackwood's notes).  Later, in its Sur-Reply, Cableview states, "While it may have been discussed, her notes [are] not reflective of that topic."  Sur-Reply at 5.  The undersigned observes that Ms. Blackwood's handwritten notes are informal and disjointed, making no attempt at a comprehensive or readable account of the topics addressed in the conversation.  See Doc. No. 273-5.  Although the notes do not mention the topic of consent to assign the 2011 Installation Agreement, it is clear from Mr. Schieszer's testimony that this topic was discussed.  Mr. Schieszer testified Ms. Blackwood told him in a February 28, 2012 phone call, "Well, you can't sell your company with this issue outstanding," and also that Time Warner was not going to consent to the assignment of the 2011 Installation Agreement unless the McLarty Action issue was resolved.  Doc. No. 261-7, at 7, 8.  This evidence is undisputed.

> I spoke with Tony[10] from TW a today [sic] and they have blessed the transfer to FTS. There is an open liability claim from an accident in 2008. We agreed that CVC will be solely responsible to resolve the issue and that FTS will in no way be held accountable.  It is from the law suit where the pole broke on our installer and we paid all workers comp claims, but he sued Duke Power and light.  Call me if you have any questions.

Doc. No. 258-14, at 2.  At his deposition, Mr. Schieszer explained his statement, in the email, that Cableview would be "solely responsible to resolve the issue": "Well, what I meant was that FTS would not have it.  It would be up to Cableview to resolve it. That's true.  But I was still anticipating the insurance company to resolve it."  Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 28.  Mr. Schieszer stated he believed at the time that Cableview's insurance would cover the indemnity payment "if it was indeed something that needed to be paid."  Id. at 30, 32.

At 4:57 p.m. on February 28, 2012, Mr. Schieszer emailed Jack Webb (Cableview's counsel) with the contact information for Lew Glenn (Time Warner's counsel), stating, "Please make sure he approves the closing documents and that they are satisfied with all the wording pertaining to the settlement."[11]  Doc. No. 258-15, at 2.

On March 1, 2012, Time Warner sent two communications (a letter and an email) to FTS conditioning its consent to assignment of the 2011 Installation Agreement on repayment for the McLarty Action.   In the letter, Ms. Blackwood stated as follows to Mike Coffey, regional director for FTS:

> You are hereby given notice . . . that [Time Warner] has asserted a claim for indemnity against [Cableview]. . . .  Time Warner presently understands that Cableview is taking action to incorporate this obligation into the closing documents related to the sale of some or all of Cableview[']s assets

---

[10]     In reference to this email, Mr. Schieszer stated at his deposition, "Now that I think about that, I said I talked with Tony, but I believe that was Diane Blackwood . . . ."  Doc. No. 258-3, at 29.

[11]     Mr. Schieszer claimed at his deposition that the "settlement" he was referring to in the email was the sale of Cableview's assets in the APA.  Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 29.

and/or ownership interest(s) to FTS, and that Cableview intends to memorialize its understanding with Time Warner that this obligation will be paid in full out of the first proceeds of the closing contemplated by Cableview and FTS.

Until this matter is fully resolved to Time Warner's satisfaction and FTS agrees in writing to accept all obligations under the Cableview–Time Warner contract(s) and any liabilities that may exist based on those contracts, Time Warner will not consent to the assignment of any contract(s) between Time Warner (or any of as affiliated entities) and any Cableview entity, whether to FTS or otherwise. FTS is not presently authorized to perform work for or on behalf of Time Warner under any such contract. Time Warner reserves the right to take such other and further actions as it deems necessary to preserve its rights and protect its claim against Cableview.

Doc. No. 256-21, at 2. The email was sent from Mr. Glenn to Kyle Hall, FTS's general counsel, and it contains the same language as Ms. Blackwood's letter. See Doc. No. 258-7, at 3 (email, sent at 1:38 p.m. on March 1, 2012). Mr. Glenn testified these communications were sent "[t]o protect the interest of Time Warner Cable" and "to make sure" that FTS was given notice of Time Warner's indemnity claim. Doc. No. 261-8 (Glenn deposition, January 7, 2015), at 17.

At 2:00 p.m. on March 1, 2012, Mr. Webb (Cableview) provided Mr. Glenn (Time Warner) with the excluded liabilities provision of the APA between Cableview and FTS. Doc. No. 261-11 (March 1, 2012 emails exchanged between Mr. Webb and Mr. Glenn, with "a cut and paste of the APA language" included); see Doc. No. 261-4 (Glenn declaration, May 28, 2015), at 3 (stating that he did not receive this provision until March 1, 2012). The provision at that time stated FTS would "not assume any liabilities or obligations of [Cableview], of whatever nature, whether known or unknown, absolute or contingent, matured or unmatured, relating to any period prior to the Closing Date, including without limitation . . . any litigation, arbitration, mediation or similar claims against [Cableview]." Doc. No. 261-11, at 2. In reply, at 2:05 p.m., Mr. Glenn asked Mr. Webb, among other things, "to have the indemnity claim expressly identified as an Excluded Liability in some way that confirms [FTS's] agreement

or understanding of its existence." Id. Mr. Glenn wrote, "At the end of the day, Time Warner Cable wants some assurance that it is not going to be left pursuing a claim against a shell company without cash or assets. Any other way you can think of to provide that assurance would be helpful." Id.

At 2:36 p.m. on March 1, 2012, FTS C.E.O. Mr. Perkins emailed Mr. Schieszer and others to report that FTS regional director Mike Coffee had just received the letter from Time Warner about the indemnity claim.  Doc. No. 258-13, at 2.  Mr. Schieszer replied a few minutes later, "This is an 08 insurance claim and it is outlined in the closing docs. We have this worked out." Id.

After 5:00 p.m. on March 1, 2012, Mr. Glenn and Mr. Webb exchanged emails in which Mr. Webb stated, "Here are the modifications. Upon approval, they will be incorporated into the APA for final execution. Thanks for your help."  Doc. No. 274-5, at 3; see also Doc. No. 256-22 (Webb deposition, Oct. 1, 2014), at 4 (explaining that FTS's counsel drafted these changes after talking with Mr. Webb).  At 9:02 the next morning (March 2, 2012), Mr. Glenn wrote to Mr. Webb, "TWC has an assignment agreement ready to go in conjunction with the closing if you can get me the signature information for the buyer."  Doc. No. 274-5, at 2.  That day, Time Warner consented to assign the 2011 Installation Agreement.  Doc. No. 274-4 (consent agreement, signed by Ms. Blackwood (Time Warner), Mr. Schieszer (Cableview), and Ronald J. Lejman (C.F.O. of FTS) on March 2, 2012).

