UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| CABLEVIEW COMMUNICATIONS OF JACKSONVILLE, INC., a Florida Corporation | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 3:13-cv-306-J-JRK |
| TIME WARNER ENTERTAINMENT-ADVANCE/NEWHOUSE PARTNERSHIP d/b/a TIME WARNER CABLE, AND TIME WARNER CABLE SOUTHEAST LLC, d/b/a TIME WARNER CABLE | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' RENEWED MOTION FOR MONETARY SANCTIONS PURSUANT TO 28 U.S.C. § 1927 AND FED. R. CIV. P. 56(h) WITH INCORPORATED MEMORANDUM OF LAW**

Defendants Time Warner Cable Southeast LLC and Time Warner Entertainment-Advance/Newhouse Partnership (collectively, "TWC"), hereby move the Court for an Order imposing monetary sanctions on Cableview's counsel under 28 U.S.C. § 1927 and Cableview Communications of Jacksonville, Inc. ("Cableview") under Fed. R. Civ. P. Rule 56(h) to reimburse TWC for attorney's fees incurred as a result of the filing of a false affidavit by Cableview's James Scheiszer ("Scheiszer").  In support of this Motion, TWC states:

1.      On October 30, 2015, TWC filed a Dispositive Motion for Terminating Sanctions and Monetary Sanctions Due to Plaintiff Cableview's Fraud on the Court (the

1

"Prior Sanctions Motion") (D.E. 192).

2.     The Prior Sanctions Motion sought relief as a result of the filing of Scheiszer's false affidavit by Cableview (D.E. 137-2; D.E. 135-1) in opposition to TWC's dispositive motion for summary judgment (D.E. 129) and dispositive motion to dismiss (D.E. 128).  Scheiszer's affidavit falsely states that the monies from the sale of the various Cableview entities' assets were at one point in Plaintiff Cableview's account. The legal grounds asserted in the Prior Sanctions Motion for the imposition of monetary sanctions included Fed. R. Civ. P. Rule 56(h) (D.E. 192, at 16, n. 19) and 28 U.S.C. § 1927 (D.E. 192, at 16-20).

3.     Cableview filed its Response to the Prior Sanctions Motion on November 16, 2015 (D.E. 193).

4.     On January 12, 2016, the Court issued its Order (D.E. 215) on TWC's Prior Sanctions Motion in which the Court denied TWC's request for terminating sanctions with prejudice and denied TWC's request for monetary sanctions "**without prejudice** to renewal at the conclusion of these proceedings."  (D.E. 215, at 33, ¶ 4(B), emphasis in original).

5.     Since the Order on the Prior Sanctions Motion, TWC deposed Cableview's controller, Garry Wilson.  This deposition testimony indicates that Scheiszer apparently did not review the pertinent Cableview accounting records until after he executed his affidavit – which is contrary to the representation made in Scheiszer's affidavit.  Indeed, this evidence shows that Scheiszer apparently did not review the Cableview accounting records until three months after the submission of his affidavit.

6.     The Cableview internal accounting records reviewed after the submission of Scheiszer's affidavit confirm the information in the Compass Bank records – namely, that the monies from the sale of the various Cableview entities' assets never went through

Plaintiff Cableview's bank account. However, instead of admitting that Scheiszer's affidavit was false after Cableview and its counsel reviewed Cableview's accounting records, Cableview and its counsel submitted further briefing to the Court misrepresenting that Scheiszer's affidavit does not refer to the Compass Bank transactions.

7.      The Court issued its Judgment (D.E. 293) in this action on January 5, 2017.

8.      Pursuant to the Court's Order (D.E. 215), TWC requests that the Court issue a separate judgment, awarding TWC monetary sanctions in the amount of $52,474.00, jointly and severally against Cableview (pursuant to Rule 56(h)) and Cableview's counsel (pursuant to 28 U.S.C. § 1927).[1]

## **MEMORANDUM OF LAW**

## I.  **INTRODUCTION**

Cableview President James Scheiszer confirmed in Cableview's Rule 30(b)(6) deposition that Cableview was never allocated (and thus had no legal right to receive) the $560,000 Cableview claimed as its sole damages in this case. When TWC moved to dismiss this action for lack of standing (D.E. 128) and for summary judgment (D.E. 129), Cableview submitted an affidavit in which Scheiszer contradicted his previous sworn testimony. TWC moved to strike Scheiszer's affidavit as a sham and—over Cableview's