Also on March 2, 2012, FTS and Cableview closed their agreement by signing the APA, under which FTS acquired substantially all of Cableview's assets, including the 2011 Installation Agreement with Time Warner.  See Doc. No. 258-10 (APA).  The APA makes specific references to "the TW Action," "the TW claim amount," and to the payment from FTS

to Time Warner (referred to as "the plaintiff in the TW Action"). Id. at 5, 31. One provision describes how payment was to be made:

> [F]ollowing receipt of joint wiring instructions from Sellers [(Cableview)] and the plaintiff in the TW Action (the "TW Wiring Instructions"), Purchaser [(FTS)] shall pay the TW Claim Amount to the plaintiff in the TW Action from the first payment due pursuant to this Section 4.1.3 and the balance of such payment to Corporate Sellers, it being agreed that Purchaser will withhold any payment pursuant to this Section 4.1.3 until such time as Purchaser receives the TW Wiring Instructions.

Id. at 5 (APA § 4.1.3). Another provision states that the APA creates "no third party beneficiary rights" "[o]ther than with respect to the plaintiff in the TW Action, and in such case solely with respect to matters relating to the TW Claim Amount . . . ." Id. at 31 (APA § 12.13). It further states that Time Warner's counsel would be given an opportunity to review to the APA "to confirm that the executed Agreement contains true and correct provisions addressing the TW Claim Amount." Id. The Excluded Liabilities provision states that FTS would not assume any liability for the "TW Action," and it refers to the "TW Claim Amount" as $515,303.17. Id. at 3-4 (APA § 2.2).

That same day (March 2, 2012), FTS C.F.O. Mr. Lejman sent Mr. Glenn a letter with an executed copy of the APA for Mr. Glenn to review the relevant provisions and to sign the letter acknowledging Time Warner's agreement to be bound by the terms therein. Doc. No. 273-10. Mr. Glenn signed the letter. Id. at 3.

Although the APA closed on March 2, 2012, no payment was made at that time; for payment to occur, pursuant to the APA, Time Warner and Cableview first needed to draft joint wiring instructions to give to FTS.

**E. Negotiations After the APA**

After the closing of the APA, Time Warner and Cableview corresponded about procedural matters related to Time Warner's North Carolina claim, including service of the

complaint.  On March 6, 2012, Mr. Glenn (Time Warner) and Mr. Webb (Cableview) exchanged emails in which Mr. Webb stated he had authority to accept service of Time Warner's complaint on behalf of Cableview, and he asked, "With regard to acceptance of service, when should I expect to see a complaint?"  Doc. No. 274-2, at 2-3; Doc. No. 261-10 (Webb deposition, October 1, 2014), at 9 (acknowledging he told Mr. Glenn he had authority to accept service).  Mr. Glenn replied, "We need to file Thursday per the Application and Order, and are planning on doing that. Let's talk about the next step, because we may want to amend depending on how you want to handle."  Doc. No. 274-2, at 2.  Mr. Webb then wrote, "Agreed. Once I get it, we can review and coordinate efforts." Id.  Also in this email exchange, Mr. Webb told Mr. Glenn that Cableview and FTS closed their transaction the previous Friday (March 2, 2012) and that he believed FTS sent Time Warner a hard copy. Id.

On March 8, 2012, Time Warner filed a complaint against Cableview in North Carolina state court for Cableview's alleged violations of its indemnity obligation in the McLarty Action. See Doc. No. 256-24 (complaint).  At his deposition, Mr. Glenn gave the following explanation for why Time Warner filed the complaint at this time:

> . . . I think I told Jack [Webb] that obviously Time Warner Cable had been paid. The deal was done.  The numbers weren't final.  The dispute wasn't resolved. And also I think it was as a procedural matter it was to—to their advantage to handle it that way.  We had already paid the filing fee.  The action was already initiated.  So while we were talking about things like the assignment of claims from Time Warner Cable to Cableview to pursue their cause of action to force the insurance carrier to cover these claims, there was the idea they could third party the insurance carrier into this existing action and then go off about it against the insurance carrier from there.

Doc. No. 256-17 (Glenn deposition, January 7, 2015), at 7 (deposition transcript page 168).

An email from Mr. Glenn to Mr. Webb on the morning of March 9, 2012 indicates that Mr. Glenn was attaching a copy of the North Carolina action complaint to Mr. Webb, and Mr.

Glenn stated, "Service copy will follow by first class mail." Doc. No. 258-9, at 2. Mr. Glenn also wrote that Time Warner had not yet received a copy of the APA, and so Mr. Webb emailed a copy of the APA to Mr. Glenn. Id. at 2-3; see Doc. No. 261-4 (Glenn declaration dated May 28, 2015), at 3.

On March 26, 2012, Mr. Glenn sent Mr. Webb a brief email indicating that an "Acceptance of Service" form was attached to the email. Doc. No. 274-1, at 3. On March 27, 2012, Mr. Glenn sent an email to Jerry Cordelli, coverage counsel for First Mercury, copied to Mr. Webb, that refers to Mr. Glenn and Mr. Cordelli's phone conversation earlier that day. Doc. No. 273-11, at 2. According to the email, Mr. Glenn understood that Mr. Webb and First Mercury would "discuss acceptance of service of the lawsuit filed by Time Warner and, in particular, who will accept service on behalf of the appropriate Cableview entities." Id. Mr. Glenn wrote, "Once service is accepted, I am willing to discuss extending the deadline for a response to this Complaint to allow Cableview and First Mercury to make appropriate determinations on how best to proceed." Id. On April 6, 2012, Mr. Cordelli advised Mr. Glenn via email that First Mercury had no objection to Cableview accepting service of the complaint. Doc. No. 273-13, at 2. In an email sent on April 12, 2012, Mr. Glenn asked Mr. Webb, "Any word from Cordelli? I want to wrap up the service thing." Doc. No. 273-14, at 2.

Mr. Cordelli wrote to Mr. Webb on April 20, 2012 about the North Carolina action, including the issue of Cableview's acceptance of service. See Doc. No. 274-3. Mr. Cordelli indicated he wanted to know whether Time Warner would agree to give First Mercury more time to respond in the case, "as First Mercury would like to have as much time as possible to address the issues arising out of the TWC Action, including the tender of the defense, before an appearance is due in the TWC Action." Id. at 2. Mr. Cordelli also addressed

different options for how the action might proceed; he stated, for instance, "[O]ne of the primary things I am interested in being able to do as soon as possible is to analyze the potential availability of other insurance to respond on behalf of Cableview and/or the other defendants." Id. Furthermore, Mr. Cordelli discussed the possibility of Duke being added as a party to the action. Id.

On April 23, 2012, Mr. Webb wrote to Mr. Glenn regarding the effect of his acceptance of service on whether First Mercury would respond in the lawsuit; Mr. Webb asked, "If I accept service on behalf of the Cableview entities, is it your understanding that Cordelli will respond?" Doc. No. 273-15, at 2-3. Mr. Glenn replied that, in his understanding, First Mercury had given such authority to Cableview and would not be prejudiced by Cableview's acceptance of service, but Mr. Glenn was not sure whether First Mercury would respond in the action. See id. at 2.