---

[1] Since this Motion seeks the imposition of monetary sanctions under Rule 56(h) and 28 U.S.C. § 1927, the time limitation in Rule 54 for filing post-judgment motions does not apply. Fed.R.Civ.P. 54(d)(2)(E) ("Subparagraphs (A)-(D) do not apply to claims for fees and expenses as sanctions for violating these rules or as sanctions under 28 U.S.C. § 1927"); *see also*, *Dubnick v. Henderson County Hospital Corp.*, No. 1:08cv465, 2009 WL 5169529, *1 (W.D. N.C. Dec. 17, 2009) (time limitation of Rule 54 does not apply to motion for sanctions under Rule 37); *Prospect Capital Corp. v. Enmon*, No. 08 Civ. 3721, 2010 WL 907596, *8, n. 9 (LBS) (S.D. N.Y. March 9, 2010) (Rule 54 time limitation does not apply to motion for sanctions under 28 U.S.C. § 1927; *Rodriguez v. Marble Care, Int'l, Inc.*, No. 10-23223-CTV, 2012 WL 7761546, *2 (S.D. Fla. Nov. 16, 2012) (separate judgment appropriate for award of post-judgment sanctions).

opposition—obtained leave from the Court to serve a subpoena seeking Compass Bank documents that would prove Scheiszer's affidavit false.  These documents proved that Cableview submitted a perjured affidavit to the Court in a calculated attempt to avoid dismissal and summary judgment on its claims due to lack of standing, and that Cableview's counsel doubled down on Scheiszer's testimony by repeating it in briefs and oral argument before this Court, even after TWC had repeatedly challenged the veracity of that testimony.  Accordingly, the Compass Bank records compel the conclusion that the Court should impose monetary sanctions on Cableview for filing an affidavit in bad faith and for delay in opposition to a motion for summary judgment, and on Cableview's counsel for unreasonably and vexatiously multiplying the proceedings in this case.

Indeed, Cableview's bank documents prove that its principals knew Scheiszer's affidavit, and the statements Cableview and its counsel made in briefing based thereon, were false, but nevertheless continued to advocate their veracity to the Court.  Cableview then tried to cover up its fraud by refusing to voluntarily produce the Compass Bank records, and then vigorously opposing TWC's service of a subpoena for their production. Their misstatements, however, were exposed by the production of the Compass Bank records.

Moreover, after the Court's Order on the Prior Sanctions Motion, TWC conducted discovery showing that Scheiszer apparently did not review the pertinent Cableview accounting records until after production of the Compass Bank records – which is contrary to the representation made in Scheiszer's affidavit.  And instead of then admitting that Scheiszer's affidavit was false even by the information in Cableview's

4

accounting records, Cableview and its counsel filed a brief falsely stating that Scheiszer's affidavit did not refer to the Compass Bank transactions (it clearly does and was previously represented as doing so in Cableview's briefs filed with the Court).

TWC expended at least $52,474 in attorney's fees in connection with its motion to obtain the Compass Bank records (D.E. 146) and its Prior Sanctions Motion (D.E. 192) – all because of the fraud on the Court by Cableview and its counsel. The Court should therefore issue a judgment awarding TWC monetary sanctions in the amount of $52,474, jointly and severally against Cableview and its counsel.

## II. <u>FACTUAL BACKGROUND</u>

### A. Cableview Sued TWC for Return of the $560,000 that TWC was Paid in Settlement of TWC's Indemnification Lawsuit.

As the Court is aware, Cableview claimed in this action that it was somehow entitled to "undo" the settlement of a claim for indemnity asserted by TWC against Cableview in a prior action, as a result of which TWC was paid $560,000. (D.E. 141 ¶¶ 17, 22-26, 33.) Specifically, Cableview agreed to "settle" (Cableview's own words) TWC's indemnity lawsuit by agreeing that TWC would be paid $560,000 out of the proceeds of the transaction by which Cableview and various other "Cableview" corporate entities sold their assets to FTS. (D.E. 129 ¶¶ 30-33.) In return, TWC agreed not to prosecute its lawsuit against Cableview and to consent to assignment of the 2011 Agreement to FTS. (*Id.* ¶¶ 30-31.)