In an email sent on May 8, 2012, Mr. Webb asked Mr. Glenn, "Can I accept service given the fact that I am not in North Carolina?" Doc. No. 274-1, at 3. Mr. Glenn replied as follows:

> I don't see any reason why not. If you would feel more comfortable, we can go ahead and serve the Cableview entities in the ordinary way. We were only holding off on that because I understood that Cableview preferred to handle service in this way. As long as you have authority to accept service for the Cableview entities, I don't think that your geographic location matters.
>
> Please let me know as soon as you can if you want us to serve them in another way, so we can get that out of the way. If you can accept service, please just sign the Acceptance and send it back to me. I will file it with the court and send a file-stamped copy back to you.

Id. at 2-3. Mr. Webb then responded, "I am fine accepting service if there is no statutory issue under NC law. I will modify the proposed document you forwarded." Id. at 2.

In the same May 8, 2012 email exchange, Mr. Webb stated he had "not yet heard back from First Mercury," and he asked, "Would TW consider escrowing the amount of the TW claim until the insurance issue is resolved?" Id.; see also Doc. No. 256-17 (Glenn deposition, January 7, 2015), at 10 (deposition transcript page 189). Mr. Glenn replied, "I will ask TWC about the escrow issue. I think that they would prefer, if First Mercury will not pay right away, to get the money from Cableview and assign all involved claims to Cableview. Let me know what you think of that option." Doc. No. 274-1, at 2.

Communications around mid-May 2012 focused on the joint wiring instructions. On May 10, 2012, Cableview president Mr. Schieszer emailed FTS employee Dave Conn, stating that Cableview had "not heard back from [Time Warner] yet," and asking that FTS "[p]lease proceed with the wire transfer for [Cableview] and hold the 515k until we get things worked out with Time Warner, thanks." Doc. No. 262-4, at 2 (emails). Replying that same day, Mr. Conn explained that the APA prohibited FTS from paying anything until FTS received the joint wiring instructions from Cableview and Time Warner. Id.

On May 14, 2012, Mr. Webb wrote to Mr. Glenn, "Need wiring instructions for TW. TW people are telling Cableview people you are the man who can make it happen." Doc. No. 284-17, at 7. Mr. Glenn replied as follows:

> I am the person authorized to make this happen. I do not yet have the wiring instructions, but expect to get them sometime today.
>
> Before TWC will authorize any wire transfer, we need to nail down the division of funds. I also assume that Cableview will want an assignment of claims in exchange for the payment to TWC. If you can draw that up and email it to me for review that might speed things up.

Id. Mr. Webb responded that same day:

> Let me get with Jim [Schieszer] today and discuss. If TW's claims are assigned to Cableview, I take it the North Carolina claim is rendered moot and dismissed. We would want an agreement from you to fully cooperate in any

> action we take against the carrier including any documentation relating to their denial of coverage in the third-party negligence claim.
>
> As for the division of funds, my understanding is that Unitek's obligation to wire to TW is limited to the amount stated in the APA. Please confirm.

Id.

On May 15, 2012, Mr. Webb sent Mr. Glenn a "draft assignment of claims," id. at 6, and he also asked Mr. Glenn for "updates on the wiring information," id. at 9. Mr. Glenn replied as follows:

> Time Warner said "no" on the escrow. They have not indicated that they will release or assign their claims for the 515k amount. I think we were clear that that amount was an estimated figure based on info they could assemble at the time. They are still assembling the final out of pocket cost total.
>
> I think it is highly unlikely that Time Warner will be able to finalize this today.

Id.; see also Doc. No. 256-17 (Glenn deposition, January 7, 2015), at 10 (deposition transcript page 189, stating that he told Mr. Webb that Cableview's escrow proposal "was not acceptable to Time Warner," as "Time Warner wanted . . . [Cableview] to go ahead and pay the obligation and then go after the insurance carrier"). Mr. Webb responded that same day:

> Please reference sections 2.2 and 4.1.3 of the APA. I believe the amount of the TW claim is clearly set out and the obligations of the parties to the APA, including any third party beneficiaries, are clear. Nor is it my recollection that this was an estimate. Time is of the essence.

Doc. No. 284-17, at 9.

In subsequent communications, Mr. Glenn and Mr. Webb engaged in negotiations about the payment amount for the joint wiring instructions and also about Time Warner assigning to Cableview its indemnity claims against First Mercury (so that Cableview could pursue those claims against First Mercury). On May 21, 2012, Mr. Glenn emailed Mr. Webb, stating, "Time Warner's position is that Cableview owes the full $600k (roughly). I have some

authority to negotiate a resolution to this to get it taken care of." Id. at 11.  Mr. Webb replied, "Why don't you give me your authority?  I will take it back to them and let them decide." Id. At 11:25 a.m. the next day, Mr. Glenn wrote as follows:

> I don't have specific authority. I recommend that we try to get our clients to split the difference, and make the offer only if the other will accept. That would leave the total payment at 565k-570k. Worth trying?
>
> I have wiring instructions now. Did you think about whether we should include a mutual release in the Assignment document?

Id.  At 4:55 p.m., Mr. Glenn attached a proposed draft of the joint wiring instructions, and he wrote, "I think that the Assignment needs to be limited to claims against First Mercury arising out of the McLarty litigation." Id. at 14.

On May 23, 2012, Mr. Webb wrote to Mr. Conn (FTS) and Mr. Schieszer that Cableview and Time Warner had "worked this matter out" and had drafted the joint wiring instructions, "including the agreed upon amounts to be distributed to both parties."  Doc. No. 262-4, at 2.  That same day, Cableview and Time Warner sent joint wiring instructions to FTS C.F.O. Ronald J. Lejman.  Doc. No. 261-9 (joint wiring instructions and related emails); see also Doc. No. 261-8 (Glenn deposition, January 7, 2015), at 23-25.   The instructions "authorize the disbursement of the $1.9 million payment" pursuant to the APA, and they direct Mr. Lejman to wire $560,000 to Time Warner's bank account and the remainder, $1,340,000, to Cableview's bank account.  Doc. No. 261-9, at 3-4.  Mr. Schieszer testified that he authorized his attorney (Mr. Webb) to sign the joint wiring instructions "[s]o we could get our money," which they (the Cableview shareholders) needed to "[p]ay bills and to make sure that [they] were going to get something out of the sale of the company, because to this point we hadn't got anything."  Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 41.

The evidence does not reflect any further communications between Cableview and Time Warner, either regarding the payment amount or the North Carolina action. Both Mr. Webb and Mr. Schieszer testified at their depositions that they never told Time Warner that Cableview had any intention to attempt to recover the payment from Time Warner. Doc. No. 261-10 (Webb deposition, October 1, 2014), at 11; Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 37.