The parties memorialized the payment terms of their settlement in the FTS Asset Purchase Agreement ("APA") and the subsequently-executed Joint Wiring Instructions.[2] (D.E. 129 ¶¶ 31, 33.)  Those documents provided that of the total of $2.4 million in FTS funds:  (1) $500,000 was to be paid to Compass Bank to pay off a loan; (2) $560,000 was to be paid to TWC; and (3) the remaining $1,340,000 was to be wired to the operating account of Cableview Communications of Florida, Inc. ("Cableview Florida").  (Ex. A; Ex. B.)  Thus, no money from the FTS transaction was to be wired to Cableview, the Plaintiff in this case.  (Ex. B.)  Nevertheless, the sole compensatory damages Cableview sought in this litigation was this same $560,000, which Cableview claimed _**it**_ (as opposed to the other Cableview entities that are not parties to this litigation) would have been paid but for TWC's alleged "interference" with the FTS transaction.  (D.E. 129 ¶ 35.)

## B. Cableview Twice Testified Under Oath that it was Never Entitled Under the APA to the $560,000 it Claimed as its Sole Damages in this Case.

Because TWC doubted that Cableview was entitled to the $560,000 from the FTS transaction, TWC took significant, thorough discovery on this issue.  First, TWC looked to the contract that created the rights of the parties to the FTS transaction—the APA—as the APA dictates how the purchase price was to be allocated amongst the "Corporate Sellers."[3]  Specifically, the APA provides that the FTS proceeds "shall be [] allocated to the Corporate Sellers in the percentages set forth in Exhibit A hereto."  (Ex. A § 4.1.) However, the version of Exhibit A to the APA that Cableview produced during discovery

---

[2]  Highlighted copies of the relevant portions of the APA and Joint Wiring Instructions are attached hereto as Exhibits A and B, respectively.

[3]  The "Corporate Sellers" consist of six different 'Cableview' entities, only one of which is Plaintiff Cableview.  Ex. A at 1.

is blank.  Consequently, TWC served interrogatories to determine how the purchase price was "allocated to the Corporate Sellers" and thus which entity was contractually entitled to the $560,000 Cableview seeks in this lawsuit.

Cableview initially refused to answer these interrogatories.  After TWC threatened to file a motion to compel, however, Cableview confirmed in its amended interrogatory responses[4] (verified under oath by Scheiszer) that one hundred percent of the proceeds from the FTS transaction that did not go to pay down the Compass Bank loan (including the $560,000 that went to TWC, for a total of $1.9 million) were "**allocated to Cableview Communications of _Florida_, Inc.**"  (Ex. C (emphasis added).)  Scheiszer confirmed these interrogatory responses in his subsequent Rule 30(b)(6) deposition, testifying that: (a) all monies from the FTS transaction except the loan payment to Compass Bank were allocated and paid to Cableview **_Florida_**; and (b) the $560,000 paid to TWEAN would have been paid to Cableview **_Florida_** with the rest of the FTS funds had it not gone to TWEAN.[5]  (Ex. D at 8:20-10:20.)  This was, of course, consistent with the way the funds were supposed to be disbursed under the APA and the Joint Wiring Instructions.  (Ex. B.)

Thus, Scheiszer's binding, sworn testimony proved that Cableview, the only Plaintiff in this lawsuit, was never allocated under the APA any part of the $560,000 in FTS proceeds, and thus had not suffered an injury in fact and lacked standing to sue for TWC's allegedly wrongful interference with the FTS transaction.  (D.E. 128 at 1-9; D.E.

---

[4]  Cableview's amended interrogatory responses are attached hereto as Exhibit C.

[5]  Highlighted, relevant portions of Cableview's 30(b)(6) deposition are attached hereto as Exhibit D.

129 at 15-16 (¶¶ 33-36), 18.)   As a result, TWC filed motions to dismiss for lack of subject matter jurisdiction and for summary judgment due to Cableview's lack of standing (the later motion raised additional reasons for entry of summary judgment). (*Id.*)

### C. Cableview Filed an Affidavit to Manufacture Standing and Save its Claims, and Independent Evidence Confirmed that Affidavit was a Perjured Fabrication.

Faced with TWC's dispositive motions based on Cableview's repeated testimonial admissions that it was not allocated and would not have been paid the $560,000 had those monies not gone to TWC, Cableview began its efforts to mislead the Court into believing that Cableview had standing to seek to recover the $560,000.  In response to TWC's motions to dismiss and for summary judgment, Cableview submitted an affidavit from Scheiszer which unequivocally stated that the proceeds from the FTS transaction (other than payments to Compass Bank and TWC) were wired into a Cableview Florida account and then transferred on the same day to a Cableview account. Specifically, Scheiszer swore, under penalty of perjury and purportedly based on "personal knowledge," that the proceeds from the FTS transaction were:

> initially **wired into an account** owned by Cableview Communications of Florida, Inc. and [were] then subsequently **transferred on the same day to the account of Cableview [*Jacksonville*]**. . . .  On May 25, 2012, the same day, **three payments of $425,000 each were made from the Cableview [*Jacksonville*] account** to each shareholder of Cableview [Jacksonville].