On July 18, 2012, Cableview filed a lawsuit in Florida state court against Cableview's insurer, First Mercury, on the basis that First Mercury breached its contract with Cableview by denying defense and coverage both in the McLarty Action and in the North Carolina action. See Doc. No. 270-4 (Schieszer deposition, March 5, 2015), at 4-5; Doc. No. 270-5 (complaint). The case was removed to this Court on August 9, 2012. See Defendant's Notice of Removal (Doc. No. 1), Cableview Commc'ns of Jacksonville, Inc. v. First Mercury Ins. Co., No. 3:12-cv-897-J-20MCR. On March 14, 2013, First Mercury filed a Motion for Partial Summary Judgment (Doc. No. 19), No. 3:12-cv-897-J-20MCR (also submitted as evidence here, Doc. No. 270-6). The parties then jointly moved to dismiss the case with prejudice on April 5, 2013, see Stipulation for Dismissal with Prejudice (Doc. No. 23), No. 3:12-cv-897-J-20MCR (submitted as evidence here, Doc. No. 270-7), and the case was dismissed with prejudice on April 8, 2013, see Order (Doc. No. 24), 3:12-cv-897-J-20MCR.

Time Warner's North Carolina indemnity action against Cableview was dismissed on October 18, 2012 due to Time Warner's failure to prosecute the case. Doc. No. 270-1 (order dismissing case because "[n]either the plaintiff, nor the defendant appeared for the scheduled hearing or trial date"); see Doc. No. 261-8 (Glenn deposition, January 7, 2015), at 21. Cableview then filed the instant action on March 21, 2013. See Complaint (Doc. No. 1).

### III.  Summary of the Parties' Positions

The three motions before the Court (and their respective oppositions) are summarized here.  Of the three motions, however, only Time Warner's Motion is substantively addressed in this Order, for the reasons discussed in Part V, below.

### A.  Time Warner's Motion

Time Warner's Motion asserts seven overall arguments for awarding summary judgment in its favor as to all of Cableview's claims.  See Time Warner's Motion at 12-25.  The first four are based on affirmative defenses.  See id. at 12-21.  First, Time Warner argues Cableview's claims are barred by the litigation privilege because the claims concern Time Warner's efforts to collect Cableview's McLarty Action indemnity debt, which was the subject of Time Warner's then-pending North Carolina case against Cableview.  Id. at 12-13; Reply at 4-7.  Second, Time Warner asserts that Cableview has suffered no damages because the payment at issue was owed to Time Warner for indemnity of the McLarty Action.  Time Warner's Motion at 13-18; Reply at 7-8.  Third, Time Warner contends that Cableview's claims are barred because the payment was made pursuant to a settlement agreement, or accord and satisfaction, between Time Warner and Cableview.  Time Warner's Motion at 18-20.  Fourth, Time Warner asserts the claims are barred by the voluntary payment doctrine.  Id. at 20-21.

Time Warner's remaining three arguments address the sufficiency of each of Cableview's three claims in the Second Amended Complaint: tortious interference, negligent representation, and violation of FDUTPA.  See id. at 21-25; Second Amended Complaint at 10-13.  In the fifth argument, Time Warner contends the tortious interference claim fails because Cableview actually consummated its transaction with FTS and, further, because Time Warner was a party to the APA and was entitled to the payment it sought.  Time

Warner's Motion at 21-23; Reply at 9.  Sixth, as to negligent representation, Time Warner argues the claim fails for lack of justifiable reliance by Cableview.  Time Warner's Motion at 23-24.  Seventh, Time Warner asserts that FDUTPA is inapplicable here because Time Warner's demand for payment did not involve "trade or commerce."  Id. at 24-25.

Cableview disputes each of the arguments in Time Warner's Motion.  See Cableview's Response at 9-20; Sur-Reply at 6-8.  First, Cableview contends the litigation privilege does not cover the conduct at issue because the conduct occurred prior to the filing of the Time Warner's North Carolina claims; the conduct involved FTS, who was not a party to the North Carolina case; and Cableview was never properly served in the case.  Cableview's Response at 9-11; Sur-Reply at 6-7.  Second, Cableview asserts that it never owed Time Warner indemnity for the McLarty Action.  Cableview's Response at 11-15; Sur-Reply at 7-8.  Third, Cableview contends there was no settlement agreement because after the APA closed, the monetary consideration amount was increased and Time Warner proceeded to file the North Carolina case.  Cableview's Response at 15.  Fourth, Cableview argues the voluntary payment doctrine is inapplicable because on its face, the 2004 Installation Agreement did not require the payment at issue.  Id. at 15-16.

Cableview argues it can support each of its claims against Time Warner.  See id. at 16-20.  In its fifth argument, as to tortious interference, Cableview contends the claim can succeed on the basis that Time Warner's improper conduct caused Cableview to receive less money from the APA transaction than it would have, and Cableview asserts Time Warner's conduct was unjustified.  Id. at 16-18.  Sixth, as to negligent misrepresentation, Cableview contends it justifiably relied on the representations of Mr. Sieiro in proceeding as though Time Warner was going to consent to the assignment of the 2011 Installation Agreement.  Id. at 18-19.  Seventh, Cableview asserts the FDUTPA is applicable because Time Warner acted

unfairly in the course of trade or commerce to extract a payment that was not a legitimate debt.  Id. at 19-20.

**B. Cableview's Motion**

Cableview's Motion seeks partial summary judgment in its favor as to all three of Time Warner's counterclaims.  See Cableview's Motion at 11-25.  The counterclaims are for breaches of the indemnity and insurance provisions of the 2004 Installation Agreement and for breach of a settlement agreement.  See TWC-SE's Counterclaims at 16-19; TWEAN's Counterclaims at 5-8.  Regarding the first counterclaim, Cableview argues it had no duty to indemnify Time Warner for the McLarty Action.  See Cableview's Motion at 11-17.  The second counterclaim fails, according to Cableview, because Cableview maintained the required insurance coverage, and the policy did not cover the McLarty Action.  See id. at 17-21.  Cableview argues the third counterclaim fails because there was no settlement agreement.  See id. at 21-24.

Opposing Cableview's Motion, Time Warner contends that Cableview breached the indemnity and insurance provisions of the 2004 Installation Agreement, as well as the settlement agreement formed between Time Warner and Cableview.  See Time Warner's Response at 10-20.

**C. Time Warner's Objections**

Time Warner's Objections were revised at the November 9, 2016 hearing.  Previously, Time Warner contended that the following evidence filed by Cableview in relation to the summary judgment motions should be stricken as inadmissible: (1) excerpts from depositions of Mr. McLarty, Al DeBonis, Ph.D., and Donald Johnson, P.E., all taken in the McLarty Action; (2) emails attributed to R. Harper Heckman and Michelle S. Spak; and (3) handwritten notes of Ms. Blackwood.  See Time Warner's Objections at 1-9; see also Doc. No. 272-2

(DeBonis deposition); Doc. No. 272-3 (Johnson deposition); Doc. No. 272-4 (McLarty deposition); Doc. No. 272-11 (Heckman and Spak emails); Doc. No. 273-5 (Blackwood notes).  At the hearing, Time Warner withdrew its objections to Mr. McLarty's deposition and Ms. Blackwood's notes, at least for the purpose of the summary judgment motions.  Tr. at 11.