(D.E. 137-2 ¶¶ 13, 14 (emphasis added).)[6]  Cableview's response to TWC's summary judgment motion (via incorporation) took the same factual position as Scheiszer's affidavit—that the FTS funds were transferred to a Cableview account:

> TW is wrong.  Cableview did indeed suffer an "injury in fact."  As per the attached Affidavit of James F. Schieszer (attached as Exhibit "1") and Plaintiff's Second Amended Responses to Defendant's Interrogatories (attached as Exhibit "2"),[7] all proceeds received by Cableview under the APA ultimately flowed to Cableview [**_Jacksonville_**] prior to the final distribution by Cableview [**_Jacksonville_**] to its corporate shareholders.[8]

(D.E. 135 (Cableview's response to motion to dismiss), Ex. F at 2 – Cableview's response to TWC's summary judgment motion argued that "Cableview does not lack standing to pursue this action," and in support of that position, "Cableview incorporates its Memorandum in Opposition" to TWC's motion to dismiss (D.E. 136, at 13).)

Because this post-discovery story was inconsistent with Cableview's previous unequivocal interrogatory responses and Rule 30(b)(6) testimony, TWC believed Scheiszer's affidavit to be false and filed its motion to strike Scheiszer's affidavit as a sham.  (D.E. 143 at 1, 10-12; D.E. 149 at 5-18; D.E. 155.)  In its response to TWC's motion to strike, Cableview (and its counsel) doubled down on Scheiszer's affidavit, stating it was not a sham because it was in fact true that the FTS "**sale proceeds ultimately flowed to a _Compass Bank Account_ in the name of Cableview**

---

[6]  A highlighted copy of Scheiszer's affidavit is attached hereto as Exhibit E.

[7]  Cableview's second amended interrogatory responses (attached hereto as Exhibit J), served on the afternoon of the last day of discovery, confusingly state that the FTS funds were "credited" to Cableview Jacksonville.  (Ex. J.)  These responses – unlike Scheiszer's affidavit - do not state that the FTS sales proceeds flowed through a bank account of Plaintiff Cableview.

[8]  A highlighted copy of this brief is attached hereto as Exhibit F.

**Communications of _Jacksonville_**, Inc. prior to ultimate distribution to the corporate shareholders." (D.E. 149 at 2 (emphasis added).)[9]   Cableview's counsel, however, subsequently represented to the Court that he (allegedly) had not seen these Compass Bank Account records (and did not believe Cableview had these bank records in its possession) when he made this representation in this court filing.[10]   (_See_ Ex. H at 41:10-13.)

To determine if Scheiszer was lying in his affidavit, TWC asked Cableview and its counsel to consent to the service of a subpoena on Compass Bank for documentation of the particular wire and other bank account transfers referenced in Scheiszer's affidavit. Cableview and its counsel, however, steadfastly refused to voluntarily permit service of this limited subpoena, and vigorously opposed TWC's motion for leave to serve the subpoena on Compass Bank.  (D.E. 146 ¶¶ 7-9, 151, 153, 154, 158.)

On September 4, 2015, the Court held a hearing on TWC's motion.  (D.E. 158.) After discussing the seriousness of Scheiszer's **five** different stories under oath (Cableview later told a sixth story),[11] the Court stated "If I'm Mr. Scheiszer and I'm accused of submitting a sham affidavit, and I can produce bank records from Compass Bank that's going to show it's not a sham affidavit and it's absolutely accurate . . . I'd be the first one to produce them."  (Ex. H at 30:3-12.)  The Court then noted "you know the old saying:  Where there's smoke there's fire?  I don't know if there's any fire . . . But I

---

[9]  A highlighted copy of this brief filed with the Court on July 17, 2015 is attached hereto as Exhibit G.

[10] A highlighted copy of this hearing transcript is attached hereto as Exhibit H.