The remaining objections are to the depositions of Dr. DeBonis and Mr. Johnson and the emails of Mr. Heckman and Ms. Spak.  Dr. DeBonis and Mr. Johnson provided expert opinions during the McLarty Action regarding Duke and Enerco's failure to properly inspect the pole, with no opinions about Cableview's role.  See Doc. No. 272-2; Doc. No. 272-3.  The emails of Mr. Heckman and Ms. Spak (who appear to have been counsel for Duke) are from November 3, 2010; they discuss a phone call from Time Warner's counsel, Mr. Williams, regarding Time Warner's decision to defend and indemnify Duke in the McLarty Action.  See Doc. No. 272-11.  Time Warner argues these depositions and emails are inadmissible hearsay.  Time Warner's Objections at 7-8.  Furthermore, Time Warner contends the depositions are precluded because Cableview failed to identify these witnesses in their initial disclosures and interrogatory responses, and Time Warner asserts the emails are unauthenticated.  Id. at 7-9.

Opposing Time Warner's Objections, Cableview contends the depositions and emails are admissible.  See Response to Objections at 6-7.  The depositions from the McLarty Action, according to Cableview, fall under an independent exception to hearsay created by Rule 32(a)(8) of the Federal Rules of Civil Procedure applicable to depositions taken in prior cases.  Id. at 6.  Cableview also argues the depositions are not precluded by Cableview's failure to disclose the witnesses earlier because such failure is harmless, given that Time Warner extensively litigated the McLarty Action and also participated in the depositions at

issue.  Id.  As to the emails, Cableview contends they are not hearsay and are sufficiently authenticated.  Id. at 7.

### IV.  Summary Judgment Standard

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011) (citing Fed. R. Civ. P. 56(c)).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Although "all facts and reasonable inferences [must be viewed] in the light most favorable to the nonmoving party," Ramos-Barrientos v. Bland, 661 F.3d 587, 594 (11th Cir. 2011) (internal quotation and citation omitted), "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative,'" Vega v. Invsco Grp., Ltd., 432 F. App'x 867, 869-70 (11th Cir.  2011) (unpublished) (quoting Anderson, 477 U.S. at 249-50).  "When the only question a court must decide is a question of law, summary judgment may be granted."  Saregama India Ltd. v. Mosley, 635 F.3d 1284, 1290 (11th Cir. 2011).

### V.  Discussion

**A.  Overview**

This discussion substantively addresses only one issue raised in Time Warner's Motion—specifically, the issue of whether the contested payment to Time Warner was part of a settlement agreement between the parties.  Upon review, the undersigned finds there was indeed a valid settlement in which Cableview voluntarily agreed to a payment of

$560,000 to Time Warner. Because Cableview agreed to the payment as part of a valid settlement, it necessarily follows that the payment was not procured by tortious interference, deceptive and unfair trade practices, or negligent misrepresentation—which are Cableview's three claims in this case. Accordingly, Cableview's claims all fail.[12]

This conclusion renders moot the remaining issues before the Court. In particular, the other arguments raised in Time Warner's Motion all alternatively seek dismissal of Cableview's claims; given the intricacy of the underlying facts in the case, addressing these unnecessary arguments would overly complicate what is ultimately a fairly straightforward matter—the settlement of a disputed claim. Cableview's Motion, too, is moot because it concerns only Time Warner's counterclaims, which are themselves moot in light of the dismissal of Cableview's claims.[13] Time Warner's counsel acknowledged this at the hearing, stating, "[I]f Time Warner Cable prevails on its motion for summary judgment, its counterclaims, we believe, would be mooted and the entire case would be disposed of." Tr. at 41.

Time Warner's Objections also need not be addressed because the disputed evidence at issue—expert depositions and emails from during the McLarty Action—would not substantively affect the settlement agreement issue. Specifically, the evidence at issue in the Objections pertains to whether Cableview actually owed a duty of indemnification. As

---

[12]     Additionally, as noted below, the facts establishing the settlement agreement necessarily defeat tortious interference in substance. Specifically, the facts demonstrate that Time Warner did not use improper means to protect its interests.

[13]     One of the counterclaims asserts that Cableview breached the parties' settlement agreement by filing this action. The other two counterclaims are essentially based on Cableview and its insurer's alleged failure to indemnify Time Warner for the McLarty Action; these are precluded by the settlement agreement, for the reasons discussed below.

discussed below, that question need not be substantively resolved to determine whether the parties entered a valid settlement agreement with respect to the indemnity claim.

## B. Time Warner's Motion

Time Warner argues in its Motion that Cableview's claims are foreclosed here because the parties reached a settlement agreement with respect to Time Warner's indemnity claim in the North Carolina action. See Time Warner's Motion at 18-20. Under the terms of this agreement, according to Time Warner, "Cableview agreed to reimburse [Time Warner] for the monies expended by [Time Warner] to defend and settle the McLarty Action in exchange for [Time Warner's] agreement to execute a written assignment of the 2011 Agreement and to cease prosecution of the North Carolina Action." Id. at 19 (citation omitted). Moreover, Time Warner asserts Cableview cannot show that it entered the agreement under duress. Id. at 19-20.

In opposition, Cableview contends there was no settlement agreement because the parties did not agree on consideration. See Cableview's Response at 15. Cableview also suggests there was duress because Time Warner "had no legal right of indemnification and its interference was not lawful." Id. at 15 n.11.

### 1. Applicable Law

"Settlements, as agreements, are governed by the principles of Florida contract law."[14] Miles v. Nw. Mut. Life Ins. Co., 677 F. Supp. 2d 1312, 1315 (M.D. Fla. 2009) (citing Schwartz v. Fla. Bd. of Regents, 807 F.2d 901, 905 (11th Cir.1987)). A valid settlement agreement

---

[14] There is no dispute that Florida contract law applies to this issue. Both parties cite only Florida law in their arguments on the issue and do not suggest that any other state's contract law applies. See Time Warner's Motion at 18-20; Cableview's Response at 15; Cableview's Motion at 21-24; Time Warner's Response at 17-20. Moreover, the agreement at issue was negotiated and agreed upon at least partly in Florida, where Cableview and its counsel reside. There is also no indication that the contract law of any other state, such as North Carolina, differs in any respect relevant to the issue at hand.

requires "mutual assent to a certain and definite proposition.  If a purported agreement leaves open its essential terms for future negotiation, or merely constitutes an agreement to agree, then there is no enforceable contract." Id. (internal quotation and citations omitted). "A valid contract arises when the parties' assent is manifested through written or spoken words, or 'inferred in whole or in part from the parties' conduct.'" Baron v. Osman, 39 So. 3d 449, 451 (Fla. 5th DCA 2010) (quoting Commerce P'ship v. Equity Contracting Co., 695 So. 2d 383, 385 (Fla. 4th DCA 1997)).