[11] _See_ Ex. H at 6-13 for a discussion of these first five stories, as well as D.E. 181 and 182 for discussion of the sixth story.

can [] smell a little smoke, and that's concerning to me." (*Id.* at 28:2-6.)   Over

Cableview's continuing meritless objections—which confirmed that Cableview would

say anything to avoid production of the Compass Bank records—the Court then granted

TWC-SE's motion.[12]   (D.E. 159.)   In doing so, the Court stated:

> THE COURT:   Any maybe he didn't rely upon those, but if those [Compass Bank] records will either prove that his affidavit is a sham or not a sham, I just [don't know] why you wouldn't produce them to show that. ***Regardless of what [Mr. Scheiszer]* <u>*relied upon*</u> *[in drafting his affidavit], the bank records are the bank records, and they're going to show how that money moved.***

(Ex. H at 31:19-24 (emphasis added).)

On September 10, 2015, TWC obtained the Compass Bank records.   These

documents, highlighted copies of which are attached hereto as Exhibit I, proved there was

a blazing fire.   Indeed, the records showed that all FTS proceeds not paid to Compass

Bank were wired directly from FTS's bank account into an account held by Cableview

***Florida*** on May 25, 2012.   (Ex. I at 3.)   Those monies were then paid directly from

Cableview ***Florida's*** account to that entity's three individual shareholders.   (*Id*. at 4, 6, 9-

11.)   These payments were made by individual Cableview ***Florida*** checks for $425,000

each (which were reviewed, signed and cashed by Cableview Florida's principals,

including Scheiszer).[13]   (*Id*. at 9-11.)   Contrary to the statements Scheiszer made under

oath in his affidavit, which Cableview continued to double down on even in the face of

---

[12]   Because Cableview had no legitimate reason to oppose TWC's motion for leave, Cableview argued that it would be prejudiced by the Compass Bank subpoena because it would take an extensive amount of time to inspect the bank's "voluminous" production.   (Ex. H at 43:16-23.)   Counsel took this position notwithstanding his admission that, as of the hearing, he had not seen these Compass Bank records.   (*Id.* at 41:10-13.)   It took five business days for TWC-SE to obtain, review, and file a motion describing Compass Bank's production, which consisted of nine pages of documents (D.E. 162.)

[13]   One of the $425,000 checks appears to have been cashed by one of the principal's relatives.   (Ex I at 10.)

TWC's challenges to the veracity of those statements, the money from the FTS transaction ***never touched Cableview's account***.  (*Id.* at 4-11.)  Accordingly, Cableview's own bank records proved that Scheiszer committed perjury in his affidavit in an intentional, calculated attempt to mislead the Court and avoid dismissal of Cableview's claims based on his previous sworn interrogatory responses and binding Rule 30(b)(6) testimony, and then attempted to cover up this perjury through unfounded objections to the production of the bank records.

### D. Cableview Continued to Mislead the Court After Production of the Compass Bank Records.

TWC presented the Compass Bank records to the Court in connection with supplemental briefs filed in support of TWC's motions to strike Scheiszer's affidavit  in connection with TWC's summary judgment motion and to dismiss Cableview's complaint.  (D.E. 171, 171-5, 172, 172-4.)  In these briefs, TWC noted the glaring discrepancy between the Compass Bank records obtained pursuant to the Court-ordered subpoena and the sworn affidavit of Scheiszer.  (*See*, *e.g.*, D.E. 172 at 3-4.)

Remarkably, rather than withdrawing Scheiszer's perjured affidavit and coming clean with the Court, Cableview and its counsel took the position that Scheiszer's affidavit made no reference to bank transfers, but rather referred to internal accounting records of Cableview.   (D.E. 182 at 2-3.)   Specifically, in opposition to TWC's supplemental motion to dismiss, Cableview argued that Scheiszer's affidavit was not false because it did not describe the transfer of funds between Cableview bank accounts, but accurately described how the FTS funds were "credited" for "accounting purposes"

(whatever that means) in Cableview's "internal" records prior to distribution to its corporate shareholders. (*Id*. at 3; *see also* D.E. 169 at 2, 5.)