"Settlement agreements are highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits . . . ." Lotspeich Co. v. Neogard Corp., 416 So. 2d 1163, 1164-65 (Fla. 3d DCA 1982) (citations omitted).  They should be invalidated only upon finding one of the following: "(1) failure of the agreement to satisfy required elements for a contract, (2) illegality, (3) fraud, (4) duress, (5) undue influence or, (6) mistake." Id. at 1165 (citation omitted).

"Establishing a case of economic duress is extremely difficult. The aggrieved party must show: (1) wrongful acts or threats, (2) financial distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action." Amoco Oil Co. v. Gomez, 125 F. Supp. 2d 492, 503 (S.D. Fla. 2000) (citations omitted).  "[I]t is not improper and therefore not duress to threaten what one has a legal right to do." G.E.E.N. Corp. v. Se. Toyota Distributors, Inc., No. 93-632-CIV-ORL-19, 1994 WL 695364, at *5 (M.D. Fla. Aug. 31, 1994) (unpublished), aff'd, 103 F.3d 147 (11th Cir. 1996) (citing City of Miami v. Kory, 394 So. 2d 494, 497 (Fla. 3d DCA 1981); Spillers v. Five Points Guaranty Bank, 335 So. 2d 851 (Fla. 1st DCA 1976)).  Moreover, economic duress "is not established merely by proof that consent was secured by the pressure of financial circumstances . . . ." Spillers, 335 So. 2d at 853 (quoting Kohen v. H. S. Crocker Co., 260 F.2d 790, 792 (5th Cir. 1958)).  Instead,

"the 'wrongful act' prong of the test for economic duress is not satisfied unless the victim has acted in response to unlawful or unconscionable pressure." Bhushan v. Loma Alta Towers Owner's Ass'n., Inc., 148 F. App'x 882, 886 (11th Cir. 2005) (unpublished) (quoting Ponder v. Lincoln Nat. Sales Corp., 612 So. 2d 1169, 1170 (Ala. 1992)).

"Undue influence must amount to over-persuasion, duress, force, coercion, or artful or fraudulent contrivances to such a degree that there is a destruction of free agency and willpower." Smith v. Paul Revere Life Ins. Co., 998 F. Supp. 1412, 1416 (S.D. Fla. 1997) (quoting Jordan v. Noll, 423 So. 2d 368, 370 (Fla. 1st DCA 1982)).

2.  Analysis

The undisputed evidence, viewed in the light most favorable to Cableview, reflects that Time Warner and Cableview entered a settlement agreement that occurred over a period of time, between March and May 2012, in which Cableview agreed to a payment of $560,000 to Time Warner in exchange for Time Warner's agreement to consent to assignment of the 2011 Installation Agreement and to cease pursuing its indemnity claim in the North Carolina action.  As is evident in the discussion that follows, the parties' mutual assent to all essential terms of their settlement agreement is manifested partly in writing—in the APA, the joint wiring instructions, and emails—and otherwise can be inferred from the parties' conduct.

In sum, the agreement occurred as follows.  In March 2012, Time Warner gave its consent to the assignment of the 2011 Installation Agreement in exchange for Cableview's agreement to APA amendments providing for payment to Time Warner for its indemnity claim.  Payment itself was not made at that time, and it is clear from the parties' conduct and communications that the settlement negotiations were still ongoing, with the matter of payment to be resolved in the joint wiring instructions.  Until then, Time Warner continued to move forward with its indemnity action as the parties negotiated about various matters,

including payment.  Negotiations ended when the parties signed the joint wiring instructions in May 2012, resulting in the $560,000 payment to Time Warner, in exchange for which Time Warner took no further action on its indemnity claim.  At that time, the parties' agreement was fully performed.  The process of the parties' negotiations and agreement is detailed further below.

The parties began negotiating their settlement on February 28, 2012, when Ms. Blackwood phoned Mr. Schieszer regarding Time Warner's indemnity claim.  See Doc. No. 261-7 (Schieszer deposition, October 16, 2014), at 5-7.  Time Warner had initiated its claim in North Carolina court on February 17, 2012, the day after the McLarty settlement, by filing an application for a twenty-one day extension to file a complaint.[15]  See Doc. No. 258-5 (North Carolina Application, summons, and Cableview emails regarding the documents); Doc. No. 259-4 (McLarty settlement).  As part of the negotiations on February 28, 2012, Ms. Blackwood notified Mr. Schieszer that Time Warner would not consent to assignment of the 2011 Installation Agreement to FTS until the indemnity claim was resolved.  Doc. No. 261-7 (Schieszer deposition, October 16, 2014), at 8.  In response, Mr. Schieszer indicated that the APA would be amended to account for Time Warner's indemnity claim, and Time Warner was given an opportunity to approve of those changes.  See Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 31 (stating that he told Ms. Blackwood the attorneys would "work out the wording in the closing settlement" to Time Warner's satisfaction with respect to the indemnity claim); id. at 29 (explaining that he referred to the Cableview-FTS

---

[15]     The North Carolina Rules of Civil Procedure provide that one way a civil action may be commenced is "by the issuance of a summons when (1) A person makes application to the court stating the nature and purpose of his action and requesting permission to file his complaint within 20 days and (2) The court makes an order stating the nature and purpose of the action and granting the requested permission." N.C. R. Civ. P. 3(a).

transaction as "the settlement"); Doc. No. 258-15, at 2 (February 28, 2012 email from Mr. Schieszer to Mr. Webb).[16]

The amended APA provisions explicitly reference Time Warner and its indemnity claim. <u>See</u> Doc. No. 258-10 (APA), at 4, 31. Under the provisions, Time Warner and Cableview were to give FTS joint wiring instructions, pursuant to which Time Warner would be paid a certain amount for its claim (specified in the APA as $515,303.17) out of Cableview's transaction with FTS. <u>Id.</u> at 5 (APA § 4.1.3); <u>id.</u> at 4 (APA § 2.2; defining the "TW Claim Amount"). On March 2, 2012, Cableview signed the APA, thereby assenting to these provisions, including that a payment be made to Time Warner for its indemnity claim. In exchange, upon its approval of the changes, Time Warner gave its consent to assignment of the 2011 Installation Agreement, Doc. No. 274-5, at 2 (March 2, 2012 email from Mr. Glenn to Mr. Webb); Doc. No. 274-4 (consent agreement), and Cableview and FTS signed the APA, Doc. No. 258-10 (APA), at 32, 39.

This exchange constituted the first step toward the settlement of Time Warner's disputed indemnity claim, but the actual payment to Time Warner was left to be resolved. This required further negotiation and agreement on joint wiring instructions to provide to FTS.