Cableview's last version of the facts was simply another transparent fabrication designed to mislead the Court. First, Scheiszer's affidavit said nothing about internal accounting records. Instead, his affidavit specifically referred to a "wire[] into an account owned by Cableview [Florida]," a subsequent "transfer" of those funds to a Cableview Jacksonville account, and three "payments" of $425,000 from Cableview Jacksonville's account to that company's shareholders. (Ex. E ¶ 13.) It is simply not possible to "wire" funds into, to "transfer" funds from, or to make "payments" out of, an internal paper account/ledger that does not have, and is not capable of having, actual money in it. Second, Cableview previously represented to the Court (before TWC told Cableview it intended to subpoena the Compass Bank records) that Scheiszer's affidavit was true because the FTS "sale proceeds ultimately flowed to a ***Compass Bank Account*** in the name of Cableview Communications of ***Jacksonville***, Inc. prior to ultimate distribution to the corporate shareholders." (Ex. G at 2 (emphasis added).) Thus, Cableview and its counsel plainly intended for the Court to believe that Scheiszer's affidavit referenced the bank accounts of Cableview Florida and Cableview (rather than internal paper accounts), and only attempted to change the plain language of that affidavit *after* TWC obtained bank records demonstrating beyond peradventure that Scheiszer's statements are patently false.

Indeed, in its Order on the Prior Sanctions Motion, the Court expressed serious concerns about the veracity of the Scheiszer affidavit:

> … **the Court has concerns about the veracity of the Schieszer Affidavit.  To the extent the Affidavit was meant to address the movement of funds through bank accounts, it is demonstrably false**.  If, instead, Schieszer intended the Affidavit to address how the Cableview Entities accounted for the funds as it contends is purportedly reflected in their internal accounting records, the Affidavit is misleading and its meaning is far from apparent from the face of the document.  **The Affidavit states that it is based on Schieszer's "personal knowledge and upon [his] review of records created in the transactional business affairs of [Cableview-Jax]."**  See Schieszer Aff. ¶ 1.  This broad reference to "records created in the transactional business affairs" neither specifically points to internal accounting ledgers, nor discounts a reliance on bank records.

(D.E. 215 at 30 (emphasis added).)

Discovery conducted after the Court's Order on the Prior Sanctions Motion indicates that when Scheiszer executed his affidavit in June 2015, he apparently did not have and thus had not reviewed the Cableview accounting records (contrary to that portion of Scheiszer's affidavit quoted above by the Court).  Indeed, Cableview's controller, Garry Wilson, testified at his deposition that he did not procure these Cableview accounting records for Scheiszer (at Scheiszer's request) until September 2015, three months after Scheiszer executed his affidavit.  Moreover, these Cableview accounting records confirmed that the FTS funds were wired to Cableview Florida's Compass Bank account, from which checks were written to its three principals – and that these FTS funds never went through Plaintiff Cableview's bank account.  (Declaration of Mark L. Block filed concurrently herewith ("Block Decl."), ¶ 3, Ex. 1 (Deposition of Garry Wilson, 49:13-50:8, 58:5-60:6), and Ex. 2 (Deposition Ex. 1576).)

However, after review of the Cableview accounting records in September 2015, neither Cableview nor its counsel informed the Court that the Compass Bank transactions

stated in Scheiszer's affidavit did not occur.  Instead, by Cableview's Reply filed on October 8, 2015 to TWC's Supplemental Brief concerning the motion to dismiss, Cableview and its counsel took the position that Scheiszer's affidavit did not describe the Compass Bank transactions.  (D.E. 182 at 2-3.)  Thus, when faced with the fact that Cableview's own internal accounting records proved Scheiszer's affidavit to be false, Cableview conjured up its final story, incredibly denying that Scheiszer's affidavit referred to bank transactions.

As a result of Cableview's fraudulent Scheiszer affidavit, TWC incurred attorney's fees in the amount of at least $52,474.  These fees were incurred in connection with: (1) TWC's motion for leave to serve the subpoena on Compass Bank; and (2) TWC's Prior Sanctions Motion.  (Block Decl., ¶¶ 4-10, Exs. 3 (invoices), 4 (summary of fees incurred in connection with TWC's motion for leave to serve subpoena on Compass Bank), 5 (summary of fees incurred in connection with TWC's Prior Sanctions Motion.)

## III. <u>ARGUMENT AND CITATION TO AUTHORITY</u>

### A. **The Court Should Levy Monetary Sanctions Against Cableview Under Rule 56(h).**

The Court should impose monetary sanctions against Cableview under Fed. R. Civ. P. Rule 56(h) (if an affidavit "is submitted in bad faith or solely for delay, the court … may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result").  *See*, *e.g.*, *Rogers v. AC Humko Corp.*, 56 F.Supp.2d 972, 981 (W.D. Tenn. 1999) (attorney's fees awarded under Rule 56(h) for filing false affidavit in support of summary judgment motion); *Barticheck v. Fidelity Union Bank/First National State*, 680 F.Supp. 144, 150 (D. N.J. 1988) (attorney's fees

awarded under Rule 56(h) for filing false affidavit in opposition to summary judgment motion).