In the meantime, after March 2, 2012, counsel for Time Warner, Cableview, and Cableview's insurer, First Mercury, conferred by phone and email about procedural matters

---

[16]     On this same date, Mr. Schieszer wrote to FTS C.E.O. Mr. Perkins that he "spoke with Tony from [Time Warner] today and they have blessed the transfer to FTS. There is an open liability claim from an accident in 2008. We agreed that CVC will be solely responsible to resolve the issue and that FTS will in no way be held accountable." Doc. No. 258-14, at 2.
       Mr. Schieszer also wrote to Cableview's counsel, Mr. Webb, "Please make sure [Mr. Glenn, Time Warner's counsel,] approves the closing documents and that they are satisfied with all the wording pertaining to the <u>settlement</u>." Doc. No. 258-15, at 2 (emphasis added). Although one might reasonably infer that "the settlement," in this context, meant Cableview and Time Warner's settlement of the indemnity dispute (as Time Warner suggests, <u>see</u> Time Warner's Motion at 11), Mr. Schieszer claimed that the "settlement" he was referring to in the email was the sale of Cableview's assets in the APA. Doc. No. 258-3 (deposition, March 5, 2015), at 29. In any event, in concluding that there was a settlement agreement, the undersigned does not rely on Mr. Schieszer's reference to "the settlement" here.

related to Time Warner's North Carolina indemnity action, including how service should be rendered and whether other parties (particularly First Mercury, but also Duke) should be included in the case.  See Doc. No. 258-9; Doc. No. 273-11; Doc. No. 273-13; Doc. No. 273-14; Doc. No. 273-15; Doc. No. 274-1; Doc. No. 274-2; Doc. No. 274-3.  Time Warner filed its complaint in the North Carolina action on March 8, 2012, Doc. No. 256-24 (complaint), which was the deadline to do so, pursuant to Time Warner's Application filed on February 17, 2012,[17] see Doc. No. 258-5 (North Carolina Application), at 6.  Counsel for Time Warner and Cableview also discussed terms for the joint wiring instructions, and they considered the possibility of Time Warner assigning to Cableview its claims against First Mercury.  See Doc. No. 284-17.

On May 23, 2012, the parties reached a meeting of the minds with respect to payment, and so they signed the joint wiring instructions, thereby consummating their settlement agreement.  See Doc. No. 262-4, at 2 (May 23, 2012 email from Mr. Webb to FTS); Doc. No. 261-9 (joint wiring instructions and related emails).  The instructions directed FTS to wire $560,000 to Time Warner and the remainder ($1,340,000) to Cableview.  Doc. No. 261-9, at 3-4.  By signing the instructions Cableview agreed to the $560,000 payment to Time Warner.  In exchange, Time Warner took no further action to pursue its claim, resulting in the dismissal of the case on October 18, 2012.  Doc. No. 270-1 (order dismissing

---

[17]  Time Warner gives the following explanation for filing its complaint at that time: "[W]hile the FTS transaction closed on March 2, the payment to [Time Warner] as provided in the APA had not yet been made, so to preserve its rights [Time Warner] had to file the Complaint by the court mandated March 8th deadline."  Time Warner's Response at 20 n.34 (emphasis added) (responding to Cableview's argument for summary judgment on Time Warner's counterclaim for breach of the settlement agreement).  Mr. Glenn testified along similar lines: "[O]bviously Time Warner Cable had been paid.  The deal was done.  The numbers weren't final.  The dispute wasn't resolved."  Doc. No. 256-17 (Glenn deposition, January 7, 2015), at 7 (deposition transcript page 168).  Mr. Glenn further explained that, "as a procedural matter," filing the complaint was thought to be "to [Cableview's] advantage," in that it would enable Cableview to "third party the insurance carrier into this existing action and then go off about it against the insurance carrier from there."  Id.

case).  Cableview gave no indication that it wished to continue litigating the matter or to attempt otherwise to recover any payment from Time Warner.  See Doc. No. 261-10 (Webb deposition, October 1, 2014), at 11; Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 37.  Instead, believing its insurer, First Mercury, was obligated to pay the claim, see Doc. No. 258-3 (Schieszer deposition, March 5, 2015), Cableview filed a case against First Mercury, see Doc. No. 270-5 (complaint).

Overall, the parties' conduct demonstrates their mutual assent to the terms of their agreement, which was fully performed.  This was a valid settlement agreement.  There is no suggestion of fraud, illegality, or mistake, and at no point was the parties' settlement a product of undue influence or duress.[18]  No evidence indicates that Time Warner's conduct was unlawful or unconscionable, see Bhushan, 148 F. App'x at 886 (discussing duress), or that it "amount[ed] to over-persuasion, duress, force, coercion, or artful or fraudulent contrivances to such a degree that there [was] a destruction of free agency and willpower," Smith, 998 F. Supp. at 1416 (defining undue influence) (quoting Jordan, 423 So. 2d at 370). To the contrary, as explained further below, Time Warner asserted a reasonable indemnity claim, and without any fraud, coercion, or similar pressure, Time Warner sought to resolve that claim, in part by exercising its legal rights with respect to other agreements with Cableview—namely, the 2011 Installation Agreement and the APA.  And for its part, Cableview freely and voluntarily consented to the terms of their agreement.

---

[18] Cableview addresses duress only indirectly, in a footnote, implying there was duress here because Time Warner "had no legal right of indemnification and its interference was not lawful." Cableview's Response at 15 n.11. Cableview does not mention fraud, illegality, mistake, or undue influence as bases for invalidating a settlement agreement here.

Time Warner's indemnity claim was reasonable, regardless of whether Time Warner actually had a right to be indemnified.[19]   Time Warner defended and settled the McLarty Action on behalf of Duke, for work performed by a Cableview employee pursuant to Cableview's 2004 Installation Agreement with Time Warner.  At least arguably, Time Warner was obligated to defend the case for Duke under the terms of their Pole Attachment Agreement.  See Doc. No. 256-2 (Pole Attachment Agreement), at 17.   Time Warner's obligation applied only if Duke was not solely negligent.  See id.  Time Warner has offered contested evidence here that raises at least the possibility that Duke was not solely negligent and that Cableview and McLarty were partly negligent.[20]   Doc. No. 259-1 (Brooks expert report), at 5-9; Doc. No. 258-19 (Barnes deposition), at 6-14; Doc. No. 258-18 (Barnes expert report), at 42; Doc. No. 284-14 (McLarty deposition, April 1, 2015), at 4, 19 (deposition transcript pages 7, 67, and 68).  And if Time Warner was contractually obligated to indemnify Duke in the McLarty Action, then Cableview arguably had a duty, under the 2004 Installation Agreement's broad indemnity provisions, to defend and indemnify Time Warner for Time Warner's contractual liability.  See Doc. No. 258-1 (2004 Installation Agreement), at 3, 8.