Here, Cableview submitted Scheiszer's false affidavit to this Court as the sole evidence in support of its opposition to the standing argument in TWC's motion for summary judgment, launching the parties into months of additional discovery and briefing, and substantially delaying resolution of this case.  (Ex. E ¶¶ 1, 13, 14; Ex. F at 2; *see also* Ex. G at 2.)  Cableview President Scheiszer knew that his affidavit was a fabrication when he executed and caused it to be filed because (among other things) he signed one check and received another check for disbursement of the FTS proceeds from the Compass Bank account of Cableview Florida (not Cableview).  (Ex. I at 4-11.) Scheiszer also knew that his false affidavit contradicted his sworn Rule 30(b)(6) deposition testimony, but nevertheless signed and caused it to be filed without any explanation as to why the Court should accept it given his prior testimony.  Finally, Scheiszer failed to withdraw his affidavit after TWC demonstrated to the Court, with the records produced by Compass Bank, that it was in fact false.  The Court should therefore award monetary sanctions in favor of TWC and against Cableview for the attorney's fees incurred by TWC in addressing Scheiszer's fraudulent affidavit.

### B.  The Court Should Also Levy Monetary Sanctions Against Cableview's Counsel Under 28 U.S.C. § 1927.

Federal Courts may impose monetary sanctions under 28 U.S.C. § 1927 against counsel who "unreasonably and vexatiously" "multiplies proceedings" in a case.  28 U.S.C. § 1927.  Under Section 1927, "objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently."  *Norelus v.*

*Denny's, Inc.*, 628 F.3d 1270, 1282 (11th Cir. 2010).   In order to determine whether an attorney has acted recklessly, the Eleventh Circuit has instructed courts to "compare the conduct at issue with how a reasonable attorney would have acted under the circumstances." *Id.*[14]

Cableview's counsel is directly complicit in his client's fraud on the Court, as he knew or should have strongly suspected that Scheiszer's affidavit was false when he filed both the affidavit and the briefs which repeated these factual falsehoods.   In fact, counsel actually took the position that he did *nothing* to determine if the facts he was representing to the Court were truthful.   Indeed, the evidence overwhelmingly establishes that Cableview's counsel was at a minimum objectively reckless in filing the false Scheiszer affidavit and the false briefs based thereon.   In this regard, Cableview's counsel:

(1) served interrogatory responses verified by Scheiszer which expressly stated that the FTS proceeds not paid to Compass Bank and TWEAN were "allocated to" Cableview Florida under the APA;

(2) was present when Scheiszer testified in Cableview's Rule 30(b)(6) deposition that this interrogatory response was accurate;

(3) read TWC's motions to dismiss and for summary judgment, which relied on Cableview's testimonial admissions that none of the $560,000 was "allocated" under the APA to Cableview to argue that Cableview lacked standing to sue;

---

[14]   *See also Stovall v. MRS BPO, LLC*, No. 6:11-cv-941-Orl-28DAB, 2013 WL 6408532, at *2-14 (M.D. Fla. Dec. 6, 2013) (sanctioning counsel under 28 U.S.C. § 1927 and inherent power for making misleading, obfuscatory representations in declarations); *Moser v. Bret Harte Union High Sch. Dist.*, 366 F. Supp. 2d 944, 985 (E.D. Cal. 2005) (sanctioning counsel under 28 U.S.C. § 1927 for "bad faith attempts to mislead the court" by making false statements in pleadings).

(4) filed the (false) Scheiszer affidavit, which asserted that the FTS monies were transferred from Cableview Florida's account to Cableview's account before being disbursed to the shareholders, in opposition to TWC's dispositive motions;

(5) read TWC's motions to strike the Scheiszer affidavit as a sham;

(6) then filed an opposition to the motion to strike asserting, based on the Scheiszer affidavit, that the FTS "sales proceeds ultimately flowed to a Compass Bank Account in the name of Cableview Communications of Jacksonville, Inc., prior to ultimate distribution to the corporate shareholders" (Ex. G at 2);

(7) vigorously opposed TWC's motion for leave to serve a subpoena on Compass Bank to obtain the records which would conclusively show whether Scheiszer's affidavit was false;

(8) at the hearing on TWC's motion for leave to serve the Compass Bank subpoena, he explicitly represented to the Court that he had "never seen" the Compass Bank records, and also "d[i]dn't believe" his clients were "in possession" of any of their bank records (Ex H at 41:10-13.); and

(9) refused to withdraw Scheiszer's affidavit after the Compass Bank records conclusively proved it to be a fabrication, and instead incredibly asserted in a pleading filed with the Court that this affidavit

did not refer to transfers between bank accounts (in direct contradiction

to his prior representation to the Court).