As Time Warner's indemnity claim was reasonable, Time Warner clearly had a legal right to assert that claim.  Time Warner did so initially by tendering the McLarty Action to

---

[19]     The undersigned concludes this without ruling on any of the legal and factual disputes underlying the indemnity claim.  Such matters need not be resolved for the issue at hand, and doing so would require exhaustive legal and factual analysis regarding the McLarty Action and the contracts among Cableview, Time Warner, and Duke.

[20]     Although the law is unclear, there is persuasive case authority to support that Time Warner need only show potential liability to be entitled to indemnity.  See, e.g., Liberty Mut. Ins. Co. v. Aventura Eng'g & Const. Corp., 534 F. Supp. 2d 1290, 1319-20 (S.D. Fla. 2008) (citing Camp, Dresser & McKee, Inc. v. Paul N. Howard Co., 853 So. 2d 1072, 1080 (Fla. 5th DCA 2003)).  There is also persuasive authority indicating that Time Warner can show potential liability through evidence produced in this case, rather than merely based on the allegations in the underlying case.  See, e.g., White Springs Agr. Chemicals, Inc. v. Gaffin Indus. Servs., Inc., No. 3:11-cv-998-J-32JRK, 2014 WL 905577, at *7 (M.D. Fla. Mar. 7, 2014) (unpublished) (citing CSX Transp., Inc. v. Becker Sand & Gravel Co., 576 So. 2d 902, 904 (Fla. 1st DCA 1991); Am. Home Ins. Co. v. City of Opa-locka, 368 So. 2d 416, 419 (Fla. 3d DCA 1979)).

Cableview and First Mercury, and when First Mercury rejected it, Time Warner sought

reconsideration.  See Doc. No. 256-8 (September 23, 2010 letter from Time Warner to

Cableview); Doc. No. 256-10 (October 28, 2010 letter from First Mercury to Time Warner);

Doc. No. 256-11 (November 3, 2010 email from Time Warner to First Mercury); Doc. No.

256-15 (December 10, 2010 letter from First Mercury to Time Warner); Doc. No. 256-16

(December 19, 2011 letter from First Mercury to Time Warner).  After this, and just after

settling the McLarty Action, in February 2012, Time Warner asserted its indemnity claim in

state court and reached out to Cableview to resolve the claim.  During that same time,

Cableview was negotiating the APA with FTS.

There was no duress or coercion involved in Time Warner's efforts to resolve its

indemnity claim.  Time Warner's actions in the APA negotiations with Cableview and FTS

were not unlawful, unconscionable, or improper.  To the contrary, Time Warner took

reasonable action to protect its two notable interests in the APA transaction.  First, because

Cableview was selling most of its assets but retaining its liabilities, the APA potentially

threatened Time Warner's ability to collect on its indemnity claim from Cableview.  Second,

Time Warner had a contractual right to consent (in writing) or withhold its consent to the

assignment of the 2011 Installation Agreement, see Doc. No. 258-6, at 11, which Cableview

intended to assign to FTS as part of the APA transaction.  It was not unlawful or otherwise

wrongful for Time Warner, on February 28, 2012, to condition its written consent on the

resolution of its indemnity claim—even if Time Warner had initially indicated (through its

agent, Tony Sieiro, in early or mid-February 2012) that it would give its consent, a fact that

is disputed, see Doc. No. 258-3 (Schieszer deposition, March 5, 2015), at 9-10.  And given

Time Warner's interests that were potentially at stake in the imminent APA closing on March

2, 2012, it was not wrongful or improper for Time Warner, on March 1, 2012, to notify FTS

directly of its indemnity claim and asserted condition to consent.  As such, more than merely demonstrating a lack of duress, the evidence also necessarily defeats tortious interference. See Ethyl Corp. v. Balter, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980) (stating that actions taken to protect or promote one's own financial or contractual interests do not amount to tortious interference "so long as improper means are not employed").

Furthermore, the evidence does not reflect that Time Warner acted wrongly in negotiations after the closing of the APA.  Under the amended APA, to which Cableview agreed without reservation, Time Warner became a third-party beneficiary of the transaction, with the right to receive payment of a portion of the proceeds and the right to agree on joint wiring instructions with Cableview regarding that payment.  See Doc. No. 258-10, at 5 (APA § 4.1.3); id. at 31 (APA § 12.13).  Over the course of Cableview and Time Warner's negotiations about the joint wiring instructions, the parties voiced disputes about different matters, such as the payment amount, whether the amount should be escrowed pending Cableview's insurance dispute, and whether Time Warner should assign to Cableview its claims against First Mercury.  But they ultimately "worked th[e] matter out," as Mr. Webb told FTS, and they gave FTS their joint wiring instructions.  Doc. No. 262-4, at 2 (email from Mr. Webb to FTS); see Doc. No. 261-9 (joint wiring instructions and related emails).

Throughout these matters, there were reasonable alternative courses of action available if Cableview did not wish to enter the agreement.  In particular, Cableview could have insisted on litigating the disputed indemnity claim with Time Warner.  But rather than do so, Cableview signed the APA and the joint wiring instructions, and then Cableview filed a claim against its insurer, First Mercury, to recover the payment, without giving Time Warner any indication that Cableview wished to reclaim its payment from Time Warner.  Indeed, Cableview never suggested, at any time until filing the instant case, that the settlement

agreement or any of its terms resulted from coercion or duress, or that the agreement was otherwise invalid in any way.

## VI.  Conclusion

Based on the foregoing, the payment of $560,000 to Time Warner was made as part of a valid, consummated settlement of Time Warner's reasonably disputed indemnity claim. Cableview freely and voluntarily agreed to the payment.  As a result, Cableview's three claims in the case—which rest on the loss of this payment—necessarily fail.  Furthermore, the remaining issues before the Court, including Cableview's Motion and Time Warner's Objections, are moot.

Accordingly, it is

**ORDERED**:

1.      The Dispositive Motion by Defendants Time Warner Cable Southeast LLC and Time Warner Entertainment-Advance/Newhouse Partnership for Summary Judgment, Incorporating Statement of Undisputed Material Facts and Supporting Memorandum of Law (Doc. No. 257) is **GRANTED**.

2.      Plaintiff's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc No. 256) is **DENIED as moot**.

3.      Defendants' Objections and Motion to Strike or Exclude Inadmissible Evidence Filed by Plaintiff in Connection with Dispositive Summary Judgment Motions, and Incorporated Memorandum of Law (Doc. No. 276) is **DENIED as moot**.

4.    The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiff on all claims raised by Plaintiff, stating that Plaintiff shall take nothing and that these claims are dismissed on the merits.  The judgment shall further state that all counterclaims raised by Defendants are dismissed with prejudice.

**DONE AND ORDERED** at Jacksonville, Florida on January 4, 2017.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

clr
Copies to:
Counsel of Record