Counsel was thus at least objectively reckless in representing to the Court—after TWC moved to strike Scheiszer's affidavit —that the FTS proceeds went through a Compass Bank Account of Cableview without even checking the bank records to determine if his factual representations were accurate.  Moreover, Cableview's counsel was intentionally complicit in an attempt to cover up Cableview's fraud on the Court and avoid sanctions by arguing that the Scheiszer affidavit did not refer to bank records (when it plainly did and was so represented in an earlier brief filed with the Court).

Additionally, Cableview's counsel failed to withdraw Scheiszer's affidavit and recant the false statements in briefs he filed based thereon, and counsel's attempted to cover up Cableview's fraud, all of which were in clear violation of the Florida Rules of Professional Conduct.  *The Florida Bar v. Dupee*, 160 So.2d 838, 849-50 (Fla. 2015) (finding counsel violated Bar Rule 4-3.3 by "fail[ing] to correct" "inaccurate," false [and] evasive" testimony of client filed with court).[15]  Counsel thus violated his duties as an officer of the Court through his continued presentation of false factual positions.

Cableview's counsel's egregious conduct also manifested itself through his complete failure to take the false affidavit and his false filings seriously.  For example, when TWC explained in an email the significance of Cableview's numerous inconsistent stories about what happened to the FTS funds, Cableview's counsel replied only with

---

[15]  *See also* F.S.A. Bar Rule 4-3.3(a)(4) ("If . . . the lawyer's client . . . has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures including, if necessary, disclosure to the tribunal."); *id.*, Comment ("If perjured testimony or false evidence has been offered . . . the advocate should ensure disclosure is made to the court.").

"♥." (*See* email, attached hereto as Exhibit K.) Cableview's counsel never substantively responded to TWC's email. Cableview's counsel also sarcastically asked in response to another email from TWC's counsel describing the significance of Scheiszer's blatantly false testimony, "Are you suggesting that criminal acts have occurred?" (*See* email, attached hereto as Exhibit L.)

Counsel thus demonstrated a complete and utter disregard for professional and ethical obligations that went far beyond "objective unreasonableness" and "bad faith." *Norelus*, 628 F.3d at 1287 (11th Cir. 2010) (affirming sanctions under § 1927 because, regardless of whether attorneys subjectively knew clients were lying, "[w]hen the truth was thrust in [counsel's] faces, they stubbornly ignored it and kept on litigating"). The Court thus should impose monetary sanctions against Cableview's counsel under 28 U.S.C. § 1927.

## IV. <u>CONCLUSION</u>

Cableview and its counsel perpetrated an egregious fraud on this Court intentionally calculated to avoid dismissal of its claims for lack of standing. TWC had to engage in significant effort to expose this fraud by obtaining Court-ordered discovery from a third party after the close of discovery. Accordingly, under the authority vested in it under Rule 56(h) and 28 U.S.C. § 1927, this Court should order Cableview and its counsel (jointly and severally) to reimburse TWC in the amount of $52,474, for attorneys' fees that TWC has incurred as a result of the filing of Scheiszer's false affidavit.

## **CERTIFICATION OF COMPLIANCE WITH L.R. 3.01(G)**

Counsel for TWC hereby certifies that it has conferred with Cableview's counsel

about the motion for sanctions, as permitted by the Court's Order (D.E. 215), and has

been informed by counsel that Cableview opposes this motion.


Respectfully Submitted,

**WARGO & FRENCH, LLP**

_/s/ Mark L. Block_
MARK L. BLOCK
California Bar No. 115457
(Admitted _Pro Hac Vice_)
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: (310) 853-6355
Facsimile: (310) 853-6333
E-mail: mblock@wargofrench.com

MICHAEL S. FRENCH
Georgia Bar No. 276680
(Admitted _Pro Hac Vice_)
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1511
E-mail: mfrench@wargofrench.com

RYAN BOLLMAN
Florida Bar No. 093553
201 S. Biscayne Boulevard, Suite 1000
Miami, Florida 33131
Telephone: (305) 777-6000
Facsimile: (305) 777-6001
E-mail: rbollman@wargofrench.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 21, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Mark L. Block*\_\_\_
MARK L. BLOCK